IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FABRICE LENORD,

        Plaintiff,

    v.

RACETRAC, INC.,

        Defendant.

CIVIL ACTION NO.
1:22-cv-04423-SCJ-RDC

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I.   INTRODUCTION

Fabrice Lenord ("Plaintiff") brings suit against his former employer, RaceTrac, Inc. ("RaceTrac") alleging race and national origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as race discrimination pursuant to 42 U.S.C. § 1981 ("§ 1981"). This motion is grounded on three undisputed material facts:

First, Plaintiff failed to timely exhaust his administrative remedies, a prerequisite to bringing suit under Title VII. Second, Plaintiff cannot establish a *prima facie* case of race or national origin discrimination or retaliation under either § 1981 or Title VII.  And third, Plaintiff cannot rebut RaceTrac's genuine, non-

discriminatory and non-retaliatory reason for the singular adverse employment action taken against Plaintiff, i.e. the elimination of Plaintiff's entire department.

Plaintiff's lawsuit relies on a string of aggrandized, petty grievances spanning five (5) years, none of which impacted the material terms and conditions of his employment and all of which were thoroughly investigated by RaceTrac. Summary judgment is proper.

## II.   STATEMENT OF FACTS

### A.   Plaintiff's Early Employment with RaceTrac

In 2012, RaceTrac hired Plaintiff (Black, Haitian)[1] as RaceTrac as a Systems Help Desk Analyst within RaceTrac's Information Systems ("IS") department. SMF ¶ 1.[2] In 2013, RaceTrac promoted Plaintiff to Network Operating Center (the "NOC") Technician Level I ("NOC I" or "NOC tech"). SMF ¶ 2. In June of 2015, RaceTrac promoted Plaintiff to NOC Technician Level II ("NOC II"). (*Id.*) As part of RaceTrac's Store Support Center, NOC techs were primarily responsible for troubleshooting connection issues at RaceTrac stores. The NOC also helped resolve issues within RaceTrac's corporate headquarters. SMF ¶ 3.

---

[1] RaceTrac does not keep records of employee's national origin. SMF ¶ 1. During his employment with RaceTrac, Plaintiff self-identified as Haitian in conversations with teammates and in reports to Human Resources described below. (*Id.*)

[2] For the purposes of this Memorandum, citations to RaceTrac's Statement of Undisputed Material Facts appear as follows: "SMF ¶ #."

The work of the NOC team revolved around the completion of "tickets." SMF ¶ 4. Each ticket contained a discrete task. The tasks ranged from setting up a new hire's phone to addressing a connection outage at a store. (*Id.*) Collaboration and teamwork were essential to maintaining group productivity within the NOC, and the NOC techs relied on each other to share knowledge, especially when addressing more complicated tickets. (*Id.*)

In 2017, RaceTrac promoted another NOC tech, Gregory Oliver (Black), to NOC manager, making Oliver Plaintiff's direct supervisor. SMF ¶ 6.

### B.    February 2019 Complaint and Investigation

In February of 2019, Plaintiff emailed Director of IT Operations and Support, John Sprayberry (White) to complain that another NOC Technician, Prince Phillips (Black) had allegedly directed the "N word" at him during a team meeting. SMF ¶ 9. According to Plaintiff, Phillips tried to call Plaintiff after work and Plaintiff did not answer. When Phillips recounted the story to coworkers, Phillips allegedly referred to himself (Phillips) using the "N word." (*Id.*) According to Plaintiff, Phillips said, "It's like [Plaintiff] said, 'Fuck this nigger' [by ignoring the call]". (*Id.*) At no time did Plaintiff allege that Phillips called him (Plaintiff) the "N Word." (*Id.*)

Sprayberry investigated Plaintiff's assertions and determined Plaintiff's allegations were false—four (4) witnesses reported that Phillips *never* used the term.

SMF ¶ 10. The investigation also revealed that Plaintiff's peers considered Plaintiff unapproachable. (*Id*.) Sprayberry and Oliver separately spoke with Plaintiff about this perception. (*Id*.) Plaintiff disregarded Sprayberry and Oliver's attempts to connect Plaintiff with his peers. (*Id*.) During his conversation with Plaintiff, Oliver explained that team members were hesitant to ask Plaintiff for help because of his demeanor. SMF ¶ 11. Plaintiff responded, "that's on them."[3] (*Id*.)

## C.     October 2019 Complaint and Investigation

In October 2019, Plaintiff met with former HR Business Partner Jillian Lewandowski (White) to complain about various frustrations with Oliver and the rest of his NOC peers. SMF ¶ 12. Plaintiff described a number of scattered issues, including: disputes over work assignments; peers sleeping at work; the February 2019 incident with Phillips (which was investigated as detailed above); and unspecified jokes about Plaintiff's accent. (*Id*.)

HR attempted to investigate Plaintiff's complaints, by speaking with all seven (7) NOC technicians, NOC manager, Greg Oliver, and Senior NOC Manager, Winston Fitzhugh (Black). SMF ¶ 13. Lewandowski and her colleague, former HR Business Partner, Ryan Buckman (White), kept contemporaneous notes from each

---

[3] Plaintiff recorded his conversation with Oliver on February 25, 2019. During this litigation, Plaintiff has produced one hundred and eleven (111) workplace recordings he made during his employment with RaceTrac, spanning October 2019 to November 2022. SMF ¶ 11, n. 2.

interview, which RaceTrac maintained and relied on thereafter. SMF ¶ 14. HR found no evidence of discriminatory treatment of Plaintiff. SMF ¶ 15. Instead, other members of the NOC reported that Plaintiff was the source of conflict. NOC tech Gerard Peters (Black)[4] reported that Plaintiff had made multiple offensive comments about Peters' Haitian national origin and on one occasion called Peters a "watered-down Haitian" because Peters was born in the US. (*Id*.)

On November 25, 2019, Plaintiff spoke with Lewandowski again. SMF ¶ 16. Most of the conversation focused on Plaintiff's frustrations with Oliver as a manager rather than overt discrimination, though Plaintiff provided a few scattered examples of alleged comments referencing to his nationality. (*Id*.) All but one of these comments were allegedly made in 2016 or before. (*Id*.) As for the more "recent" comment, Plaintiff told Lewandowski that someone in the past year had joked about putting a Dominican Republic flag on Plaintiff's desk. (*Id*.) Plaintiff refused to tell Lewandowski who made the "joke." *Id*. Dating back further, Plaintiff complained that in 2016 (before becoming Plaintiff's supervisor) Oliver allegedly once commented that "Haitians love work." (*Id*.)

---

[4] As noted, RaceTrac does not track national origin. But, according to Plaintiff, when Peters was hired, Oliver allegedly told Plaintiff "I hired another Haitian guy." SMF ¶ 13.

Though Lewandowski found no evidence that Plaintiff had been discriminated against, HR arranged for both the NOC and engineering teams to undergo professional conduct training. SMF ¶ 18. The training covered accountability, retaliation, and a re-alignment of conduct and performance expectations. (*Id.*)

Oliver gave Plaintiff an "Above Expectations" rating on his 2019 performance review. SMF ¶ 19. To start 2020, Plaintiff received an annual raise—from at least 2019 until his termination in 2022, Plaintiff was the highest paid NOC tech by a substantial margin. SMF ¶ 20.

### D.  **John Lukas Formulates an Automation Plan**

In February 2020, RaceTrac hired John Lukas (White) as its Vice President of Information Systems, the highest-ranking member of the IS department. SMF ¶ 21. Lukas spent the first six (6) months of his employment evaluating RaceTrac's technological systems. SMF ¶ 22. Lukas identified several processes which could be streamlined. SMF ¶ 23. In Q3 2020, Lukas began implementing a long-term automation strategy, which would allow the business' technologies to keep pace with its growth and reduce labor costs. SMF ¶ 24.

For the Store Support Center (where Plaintiff worked), this automation strategy involved three (3) major improvements designed to reduce connection outage issues at stores. SMF ¶ 25. First, RaceTrac updated its broadband hardware

resulting in fewer connection outages. (*Id*.) Second, RaceTrac installed redundant cell connections at stores to serve as back-ups that would turn on automatically during broadband outages, decreasing the urgency for resolving outages. (*Id*.) Third, RaceTrac implemented remote imaging capability for replacement hardware, allowing field technicians (contractors) to program new replacement hardware on-site; previously, NOC techs were responsible for programing hardware and then shipping replacement devices to the stores. (*Id*.) These three improvements dramatically reduced the NOC's workload, beginning in Q4 of 2020 and culminating in Q2 of 2023. SMF ¶ 26.

### E.   August 2020 Incident, Complaint, and Investigation

During a team meeting on August 12, 2020, Plaintiff challenged Oliver in front of the entire NOC team, and in response, Oliver called Plaintiff a "smartass." SMF ¶ 27. Afterward, Plaintiff met with Oliver and Fitzhugh to discuss the incident. SMF ¶ 28. Oliver apologized to Plaintiff, but Plaintiff refused to take responsibility for the disrespectful tone he had directed at his supervisor, Oliver. (*Id*.)

On August 21, 2020, Plaintiff e-mailed Winston and IS Director, Michael Campbell (White) to complain about the "smartass" incident—even though Oliver had already discussed the issue with Plaintiff and apologized. SMF ¶ 29. The subject of the e-mail was "Disparity of Treatment and Retaliation" and the e-mail broadly

referenced Plaintiff's perception that he was treated differently and harassed because of his Haitian national origin. (*Id.*) In particular, Plaintiff stated he was called a "Haitian N****" several times at work and in text messages. SMF ¶ 30. Notably, in an earlier draft of this email, Plaintiff had instead written the phrase "Haitian Ninja," but Plaintiff changed it to "Haitian N****" before sending the email out.[5] SMF ¶ 31.

In response to Plaintiff's August 21, 2020 email, Plaintiff met with Director of SSC HR, Talent, and Total Rewards, Caroline Grubbs (White) and Fitzhugh. SMF ¶ 35. They asked Plaintiff to provide them with more specifics and to share the inflammatory text message. SMF ¶ 36. Plaintiff refused and would not provide additional details. (*Id.*) Grubbs and Fitzhugh attempted to work with Plaintiff to reach common ground. (*Id.*) Plaintiff refused to engage in any discussions about solutions or to share more specifics supporting his allegations. As a result, HR and Fitzhugh were unable to further investigate Plaintiff's claims. (*Id.*)

On October 5, 2020, Campbell, Fitzhugh, and HR Business Partner Laura Repic (White) met with Plaintiff to discuss his history of conflicts with the other members of the NOC team (including Oliver) and unsubstantiated complaints. SMF

---

[5] In later representations to EEOC, Plaintiff stated that NOC Engineer Kyle Setchel (Caucasian) allegedly called Plaintiff a "Haitian ninja" in or around November of 2019. SMF ¶ 32. According to Plaintiff, Setchel told Plaintiff that he (Setchel) wanted to be a "Haitian ninja" like Plaintiff, referring (positively) to Plaintiff's speed and work product and to Plaintiff's reputation. (*Id.*) Plaintiff has also produced a screenshot of one such message that reads: "Excellent. Just the way I like it. Flying under the radar. Just call me a Haitian Ninja in training." SMF ¶ 33.

¶ 36. Campbell urged Plaintiff to work on his relationships, and advised Plaintiff that his many unsubstantiated reports to HR against his teammates had a negative impact on his rapport with the team. SMF ¶ 37. (*Id.*) When Campbell explained that no team member had corroborated any of Plaintiff's multiple accusations, Plaintiff suggested that "the whole team is in on it." SMF ¶ 38. Campbell explained, he was not directing Plaintiff to refrain from reporting perceived discrimination; but, he should cooperate with any investigation and provide HR with any evidence he might have. (*Id.*)

Campbell further explained that there was an expectation that Plaintiff, as a NOC Level II, would be a leader on his team. SMF ¶ 39. Plaintiff should mentor and train less senior NOC technicians, instead of reporting them to management every time they made a mistake. (*Id.*) Because of Plaintiff's issues with team collaboration and leadership, Plaintiff received a "Below Expectations" rating for his 2020 performance evaluation.[6] SMF ¶ 41. Despite this rating, Plaintiff received an annual raise to start 2021. (*Id.*)

### F.    **April 2021, Plaintiff Files EEOC Charge**

On April 8, 2021, Plaintiff filed a charge with the EEOC alleging race and national origin discrimination and retaliation in violation of Title VII. SMF ¶ 42.

---

[6] As evidenced by other NOC II evaluations within the department, leadership and collaboration were critical expectations of the role. SMF ¶ 40.

Specifically, Plaintiff referenced his complaints in February of 2019 and August of 2020, along with the October 5, 2020, conversation with Campbell, Fitzhugh, and Repic. (*Id.*) RaceTrac, once again, investigated these allegations and submitted a statement of position in response on December 15, 2021. SMF ¶ 43.

### G.    Plaintiff's Performance Improvement Plan

On July 20, 2021, Plaintiff met with Oliver to discuss his performance. Plaintiff described his unhappiness in his position, his mistrust for management, and his frustrations with Oliver. SMF ¶ 44. On July 22, Plaintiff met with Campbell about these same issues. *Id.* Plaintiff became agitated, explaining that he regarded his 2020 review (which was issued seven (7) months prior) as fabricated and disrespectful. (*Id.*) Campbell once again explained that Plaintiff struggled with collaboration and leadership. Plaintiff disagreed. (*Id.*)

On August 18, 2021, Campbell initiated a performance improvement plan ("PIP") to assist Plaintiff in improving teamwork and leadership abilities. SMF ¶ 47. During the weekly meetings, Campbell, Chris Shoemake (White) (now Oliver's boss) review Plaintiff's collaboration efforts and noted Plaintiff was starting to receive more questions from teammates. (*Id.*) On September 29, 2021, Plaintiff was taken off of the PIP. SMF ¶ 49. Shoemake praised Plaintiff for Plaintiff's improvement. However, Shoemake also warned Plaintiff that regression could result

10

in further discipline including termination. (*Id.*) Plaintiff received a "Below Expectations" rating on his 2021 review due to the issues which led to the PIP. SMF ¶ 50. To start 2022, however, Plaintiff received another annual raise, maintaining his status as the highest paid NOC tech. SMF ¶ 51.

### H.    2022 Team Issues

Throughout 2022, Plaintiff continued to complain about his teammates. SMF ¶ 51. One example of such, in July 2022, Plaintiff complained about NOC I, Jeffrey Stiteler (White) using profanity—Plaintiff had confronted Stiteler during a team-meeting and Stiteler defended himself. SMF ¶ 52. Oliver admonished Stiteler and directed Stiteler to apologize to Plaintiff. SMF ¶ 53. In a later meeting with Plaintiff, Oliver counseled Plaintiff about moving on from situations and exhibiting leadership by example: "Being a peer leader does NOT mean providing direction for other team members' time keeping or attendance, going behind others and checking their work, or trying to manage the performance of your peers." (*Id.*)

### I.    August 2022 Complaint and Investigation

On August 9, 2022, Plaintiff was issued a right-to-sue letter from EEOC. SMF ¶ 54. On August 14, 2022, Plaintiff sent an email to HR with the subject "Disparity Treatment" describing more frustrations with Oliver: "It is clear my national of origin (Haitian) is the reason Mr. Oliver has been targeting me and has displayed a

different set of rules and job description pertaining to me." SMF ¶ 55. Plaintiff complained that he received undeserved discipline while his peers who engaged in misconduct had received none, and that his job description was changed requiring him to take on additional responsibilities. (*Id*.) This time, RaceTrac engaged outside counsel to investigate Plaintiff's complaints. SMF ¶ 56. Beyond his initial complaint, once again, Plaintiff refused to participate in the investigation. SMF ¶ 57. Based on the investigation, RaceTrac concluded that there was no evidence of discriminatory or retaliatory treatment of Plaintiff. SMF ¶ 56.

### J.    November 2022, Reduction in Force

In October of 2022, Oliver voluntarily resigned for reasons unrelated to Plaintiff. SMF ¶ 58. When this happened, Lukas determined that full-time support staff was no longer necessary and the work of responding to the remaining volume of connection failures could be distributed across other positions and outside partners. SMF ¶ 59. Thus, Lukas decided to initiate a reduction in force ("RIF") of the remaining NOC techs. (*Id*.)

On November 30, 2022, RaceTrac eliminated the NOC Technician position, resulting in the termination of Phillips, Stiteler, and Plaintiff.  SMF ¶ 61. Each was

offered a severance agreement with an identical no re-hire provision. (*Id*.) Plaintiff

elected not to sign his severance agreement.[7] (*Id*.).

### K.     <u>The Instant Lawsuit</u>

On November 4, 2022, Plaintiff filed suit alleging violations of Title VII and

§ 1981. SMF ¶ 63. In the initial Complaint, Plaintiff complained about his placement

on a PIP, his "unfavorable" evaluations, and Campbell allegedly "threatening him

with termination." (*Id*.) On January 6, 2023, RaceTrac moved to dismiss on the

grounds that Plaintiff had not alleged any adverse action. SMF ¶ 64. On January 30,

2023, Plaintiff moved to amend his Complaint to incorporate his termination. SMF

¶ 65. Plaintiff did not file a charge of discrimination related to his termination with

the EEOC. (*Id*.)

## III.    <u>ARGUMENT AND CITATION TO AUTHORITY</u>

### A.     **Legal Standard**

Summary judgment is appropriate where there is no genuine issue as to any

material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ.

P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Summary

---

[7] Plaintiff alleges that after his termination he applied for an HRIS Administrator position at RaceTrac. SMF ¶ 62. RaceTrac has no record of Plaintiff submitting *any* applications after his termination. RaceTrac had an open "HRIS Administrator" position in March of 2021. *Id.* That position was filled on April 5, 2021.

judgments in favor of defendants are not rare in employment discrimination cases. *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1080-81 (11th Cir. 1990).

**B.    Summary Judgment is Proper on Plaintiff's Title VII Claims Because Plaintiff Failed to Exhaust Administrative Remedies**

In Georgia, before filing a Title VII lawsuit in court, plaintiffs are required to file a charge with the EEOC no later than 180 days after the purported discriminatory employment incident. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001); 42 U.S.C. § 2000e–5(e)(1). Here, Plaintiff has filed a single charge of discrimination on April 8, 2021. As set forth below, Plaintiff's Title VII claims are barred because (1) Plaintiff's April 8, 2021 charge was untimely, and (2) Plaintiff failed to exhaust his administrative remedies with regard to any conduct alleged in the Complaint which occurred after April 2021, such as Plaintiff's termination.

First, Plaintiff's EEOC charge was untimely because the charge only references events which occurred more than 180 days before the charge was filed (*i.e.* events which occurred before October 10, 2020): (1) Plaintiff's complaint in February of 2019; (2) Plaintiff's complaint in August of 2020; and (3) as stated on the charge, "[o]n or about October 1, 2020, I was told by senior management that if I made any more 'baseless' claims it could lead to termination." Campbell made this statement on October 5, 2020. Regardless of the full substance of that conversation, this event occurred more than 180 days prior to Plaintiff filing his charge. Thus, the

allegations contained in Plaintiff's charge are untimely. Indeed, the charge appears untimely on its face: It declares that the "latest" date on which "DISCRIMINATION TOOK PLACE" as October 1, 2020—more than 180 days prior to April 8, 2021.

The fact that Plaintiff marked the "CONTINUING ACTION" box on the EEOC form does not render his charge timely. Nor does it grant Plaintiff *carte blanche* to rope in other untimely allegations. The Eleventh Circuit does not recognize the traditional "continuing violation doctrine." *See Shields v. Fort James Corp.,* 305 F.3d 1280, 1281–82 (11th Cir. 2002) (noting that the Supreme Court in *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 113-114, (2002), "essentially rejected the 'continuing violation doctrine[.]'"). As a result, untimely events are actionable only where they are part of a hostile environment claim, and some "portion" of the hostile environment claim was the subject of a timely charge. *Shields,* 305 F.3d at 1282-83. Here, Plaintiff cannot point to *any timely allegation*. So, no "portion" of Plaintiff's theoretical hostile environment claim was the subject of a timely charge. Therefore, Plaintiff is barred from using a theoretical Title VII hostile environment claim to rescue other untimely allegations.

Next, Plaintiff failed to exhaust administrative remedies with regard to his PIP and his termination because such actions were never the subject of a timely charge.

The Eleventh Circuit has held that plaintiffs "must file a charge within 180 days of the date of a *discrete discriminatory or retaliatory act* or lose the ability to recover for it." *Stewart v. Jones Util. & Contracting Co. Inc.*, 806 F. App'x 738, 741 (11th Cir. 2020) (emphasis added) (citing *Morgan*, 536 U.S. at 113-114). The Eleventh Circuit has made clear plaintiffs are required to either amend their charge or file a new charge when "discrete acts" occur after the filing of a charge. *See Duble v. FedEx Ground Package Sys., Inc.,* 572 F. App'x 889, 892 (11th Cir. 2014) ("[N]ew acts of discrimination are inappropriate for a post-charge judicial complaint.") (citation omitted).  In *Morgan*, the Court explained, "termination, failure to promote, denial of transfer, or refusal to hire" are "discrete acts." *Morgan*, 536 U.S. at 114. Courts in the Eleventh Circuit have also found that performance evaluations and PIPs are "discrete acts" which must be the subject of a timely charge. *See Varnado v. Mukasey*, No. 08-61331, 2010 WL 2196263 at * 2 (S.D. Fla. June 1, 2010) (biased evaluation, placement on performance improvement plan, and failure to promote were all discreet acts of discrimination and not part of a continuing violation). Because Plaintiff's PIP and his termination were never the subject of a timely charge, or any charge for that matter, Plaintiff is *barred* from bringing suit under Title VII based on those events.

In light of the foregoing, all of Plaintiff's Title VII claims (Counts I, II, and IV) are administratively barred and summary judgment is proper.

## C. Plaintiff Cannot Make Out a *Prima Facie* Case of Discrimination Under Title VII or § 1981

Plaintiff's Title VII (and § 1981) claims also fail on the merits. Plaintiff cannot establish a *prima facie* case of race and national origin discrimination. In RIF cases, the *prima facie* test for discrimination based on circumstantial evidence is modified, and a plaintiff must show that: (1) "he was a member of a protected group and was adversely affected by an employment decision;" (2) "he was qualified for his own position or to assume another position at the time of the discharge;" and (3) "sufficient evidence from which a rational fact finder could conclude that his employer intended to discriminate against him in making the discharge decision." *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1331 (11th Cir. 1998). As set forth below, Plaintiff suffered no adverse action other than his termination, so Plaintiff must establish his *prima facie* case using the RIF framework, which he cannot do.[8]

### a. Informal Coaching, Job Criticisms, Negative Performance Evaluations, and PIPs Do Not Constitute Adverse Actions

---

[8] Discrimination claims arising under § 1981 follow the same framework of proof as Title VII claims. *Standard,* 161 F.3d at 1330. And, the same adverse action standard and modified RIF framework apply to § 1981. *Id.* at 1331.

In his Amended Complaint, Plaintiff lists the following as alleged adverse actions: "[RaceTrac] placed Plaintiff on a PIP, gave him derogatory evaluations, subjected him to continual discriminatory comments, threatened to terminate him, and eventually terminated him." (Am. Compl. ¶ 71).

Plaintiff's negative performance evaluations in 2020 and 2021, his placement on a PIP are not cognizable adverse actions under Eleventh Circuit precedent. *See Davis v. Town of Lake Park, Fla.,* 245 F.3d 1232, 1242 (11th Cir. 2001) ("Expanding the scope of Title VII to permit discrimination lawsuits predicated only on unwelcome day-to-day critiques and assertedly unjustified negative evaluations would . . . limit an employer's ability to maintain and improve job performance."). To constitute adverse actions under Title VII (or §1981), performance criticisms must produce a material change in the conditions or privileges of employment, such as a reduction in pay or responsibility. *See Cheatham v. DeKalb Cnty.*, 682 F. App'x 881, 890 (11th Cir. 2017). Similarly, PIPs are not adverse actions without associated *material* consequences. *See also Hilliary v. FlightSafety Int'l, Inc.*, 778 F. App'x 835, 841 (11th Cir. 2019) (PIP which placed plaintiff under additional scrutiny was not materially adverse).

Plaintiff has not presented evidence of any *material* consequence flowing from the criticisms he received. Indeed, Plaintiff remained the highest paid NOC

tech, even after the PIP. And, Plaintiff's claim that his responsibilities were inequitably expanded as a part of the PIP is false and has no impact on the adverse action analysis. First, the other NOC II's performance evaluations show they were subjected to the same leadership and teamwork responsibilities. Further, "[i]n the vast majority of instances . . . an employee alleging . . . a change in work assignments, without any tangible harm, will be outside the protection afforded by Congress in Title VII's anti-discrimination clause." *Davis*, 245 F.3d at 1245. Accordingly, Plaintiff must rely on his termination advance his claims.

### b.   Plaintiff Cannot Make Out a *Prima Facie* Case of Discrimination Based on His Termination

Plaintiff cannot establish his *prima facie* case under the modified RIF framework, because he cannot show that he was qualified or that RaceTrac harbored discriminatory intent in terminating him as part of the RIF.

"Where a particular job position is entirely eliminated for nondiscriminatory reasons, for a plaintiff to prevail against his employer he must show that he was qualified for another available job with that employer; qualification for his current position is not enough." *Earley v. Champion Int'l. Corp.*, 907 F.2d 1077, 1082 (11th Cir.1990). Plaintiff's position was undisputedly eliminated. And, Plaintiff has presented no evidence he was qualified for another position available at the time of

his termination. Notably, when a position opened up on the engineering team in June of 2022, Plaintiff did even not apply.

> When an employer reduces its work force for economic reasons, it is not required to transfer or rehire laid-off employees in a protected class as a matter of course . . . If an employee fails to apply for a particular position, []he cannot establish a prima facie case of discrimination, unless the employer lacked a formal system for providing notice of job opportunities[.]

*Crisman v. Fla. Atl. Univ. Bd. of Trustees*, 659 F. App'x 572, 578 (11th Cir. 2016) (citation omitted). While Plaintiff claims that he applied for an "HRIS Administrator" position, RaceTrac has no record of Plaintiff submitting *any* applications after his termination. Indeed, no "HRIS Administrator" position has existed at RaceTrac since November 2021. SMF ¶ 61. Moreover, the position required 1-3 years of administrative HR experience and experience using HR software. Thus, Plaintiff was not qualified and the position was not available.

To establish discriminatory intent, Plaintiff must proffer evidence that RaceTrac (1) "consciously refused to consider retaining a plaintiff because of his race or national origin," or (2) "regarded race or national origin as a negative factor in such consideration." *Padilla v. N. Broward Hosp. Dist.*, 270 F. App'x 966, 971 (11th Cir. 2008) (citation omitted). The decision to close the NOC was part of an automation strategy that began in 2020 and was motivated by purely technical and economic concerns. By the end of 2022, Lukas' automation plan had drastically

reduced network outages, virtually eliminated the need for immediate NOC responses, and shifted responsibility for the replacement of malfunctioning hardware from the NOC to technicians in the field. As a result, the team had been reduced to just three remaining NOC techs. When the NOC closed, those three NOC techs, Plaintiff (Black, Haitian), Stiteler (White, American), and Phillips (Black, American) were terminated. Plaintiff has produced no evidence that race or national origin were factors in that decision. *See Ward v. Gulfstream Aerospace Corp.*, 894 F. Supp. 1573, 1580 (S.D. Ga. 1995) (finding no discriminatory intent where four employees in eleven-person department were retained while only one was a member of plaintiff's protected classes). Accordingly, Plaintiff has failed to establish a *prima facie* case of discrimination.

**D.    Plaintiff Cannot Make Out a *Prima Facie* Case of Retaliation Under Title VII or § 1981**

Plaintiff's Title VII (and § 1981) retaliation claims also fail on the merits. To establish a *prima facie* case of retaliation under Title VII or § 1981, Plaintiff must show that: (1) he engaged in statutorily protected conduct; (2) he suffered an adverse action; and (3) "there is some causal relationship" between the protected activity and the adverse action. *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir.

2020).[9] Here, Plaintiff cannot establish his *prima facie* case because his only adverse action, his termination, was not causally connected to any protected activity.

### a.    Plaintiff Did Not Engage in Protected Activity

To constitute protected activity under Title VII (and § 1981), Plaintiff "must not only show that he subjectively (that is, in good faith) believed that [RaceTrac] was engaged in unlawful employment practices, but also that his belief was objectively reasonable." *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997). Because Plaintiff's complaints were not offered in either subjective or objective good faith, he did not engage in protected activity under Title VII or § 1981. Moreover, to constitute protected activity under § 1981, Plaintiff must have reported misconduct covered by § 1981—in other words, *discrimination based on race*. *Id.* at 961. Because Plaintiff's complaints exclusively relate to his national origin, not his race, Plaintiff did not engage in protected activity under § 1981.

#### i. August 2022 Complaint

In his August 15, 2022 email to HR, Plaintiff expressly stated: "It is clear my national of origin (Haitian) is the reason Mr. Oliver has been targeting me" without mentioning race. Clearly, this email is not protected activity under § 1981.

---

[9] Courts apply the same *prima facie* case for retaliation under § 1981 and Title VII retaliation. *Gogel v. Kia Motors Mfg. of Georgia, Inc.,* 967 F.3d 1121, 1134 (11th Cir. 2020).

Plaintiff also makes a number of false and/or exaggerated claims in this email. Plaintiff falsely claims his job description was changed. The record shows all the NOC II's were consistently expected to engage in the same leadership and teamwork responsibilities. Plaintiff also falsely complains that he was the only team member subjected to discipline. Jones received a final written warning after Plaintiff reported Jones fabricating tickets, and Stiteler received a coaching and was directed to apologize to Plaintiff after using profanity. In reality, Plaintiff received no formal discipline outside of his PIP, and Plaintiff remained the highest paid NOC technician throughout the relevant period. Furthermore, no allegation has any connection to Plaintiff's race or nationality outside of Plaintiff's conclusory claims to the contrary.

### ii. August 2020 Complaint

Plaintiff's allegations included in August 2020 email are clearly centered on his nationality: "because I'm a Haitian I'm consistently being insulted, look down up on, making fun of because of my accent, my spelling, my tone, they are not being sensitive to my work ethics, my culture." These allegations patently relate to Plaintiff's nationality *rather than his race*.

The complaints were also not reasonable or offered in good faith. Plaintiff produced 111 audio recordings, most of which are over an hour long, dating back to October of 2019 and running until November of 2022. While Plaintiff alleged that

he was "consistently being reminded that I'm Haitian" and "constantly hearing abusive language", there is not one single instance of an employee insulting Plaintiff because of his nationality (or race) on any of these recordings. Plaintiff testified about a few scattered "insults" to his nationality in ten (10) years of employment with RaceTrac, all of which occurred before 2017. Plaintiff's claim that he was "constantly" hearing insults was clearly not offered in good faith.

Plaintiff's claim that he has been called a "Haitian N****" is similarly misleading. For one, Plaintiff produced a draft of this email which used the phrase "Haitian Ninja"—clearly Plaintiff used asterisks in the final version to make his complaint more compelling by evoking "the N word." Indeed, the undisputed record suggests that Kyle Setchel was referencing Plaintiff's reputation for being quiet and maintaining a low profile by using the word "Ninja," not Plaintiff's race: "*Flying under the radar*. Just call me a Haitain Ninja in training."

Plaintiff cannot credibly rely on the text message from Setchel. In his response to EEOC, Plaintiff wrote that Setchel referred to him as a "Haitian Ninja" by text on "11/14/2019." But, Plaintiff spoke to Lewandowski on November 25, 2019, and never mentioned Setchel's use of this term, even when directly asked if he had any issues with Setchel. Having not bothered to mention any concern about Setchel's text message for almost a year, Plaintiff's decision to mischaracterize it as a use of

"the N word," constitutes bad faith. Having dissembled regarding the content of the message, Plaintiff's decision to thereafter refuse to provide the text message or the name of the employee responsible during his call with Grubbs and Fitzhugh only confirms that Plaintiff knew his complaint was, at best misleading, and further demonstrates that Plaintiff did not act in good faith in making the allegation. *See Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (failure to report a racist comment for eight months supported conclusion that plaintiff lacked objectively reasonable belief that the conduct violated Title VII).

Lastly, the recorded incident with Oliver wherein Oliver called Plaintiff a "smartass" was clearly not motivated by national origin (or race) discrimination. Plaintiff took a sarcastic and insubordinate tone with a supervisor during a team meeting and his supervisor responded in-kind.

### iii. October and November 2019 Complaints

Plaintiff's October and November 2019 reports to HR were also exclusively focused on national origin—to the extent they contained discriminatory allegations at all. As such, these reports did not constitute protected activity under § 1981.

These reports were also not objectively reasonable or offered in good faith. In his 2019 complaints to Lewandowski, Plaintiff recalled a few references to his nationality, made three years prior (or more), and Plaintiff repeatedly refused to

inform Lewandowski who had made these statements. In her conversations with Peters and Oliver, however, Lewandowski discovered some harassing comments *Plaintiff had made about Peters*—referring to him as a "watered down Haitian." Plaintiff cannot have reasonably believed that any of the various complaints he submitted in October of 2019 constituted discriminatory conduct, especially where he himself had taunted Peters about Peters' Haitian ancestry.

### iv. February 2019 Complaint

Only Plaintiff's complaint about Phillips from February 2019 directly implicated race. In that single instance, a Black man allegedly referred to himself using the "N word." No reasonable person could have understood this to be a violation of Plaintiff's rights under Title VII or § 1981. See e.g. *Harrington v. Disney Reg'l Entm't, Inc.*, 276 F. App'x 863, 875–77 (11th Cir. 2007) (although offensive, reference to the plaintiff as "lazy n*****" and occasional use of term "ghetto" did not amount to actionable conduct for racial harassment claim). Moreover, the four other individuals who were speaking with Phillips when he (Phillips) allegedly used the "N word," stated that Phillips never uttered the "N word."

### b.    Plaintiff's Performance Evaluations and His PIP Are Not Adverse Actions Capable of Supporting a Retaliation Claim

As discussed above, job criticisms and PIPs unaccompanied by "material" consequences do not constitute adverse actions. That is true even under the more

generous retaliation standard for adverse actions. In the retaliation context, Plaintiff must show that RaceTrac took some action "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S. Ct. 2405, 2409, 165 L. Ed. 2d 345 (2006).[10] Plaintiff has not presented any evidence demonstrating a material consequence flowing from coachings, evaluations, or the PIP sufficient to dissuade a reasonable worker from engaging in protected activity.[11] *See Redd v. United Parcel Serv., Inc.,* No. CV-12-BE-3986-S, 2014 WL 4792234, at *18 (N.D. Ala. Sept. 24, 2014), *aff'd*, 615 F. App'x 598 (11th Cir. 2015) (finding that plaintiff's placement on a PIP was not a retaliatory adverse action where there was no change in plaintiff's compensation, benefits, or position, though plaintiff felt "the extra oversight was annoying and even subjectively humiliating.").

### c.    Plaintiff's protected conduct and his termination were wholly unrelated

Though his termination may be an adverse action, Plaintiff must also show "that the protected activity and the adverse action were not wholly unrelated." *Gogel*

---

[10] The same adverse action standard applies to retaliation claims under Title VII and § 1981. *See Harris v. Bd. of Trustees Univ. of Alabama,* 846 F. Supp. 2d 1223, 1240 (N.D. Ala. 2012) ("[T]he prima facie elements that govern Plaintiff's § 1981 retaliation claim are essentially the same as those governing Title VII retaliation[.]").

[11] Notably, Plaintiff was not dissuaded by his coachings, performance evaluations, or the PIP and continued to lodge complaints of alleged harassment with EEOC and HR at RaceTrac.

*v. Kia Motors Mfg. of Ga., Inc*., 967 F.3d 1121, 1135 (11th Cir. 2020). Plaintiff can do so by showing a close temporal proximity between the decision maker's discovery of his protected activity and the adverse action he suffered. *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). Plaintiff has not carried his burden to show causation based on temporal proximity. Lukas made the decided to close the NOC after Oliver resigned in October of 2022. Plaintiff has presented no evidence that Lukas was aware of Plaintiff's August 15, 2022 complaint or any other complaint lodged by Plaintiff regarding perceived discriminatory treatment at that time. Moreover, the job elimination was the result of a multi-year automation strategy initiated by Lukas in Q3 of 2020. *See Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) (dismissing retaliation claim in part because the employer contemplated the action prior to the protected activity).

## E.    RaceTrac's Actions are Supported by Legitimate Business Reasons

Even if Plaintiff could make out a *prima facie* case as to any of his claims, which he cannot, Plaintiff cannot rebut RaceTrac's proffered reasons for its actions. Where a plaintiff establishes a *prima facie* case of discrimination or retaliation under Title VII or § 1981, the employer can provide a legitimate business reason for its actions. *Wilson v. Bellsouth Telecommunications Inc.*, 386 F. App'x 971, 972 (11th Cir. 2010). Here, Plaintiff was undisputedly terminated in a RIF initiated by Lukas

28

as part of an automation strategy designed to upgrade RaceTrac's technological systems to keep pace with growth. To avoid summary judgment, Plaintiff must show that Lukas' reasons for eliminating Plaintiff's position were pretextual. *Id*. To do so, Plaintiff must show "both that the reason was false, and that discrimination was the real reason." *Springer v. Convergys Customer Mgmt. Grp. Inc.,* 509 F.3d 1344, 1349 (11th Cir. 2007). Plaintiff has presented no evidence of either.

Plaintiff has not presented any evidence that Lukas' proffered reason was false. The decision to close the NOC was motivated by technical and economic motives—enhancing technical scalability and reducing labor costs. As discussed above, Lukas' automation strategy was successful: network outages were reduced, NOC responses became less urgent, and hardware replacement was shifted to technicians in the field. Plaintiff has presented no evidence demonstrating that the goals of the automation strategy were not the true reasons behind NOC's closure. *See Margolis v. Pub. Health Tr. of Miami-Dade Cnty.,* 89 F. Supp. 3d 1343, 1352 (S.D. Fla. 2015) (summary judgment proper where cost-reduction offered as the reason for RIF and plaintiff presented no evidence to show that reason was false).

Plaintiff has not offered a single shred of evidence that Plaintiff was treated differently because of his race, national origin, or protected activity with regard to his termination. The other terminated NOC Technicians (Stiteler and Phillips) were

members of other races and/or nationalities, and, neither had engaged in protected activity. Moreover, none of the terminated NOC Techs (including Plaintiff) were offered alternative employment within RaceTrac, and all three were presented with severance agreements which included a "no re-hire" provision—though Plaintiff was offered substantially more money because of his tenure with the Company. Without some evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" Plaintiff cannot demonstrate pretext. *Gogel v. Kia Motors Mfg. of Georgia, Inc.,* 967 F.3d 1121, 1136 (11th Cir. 2020); *see also de la Cruz v. Children's Tr. of Miami-Dade Cnty.*, 843 F. Supp. 2d 1273, 1282 (S.D. Fla. 2012) (finding no pretext where plaintiff's entire department was eliminated pursuant to RIF). Because Plaintiff has not offered evidence that the proffered reasons for the RIF are pretextual, Plaintiff's claims all fail and summary judgment is proper.

## IV.    CONCLUSION

As there exists no genuine issue of material fact preventing entry of judgment in RaceTrac's favor, Defendants Motion for Summary Judgment should be granted.

Respectfully submitted this <u>26th</u> day of September, 2023.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel for Defendant certifies that this document has been prepared in Times New Roman, 14-point font, which is one of the fonts and point selections approved by the Court in Local Rule 5.1(B).

**FORDHARRISON LLP**
271 17th Street, NW
Suite 1900
Atlanta, Georgia 30363
Telephone: (404) 888-3800
Facsimile: (404) 888-3863

*/s/ Charles W. Hoffman*
John L. Monroe, Jr.
Georgia Bar No. 516190
jmonroe@fordharrison.com
Charles W. Hoffman
Georgia Bar No. 165556
choffman@fordharrison.com
*Attorneys for Defendant RaceTrac*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

FABRICE LENORD,

          Plaintiff,

   v.

RACETRAC, INC.,

          Defendant.

CIVIL ACTION NO.
1:22-cv-04423-SCJ-RDC

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on September 26, 2023, a true and correct copy of

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION

FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the

CM/ECF System, which will automatically send e-mail notification of such filing to

the attorneys of record:

          Beverly A. Lucas, Esquire
          beverly@lucasandleon.com
          **LUCAS & LEON, LLC**
          Post Office Box 752
          Clarkesville, Georgia 30523

               /s/ *Charles W. Hoffman*
               Georgia Bar No. 165556
               choffman@fordharrison.com

Ford & Harrison LLP
271 17th Street, NW, Suite 1900
Atlanta, GA  30363