IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FABRICE LENORD,

       Plaintiff,

v.

RACETRAC, INC.,

       Defendant.

CIVIL ACTION NO.
1:22-cv-04423-SCJ-RDC

## DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Rule 56 (b)(1) of the Local Rules of this Court, Defendant RaceTrac, Inc. (hereinafter referred to as "RaceTrac"), submits its Statement of Undisputed Material Facts in support of its Motion for Summary Judgment as follows:

## UNDISPUTED MATERIAL FACTS

### A.    Plaintiff's Early Employment with RaceTrac

1.    In 2012, RaceTrac hired Plaintiff (Black, Haitian)[1] as RaceTrac as a Systems Help Desk Analyst within RaceTrac's Information Systems ("IS")

---

[1] RaceTrac does not keep records of employee's national origin. (Grubbs Dep. 15: 23-25, 16: 1). During his employment with RaceTrac, Plaintiff self-identified as Haitian in conversations with teammates and in reports to Human Resources. (Lewandowski Decl. Ex. A; Lenord Dep. Ex. 14).

department. (Lenord Dep. 33: 20-25, 34: 9-13).

2.      In 2013, RaceTrac promoted Plaintiff to Network Operating Center (the "NOC") Technician Level I ("NOC I" or "NOC tech"). (Pl. Dep. 32: 24-25, 33: 1-2; 34: 14-17). In June of 2015, RaceTrac promoted Plaintiff to NOC Technician Level II ("NOC II"). (Lenord Dep. 34: 18-22).

3.      As part of RaceTrac's Store Support Center, NOC techs were primarily responsible for troubleshooting connection issues at RaceTrac stores. (Lenord Dep. 33: 3-19). The NOC also helped resolve issues within RaceTrac's corporate headquarters. (Lenord Dep. 33: 8-9).

4.      The work of the NOC team revolved around the completion of "tickets." (Lenord Dep. 71: 13-19, 180: 9-13; Lenord Dep. Ex. 1). Each ticket contained a discrete task. (Lukas Dep. 55: 2-12, 22-25, 56: 1-25, 57: 1-25). The tasks ranged from setting up a new hire's phone to addressing a connection outage at a given store. (Lukas Dep. 57: 22-25). In general, completion of a ticket amounted to the execution of a rote script or process. (Lukas Dep. 57: 4-25, 58: 1-9).

5.      At times, there were arguments between NOC techs over who claimed an open ticket first. (Hoffman Decl. Ex. N 00:01:15 – 00:04:40). Collaboration and teamwork were essential to maintaining group productivity within the NOC,

and the NOC technicians relied on each other to share knowledge, especially when addressing more complicated tickets. (Grubbs Dep. 38: 6-23; 160: 2-8; 170: 8-22; Lenord Dep. Ex. 20).

**B.    2017 Complaint**

6.    In 2017, RaceTrac promoted Gregory Oliver (Black) from the position to NOC tech to NOC manager. (Lenord Dep. 13: 23-25, 35: 4-10, 242: 12-13). In turn, Oliver became Plaintiff's direct supervisor. (Lenord Dep. 13: 23-25).

7.    Soon after, Plaintiff began complaining about Oliver. (Lenord Dep. Ex. 5). In September of 2017, Plaintiff emailed Human Resources to complain that Oliver required Plaintiff to find coverage for himself when requesting Sundays off. (*Id.*) When Human Resources followed up, Plaintiff spiraled into a complaint about another NOC tech, Evan Jones (Black), who was reportedly playing with a knife at work. (Lenord Dep. Ex. 6).

8.    Responding to Plaintiff's report, then Director of IT Operations, John Sprayberry (White) issued Jones disciplinary action, warning not to bring the knife to work again. (Lenord Dep. Ex. 7). None of Plaintiff's email complaints in 2017 specifically mention race or national origin. (Lenord Dep. Ex. 5-7).

**C.    February 2019 Complaint and Investigation**

9.    In February of 2019, Plaintiff emailed Sprayberry to complain that another

NOC Technician, Prince Phillips (Black) had allegedly directed the "N word" at him during a team meeting. (Lenord Dep. Ex. 9). According to Plaintiff, Phillips tried to call Plaintiff after work and Plaintiff did not answer. (*Id.*) When Phillips was later recounting the story to his peers of trying to reach Plaintiff, Phillips allegedly referred to himself (Phillips) using the "N word." According to Plaintiff, Phillips said, "It's like [Plaintiff] said, 'Fuck this nigger' [by ignoring the call]". (*Id.*; Lenord Dep. 16: 6-14).

10. Sprayberry investigated Plaintiff's assertions and determined Plaintiff's allegations were false—four (4) witnesses reported that Phillips never used the term. (Lenord Dep. Ex. 10). The investigation also revealed that Plaintiff's peers considered Plaintiff unapproachable. (*Id.*) Sprayberry and Oliver separately spoke with Plaintiff about this perception. (*Id.*; Hoffman Decl. Ex. A 00:05:55-00:28:00). Plaintiff disregarded Sprayberry and Oliver's attempts to connect Plaintiff with his peers. (Hoffman Decl. Ex. A 00:05:55-00:11:00).

11. During his conversation with Plaintiff, Oliver explained that team members were hesitant to ask Plaintiff for help because of his demeanor. (*Id.*) Plaintiff

responded, "that's on them."[2] (Hoffman Decl. Ex. A 00:06:40-00:07:12).

**D.     October 2019 Complaint and Investigation**

12.  In October 2019, Plaintiff met with former Human Resources Business Partner Jillian Lewandowski (White) to complain about various frustrations with Oliver and the rest of his NOC peers. (Lenord Dep. 115: 22-25, 116: 1-18; Lewandowski Decl. ¶ 2; Hoffman Decl. Ex. B). Plaintiff described a number of scattered issues, including: disputes over work assignments; his peers sleeping on the job; the February 2019 incident with Phillips involving the "N word"; and unspecified jokes about Plaintiff's accent. (Lewandowski Decl. ¶ 3-4, Ex. A).

13.  Human Resources then attempted an investigation into Plaintiff's assertions. (Lewandowski Decl. ¶ 3). In total, Human Resources interviewed nine (9) people including Plaintiff. (Lewandowski Decl. ¶ 3-4, Ex. A). Specifically, HR spoke with NOC Technicians, Anthony McCutheon (Black), DeJuan Kornegay (Black), Evan Jones (Black), NOC Tech Gerard Peters (Black,

---

[2] Plaintiff recorded his conversation with Oliver on February 25, 2019. (Hoffman Decl. Ex. A). In the course of this litigation, Plaintiff has produced one hundred and eleven (111) workplace recordings he made during his employment with RaceTrac, spanning October 2019 to November 2022. (Hoffman Decl. ¶ 3).

Haitian)[3], Prasad Udawalia (Indian), and Prince Phillips (Black), along with NOC manager, Greg Oliver, and Oliver's supervisor, Senior NOC Manager, Winston Fitzhugh (Black). (Lewandowski Decl. ¶ 3-4, Ex. A).

14.    Lewandowski and her colleague, former Human Resources Business Partner, Ryan Buckman (White), kept contemporaneous notes from each interview, which RaceTrac maintained and relied on thereafter. (Lewandowski Decl. ¶ 3-4, Ex. A).

15.    Lewandowski and Buckman found no evidence of discriminatory treatment toward Plaintiff. (Lewandowski Decl. ¶ 7, Ex. B). Instead, other members of the NOC reported that Plaintiff was a source of conflict. In fact, Peters reported that Plaintiff had made multiple offensive comments about Peters' Haitian national origin, and on one occasion called Peters a "watered-down Haitian" because Peters was born in the US. (Lewandowski Decl. ¶ 5, Ex. A). Lewandowski also recorded that, in one instance, when Peters brought in candy for the team, Plaintiff reportedly asked Peters, "what kind of man offers another man candy, do you want me to fuck your wife?" (*Id*.)

16.    On November 25, 2019, Plaintiff spoke with Lewandowski again. (Hoffman

---

[3] As noted, RaceTrac does not track the national origin of its employees.  According to Plaintiff, when Peters was hired, Oliver allegedly told Plaintiff "I hired another Haitian guy." (Lenord Decl. 58: 3-15; 241: 21-23).

Decl. Ex. C). Most of the conversation focused on Plaintiff's frustrations with Oliver as a manager rather than overt discrimination, though Plaintiff provided a few scattered examples of comments referencing to his nationality. (*See generally Id.*) All but one of these comments were allegedly made in 2016 or before. (Hoffman Decl. Ex. C 00:41:25 – 00:46:27). As for the more "recent" comment, Plaintiff told Lewandowski that someone in the past year had joked about putting a Dominican Republic flag on Plaintiff's desk. (Hoffman Decl. Ex. C 00:46:27 - 00:47:37). Plaintiff refused to tell Lewandowski who made the "joke." (Hoffman Decl. Ex. C 00:48:00 - 00:49:00). Dating back further, Plaintiff complained that in 2016 (before becoming Plaintiff's supervisor) Oliver allegedly once commented that "Haitians love work." (Hoffman Decl. Ex. C 02:22:10 – 02:22:38; Lenord Dep. 117: 25, 118: 1-24).

17. Lewandowski also asked Plaintiff about his relationship with the engineering/infrastructure team.[4] (Hoffman Decl. Ex. C 02:16:35 – 02:20:45). Plaintiff specifically told Lewandowski he had no issues with engineer Kyle Setchel. (Hoffman Decl. Ex. C 02:18:57 – 02:19:40).

---

[4] The "engineering" or "infrastructure" team was responsible for creating the software scripts which the NOC techs executed. (Lukas Dep. 58: 18-25; 75:4-20; 94: 4-25).

18.    Although Lewandowski's investigation found no discriminatory treatment based on Plaintiff's race or national origin, Human Resources arranged for the entire NOC team (including Plaintiff) and the engineering team to undergo professional conduct training on December 18, 2019. (Lewandowski Decl. ¶ 7, Ex. B). The training covered accountability, retaliation, and a re-alignment of conduct and performance expectations. (*Id*.)

19.    Oliver gave Plaintiff an "Above Expectations" rating on his 2019 performance review, though Oliver noted that Plaintiff needed to "work on his relationships with his team members" and to be "more vocal." (Lenord Dep. Ex. 20; Lenord Dep. 173: 21-25, 174: 1-12).

20.    To start 2020, Plaintiff received an annual raise—from at least 2019 until his termination in 2022, Plaintiff was the highest paid NOC tech by a substantial margin. (Grubbs Decl. ¶ 6). Plaintiff also received $4,149.47 in bonuses in 2019. (Grubbs Decl. ¶ 7).

**E.    John Lukas Formulates an Automation Plan**

21.    In February 2020, RaceTrac hired John Lukas (White) as its Vice President of Information Systems, the highest-ranking member of the IS department. (Lukas Dep. 14: 10, 5: 9-11; 7:23-25; 8: 1-5; 81: 9-11; Grubbs Dep. 22: 11-20).

22.  Lukas spent the first six (6) months of his employment evaluating RaceTrac's technological systems. (Lukas Dep. 20: 15-21).

23.  Lukas identified several processes, specifically in the store environment, which could be dramatically improved and streamlined. (Lukas Dep. 20: 15-21, 21: 1-25, 22: 1-25, 23: 1-25, 24: 1-13).

24.  In approximately Q3 2020, Lukas began implementing a long-term automation strategy, which would allow the business' technologies to keep pace with its growth and would reduce labor costs. (Lukas Dep. 20: 15-21, 21: 1-25, 22: 1-25, 23: 1-25, 24: 1-13; 25: 10-17; 26: 1-18; 32: 8-15).

25.  For the Store Support Center, this automation strategy involved three (3) major improvements designed to reduce connection outage issues at stores. (Lukas Dep. 20: 15-21, 21: 1-25, 22: 1-25, 23: 1-25, 24: 1-13). First, RaceTrac updated its broadband hardware resulting in fewer connection outages. (Lukas Dep. 18: 20-25, 19: 1-5, 22: 7-10, 23: 15-25, 24: 1-7). Second, RaceTrac installed redundant cell connection at stores to serve as a back-up that would kick on whenever there was a broadband outage, decreasing the urgency for resolving the outage. (Lukas Dep. 21: 8-21). And third, RaceTrac implemented remote imaging capability for replacement hardware, allowing field technicians (independent contractors) to program new replacement

hardware on-site; previously, NOC technicians were responsible for programing hardware and then shipping replacement devices to the stores. (Lukas Dep. 22: 20-25, 23: 1-14; 38: 1-11; 40: 1-15).

26. These three improvements dramatically reduced the NOC's workload, beginning in Q4 of 2020 and culminating in Q2 of 2023. (Lukas Dep. 24: 4-23).

**F. August 2020 Incident, Complaint, and Investigation**

27. During a team meeting on August 12, 2020, Oliver and Plaintiff had an argument, during which Plaintiff inappropriately challenged Oliver in front of the entire department, and in response, Oliver called Plaintiff a "smartass." (Lenord Dep. 138: 7-25, 139: 1-16, 140: 20-22, 143: 5-25, 144: 1-22; Hoffman Decl. Ex. D, 00:08:04 – 00:11:20).

28. Afterward, Plaintiff met with Oliver and Fitzhugh to discuss the incident. (Lenord Dep. 141: 15-20; Hoffman Decl. Ex. E 00:12:23 – 00:26:24). Oliver apologized to Plaintiff, but Plaintiff refused to take responsibility for his disrespectful tone toward his supervisor, Oliver. (Hoffman Decl. Ex. E 00:18:00 – 00:23:10).

29. On August 21, 2020, Plaintiff e-mailed Winston and IS Director, Michael Campbell (White) to complain about the "smartass" incident—even had

already discussed the issue with Plaintiff and apologized. (Lenord Dep. Ex. 14; Lenord Dep. 146: 17-25, 147: 1-7). The subject of the e-mail was "Disparity of Treatment and Retaliation" and the e-mail broadly referenced Plaintiff's perception that he was treated differently and harassed because of his Haitian national origin. (Lenord Dep. Ex. 14).

30.    In particular, Plaintiff stated he "was called a "Haitian N***" several times at work and in text messages. (Lenord Dep. Ex. 14).

31.    Notably, in an earlier draft of this email, Plaintiff had instead written the phrase "Haitian Ninja." (Lenord Dep. Ex. 13; Lenord Dep. 146: 9-16). And, as depicted on a recording of a conversation between Plaintiff and an unidentified female from August 13, 2020, Plaintiff devoted substantial effort to crafting the August complaint to sound as inflammatory as possible. (*See generally* Hoffman Decl. Ex. F).

32.    In later representations to EEOC, Plaintiff stated that NOC Engineer Kyle Setchel (White) allegedly called Plaintiff a "Haitian Ninja" on a few occasions in or around November of 2019. (Lenord Dep. Ex. 18; Lenord Dep. 169: 20-24).  According to Plaintiff, Setchel told Plaintiff that he (Setchel) wanted to be a "Haitian ninja" like Plaintiff, referring (positively) to Plaintiff's speed and work product and to Plaintiff's quiet reputation. (Lenord Dep. Ex. 18).

33.  Plaintiff has also produced a screenshot of one such message that reads: "Excellent. Just the way I like it. Flying under the radar. Just call me a Haitian Ninja in training." (Lenord Dep. 151: 10-25, 152: 1-4).

34.  In response to Plaintiff's August 21,2020 email, Plaintiff met with Director of SSC HR, Talent, and Total Rewards, Caroline Grubbs (White) and Fitzhugh. (Lenord Dep. 155: 17-25, 156: 1-2; Hoffman Decl. Ex. G).

35.  They asked Plaintiff to provide them with more specifics and to share the inflammatory text message. (Hoffman Decl. Ex. G 00:39:00 – 00:39:50). Plaintiff refused to do both and would not provide additional details. (Lenord Dep. 155: 17-25, 156: 1-2; Hoffman Decl. Ex. G 00:39:00 – 00:39:50, 00:47:00-00:52:00). Grubbs and Fitzhugh attempted to work with Plaintiff to reach common ground. Plaintiff refused to engage in any discussions about solutions or to share more specifics supporting his allegations. (Hoffman Decl. Ex. G 00:47:00-00:52:00). As a result, HR and Fitzhugh were unable to further investigate Plaintiff's claims. (Grubbs Dep. 53: 17-25, 54: 1-15, 136: 7-25).

36.  On October 5, 2020, Campbell, Fitzhugh, and Human Resources Business Partner Laura Repic (White) met with Plaintiff to discuss his history of conflicts with the other members of the NOC team (including Oliver) and

unsubstantiated complaints. (Hoffman Decl. Ex. H; Lenord Dep. Ex. 16; Lenord Dep. 156: 12-25).

37. Campbell urged Plaintiff to work on his relationships, and advised Plaintiff that his many uncorroborated and unsubstantiated reports to Human Resources against his teammates had a negative impact on his rapport with the team. (Hoffman Decl. Ex. H 00:11:50 – 00:20:32). As the investigation in October 2019 had revealed, there was a documented sense that Plaintiff "has had a problem with everyone at one time or another", that he "doesn't come to stuff and doesn't participate in things", and that Plaintiff "is not the most friendly person." (Lewandowski Decl. Ex. A).

38. When Campbell explained that no team member had corroborated any of Plaintiff's multiple accusations, Plaintiff suggested that "the whole team is in on it." (Hoffman Decl. Ex. H 00:15:07 – 00:15:41). Campbell explained that he was not directing Plaintiff to refrain from reporting perceived discriminatory treatment; rather, in the event Plaintiff made further complaints, he should cooperate with any investigation that follows. (Hoffman Decl. Ex. H 00:18:30 – 00:20:24).

39. Campbell further explained that there was an expectation that Plaintiff, as a NOC Level II, would be a leader on his team. (Hoffman Decl. Ex. H 00:12:50

– 00:13:28). Plaintiff would be expected to help mentor and train less senior NOC technicians, instead of reporting them to management every time they made a mistake. (Hoffman Decl. Ex. H  00:12:50 – 00:13:28; Lenord Dep. Ex. 2; Lenord Dep. 225: 5-13).

40.    As depicted in their performance evaluations, these responsibilities of leadership and collaboration were also imposed on the other NOC Level II's, Gerard Peters and Evan Jones. (Grubbs Decl. Ex. B-C).

41.    Because of these issues with team collaboration and leadership, Plaintiff received a "Below Expectations" rating for his 2020 performance evaluation. (Lenord Decl. 178: 7-12; Lenord Dep. Ex. 20). Despite this rating, Plaintiff received an annual raise to start 2021. (Grubbs Decl. ¶ 6). Plaintiff also received $1,241.67 in bonuses in 2020. (Grubbs Decl. ¶ 7).[5]

**G.    April 2021, Plaintiff Files EEOC Charge**

42.    On April 8, 2021, Plaintiff filed a charge with the EEOC alleging race and national origin discrimination and retaliation in violation of Title VII. (Lenord Dep. Ex. 17; Lenord Dep. 168: 17-25, 169: 1-12).  Specifically,     Plaintiff referenced his complaints in February of 2019 and August  of  2020,  along

---

[5] In 2020, the bonus program for NOC techs was dissolved and no NOC techs received a bonus thereafter. (Grubbs Dep. 113: 17-25, 114: 1-9; Grubbs Decl. ¶ 7).

with the October 5, 2020, conversation with Campbell, Fitzhugh, and Repic. (Lenord Dep. Ex. 17).

43. RaceTrac, once again, investigated these allegations and submitted a statement of position in response on December 15, 2021. (Lenord Dep. Ex. 18; Lenord Dep. 169: 17-24).

**H.    Plaintiff's Performance Improvement Plan**

44. On July 20, 2021, Plaintiff met with Oliver to discuss his performance. Plaintiff described his unhappiness in his position, his mistrust for management, and his frustrations with Oliver. (Hoffman Decl. Exhibit I 00:09:40 – 00:16:05).

45. On July 22, Plaintiff met with Campbell about these same issues. (Hoffman Decl. Exhibit J). Plaintiff asserted that he deserved a promotion because he consistently completed a high number of tickets. (Hoffman Decl. Exhibit J 00:06:25 – 00:08:00). Plaintiff then became agitated, explaining that he saw his 2020 review (which was issued seven (7) months prior) as fabricated and disrespectful. (*Id*.). Campbell once again explained that Plaintiff struggled with collaboration and leadership. Plaintiff disagreed. (Hoffman Decl. Exhibit J 00:08:30 – 00:10:50).

46. On August 11, 2021, Campbell and the new Director of Store Systems

Support, Chris Shoemake (White) (now Oliver's boss) met with Plaintiff to discuss his issues with collaboration and leadership. (Hoffman Decl. Exhibit K; Lenord Dep. 209: 8-24). Campbell explained that he wanted to develop a plan to improve Plaintiff's soft skills. (Hoffman Decl. Ex. K 0:06:00 – 00:06:30).

47.   On August 18, 2021, Campbell initiated a performance improvement plan ("PIP") to work on team collaboration and leadership. (Hoffman Decl. Ex. L; Lenord Dep. Ex. 21; Lenord Dep. 190: 24-25, 191: 1-23, 192: 3-10; Lenord Dep. Ex. 22; Lenord Dep. Ex. 23). Shoemake, Oliver, and Plaintiff had weekly meetings monitoring Plaintiff's progress. (Lenord Dep. 194: 2-17; Hoffman Decl. Ex. M) Throughout these meetings, Plaintiff documented his efforts to collaborate with team mates. (*Id.*)

48.   Over the course of the PIP, Plaintiff demonstrated an increased willingness to engage with teammates, speak up during team meetings, and work on his communication with Oliver. (Hoffman Decl. Ex. M 00:20:00 – 00:20:36). Plaintiff maintained that he was not doing anything different, but, during the September 1, 2019 PIP meeting, Plaintiff noted that the new techs were asking him more questions. (Hoffman Decl. Ex. M 00:30:45 – 00:31:00).

49.   On September 29, 2021, Plaintiff was taken off of the PIP. (Hoffman Decl.

Ex. N; Lenord Dep. 194: 4-13). Shoemake praised Plaintiff, acknowledging that Plaintiff had done well with these issues since Shoemake had become involved. (Hoffman Decl. Ex. N 00:11:54 – 00:12:30). Shoemake then warned Plaintiff that regression would not result in another PIP, but could result in discipline up to and including termination. (Hoffman Decl. Ex. N 00:12:30 – 00:14:10).

50.    Plaintiff received a "Below Expectations" rating for his 2021 review because of the issues with soft skills which led to the PIP. *(*Lenord Dep. Ex. 20; Lenord Dep. 172: 3-7).

51.    To start 2022, however, Plaintiff received another annual raise, maintaining his status as the highest paid NOC tech. (Grubbs Decl. ¶ 6).

**I.    2022 Team Issues**

51.    Throughout 2022, Plaintiff continued to complain about his teammates. In April of 2022, Plaintiff reported that Jones was fabricating tickets and in turn, Jones was issued a final written warning. (Grubbs Dep. 138: 20-24).

52.    On July 13, 2022, Plaintiff commandeered a team meeting to address a personal grievance with Jeff Stiteler over a ticket they had both tried to claim. (Lenord Dep. 77: 7-16, 216: 22-25, 217: 1-17; Hoffman Decl. Ex. O). Stiteler, feeling challenged, stated "[y]ou never do any of that s—t" and later "[w]hat

17

the f—k didn't I address?" Lenord responded that he does not allow people to curse at him and exited the (virtual) meeting. (Hoffman Decl. Ex. O 00:00:53 – 00:10:35).

53. Plaintiff reported this incident to Oliver. (Lenord Dep. 216: 15-24; Lenord Dep. Ex. 29). Oliver coached Stiteler about his language and directed Stiteler to apologize to Plaintiff. (Lenord Dep. 225: 5-14, 41: 12-22; Lenord Dep. Ex. 2). Then, Oliver met with Plaintiff about the incident. (Lenord Dep. Ex. 2). Oliver coached Plaintiff about moving on from situations and exhibiting leadership by example: "Being a peer leader does NOT mean providing direction for other team members' time keeping or attendance, going behind others and checking their work, or trying to manage the performance of your peers." (*Id.*)

**J.    August 20222 Complaint and Investigation**

54. On August 9, 2022, Plaintiff was issued a right-to-sue letter from EEOC. (Lenord Dep. Ex. 19; 170: 5-12).

55. On August 14, 2022, Plaintiff sent an email to Human Resources with the subject "Disparity Treatment" describing more frustrations with Oliver. (Lenord Dep. 31; Lenord Dep. 226: 14-25, 227: 1-11; 229: 19-24). Plaintiff wrote, "It is clear my national of origin (Haitian) is the reason Mr. Oliver has

been targeting me and has displayed a different set of rules and job description pertaining to me." (Lenord Dep. 31). Plaintiff further complained that he had received undeserved discipline while his peers who engaged in misconduct had received none, and that his job description was changed to require him to take on additional responsibilities. (*Id*.)

56.     This time, RaceTrac engaged outside counsel to investigate Plaintiff's complaints. (Grubbs Decl. ¶ 9). Based on the investigation, RaceTrac concluded that there was no evidence of discriminatory or retaliatory treatment against Plaintiff. (*Id*.)

57.     Beyond his initial complaint, Plaintiff refused to participate in the investigation. (Grubbs Decl. ¶ 9; 230: 6-20).

**K.     November 2022, Reduction in Force**

58.     In October of 2022, Oliver voluntarily resigned for reasons unrelated to Plaintiff. (Grubbs Decl. ¶ 10).

59.     When this happened, Lukas determined that full-time support staff was no longer necessary and the work of responding to the remaining volume of connection failures could be distributed across other positions and outside partners. (Lukas Dep. 24: 24-25, 25: 1-25; 92: 22-25, 93: 1-4). Thus, Lukas decided to initiate a reduction in force ("RIF") of the remaining NOC techs.

(*Id.*)

60.    On November 30, 2022, RaceTrac eliminated the NOC Technician position, resulting in the termination of Phillips, Stiteler, and Plaintiff.  (Grubbs Dep. 154: 8-10; Lenord Dep. 44: 4-22, 45: 1-8). Each was offered a severance agreement. (Grubbs Decl. ¶ 12). Plaintiff elected not to sign his severance agreement. (Lenord Dep. 249: 20-21).

61.    Plaintiff alleges that after his termination he applied for an HRIS Administrator position at RaceTrac. (Plaintiff Dep. 253: 14-24). RaceTrac has no record of Plaintiff submitting *any* applications after his termination. (Grubbs Decl. ¶ 13). RaceTrac had an open "HRIS Administrator" position in March of 2021. (Grubbs Decl. ¶ 14). That position was filled by an employee with experience working with RaceTrac's HR software (Workday) and years of administrative experience. (Grubbs Decl. ¶ 13-16). On November 8, 2021, that employee was promoted from HRIS Administrator to HRIS Analyst. Since that date, RaceTrac has not had an HRIS Administrator position. (Grubbs Decl. ¶ 16).

## L.    <u>The Instant Lawsuit</u>

62.    On November 4, 2022, after Lukas had already decided to close the NOC, Plaintiff filed suit alleging violations of Title VII and § 1981. [Doc. 1].

63.    In the initial Complaint, Plaintiff complained about his placement on a PIP, his "unfavorable" evaluations, and Campbell allegedly "threatening him with termination." (*Id*.)

64.    On January 6, 2023, RaceTrac moved to dismiss on the grounds that Plaintiff had not alleged any adverse action. [Doc. 5].

65.    On January 30, 2023, Plaintiff moved to amend his Complaint to incorporate his termination. [Doc. 15]. Plaintiff did not file a charge of discrimination related to his termination with the EEOC. (Lenord Dep. 250: 21-25, 251: 1-3).

Respectfully submitted this 26th day of September, 2023.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), the undersigned counsel for Defendant certifies that this document has been prepared in Times New Roman, 14-point font, which is one of the fonts and point selections approved by the Court in Local Rule 5.1(B).

**FORDHARRISON LLP**                    */s/ Charles W. Hoffman*
271 17th Street, NW                     John L. Monroe, Jr.
Suite 1900                              Georgia Bar No. 516190
Atlanta, Georgia 30363                  jmonroe@fordharrison.com
Telephone: (404) 888-3800               Charles W. Hoffman

Facsimile: (404) 888-3863        Georgia Bar No. 165556
choffman@fordharrison.com
*Attorneys for Defendant RaceTrac*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

FABRICE LENORD,

         Plaintiff,

   v.

RACETRAC, INC.,

         Defendant.

CIVIL ACTION NO.
1:22-cv-04423-SCJ-RDC

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 26, 2023, a true and correct copy of **DEFENDANT'S STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing to the attorneys of record:

Beverly A. Lucas, Esquire
beverly@lucasandleon.com
**LUCAS & LEON, LLC**
Post Office Box 752
Clarkesville, Georgia 30523

/s/ *Charles W. Hoffman*
Georgia Bar No. 165556
choffman@fordharrison.com

23

Ford & Harrison LLP
271 17th Street, NW, Suite 1900
Atlanta, GA  30363