**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF GEORGIA ATLANTA DIVISION**

| | | |
|---|---|---|
| FABRICE LENORD, | ) | |
|    Plaintiff, | ) | |
| | ) | Civil Action File |
| v. | ) | No. 1:22-cv-04423-SCJ-RDC |
| | ) | |
| RACETRAC, INC., | ) | |
|    Defendant. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION
TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I.  SUMMARY OF THE ARGUMENT

Fabrice Lenord, ("Mr. Lenord") who is a Haitian Black man, was hired as a temporary worker by Racetrac, Inc. ("Defendant") where he worked as a help desk employee. He was later promoted to NOC I then due to his impressive work, he was subsequently promoted to NOC II. Mr. Lenord's immediate supervisor was Greg Oliver, an African-American, non-Haitian male. Mr. Lenord suffered harassment due to race/national origin discrimination and subsequently retaliation on an on-going basis, over a period of years. This was even though his production was substantially higher than his similarly situated co-workers. He was held to a higher standard than his similarly situated co-workers and subjected to different policies.  As a result, and due to discrimination and retaliation by Defendant, Mr.

Lenord was given mixed messages, caught in a number of "Catch-22" situations, which were impossible to satisfy.

## II.    <u>STATEMENT OF THE FACTS</u>

Mr. Lenord is a forty-six-year-old Haitian Black man. (Plt's Declaration ¶1) He has worked in the computer field for fourteen years. (Plt's Declaration ¶2) Ten of those years he worked for Defendant. (Plt's Declaration ¶3) He was born in Haiti. (Plt's Declaration ¶5) He speaks three languages, and he speaks English with a Haitian accent. (Plt's Declaration ¶6) He was the only Haitian-borne employee working in his department. (Plt's Declaration ¶7) Mr. Lenord has suffered an ongoing pattern of discrimination and retaliation perpetrated by Defendant. (Plt's. Dep. 9:4-11) This included co-workers who made comments about his ethnicity. (Plt's. Dep. 121:10-25; 122:1-25; 123:1-25) Mr. Lenord reported that a co-worker, Evan Jones, a black, non-Haitian, was bringing a knife to work and flipping it around causing Mr. Lenord to fear for his safety.  (Plt's. Dep. 23:15-18; 24:3-23) It took eighteen months for Defendant to finally end this obvious violation of company policy. (Plt's. Dep. 20-21) Rather than recognizing these events as an ongoing pattern of discrimination and retaliation, Defendant kept telling Mr. Lenord that he had to "move on." (Plt's. Dep. 78:3-9) On at least one occasion, someone working for Defendant molested the articles located on Mr.

Lenord's desk. (Plt's. Dep. 12:1-10) Mr. Lenord found this very upsetting as he takes his work quite seriously. (Plt's. Dep. 12:6-10; 228:2-6) The harassment suffered by Mr. Lenord was witnessed and ratified by his immediate supervisor, Greg Oliver. (Plt's. Decl. ¶8) Oliver told Mr. Lenord that investigating the person(s) who molested Mr. Lenord's desk would only alienate Mr. Lenord from the team and no investigation into the matter occurred. (Plt's. Dep. 104:2-10) When other harassment occurred like the comments about Mr. Lenord's ethnicity, Oliver was sometimes present and did not intervene. (Plt's. Decl. ¶8)

Defendant maintained a minimum number of tickets that each employee in the department was required to "close" on a weekly basis. (Ex. 18 job description) Mr. Lenord met and exceeded the minimum number consistently. (Ex. 12 & 13 ticket numbers) Defendant was well aware of Mr. Lenord's efficiency, knowledge and capacity to work hard. (Plt's. Dep. 180:2-13) As Mr. Lenord had mentioned to Defendant on multiple occasions, he was "there to work." (Plt's. Dep. 23:2-4)

There are multiple instances where Mr. Lenord was treated differently from his similarly situated co-workers. (Plt's. Dep. 61:19-25; 62:1-6; 62:16-25) Mr. Lenord was held to a higher standard than his similarly situated co-workers. (Plt's. Dep. 61:19-25; 62:1-6; 62:16-25; 201:12-25; 202:1-8) Evan Jones, also a NOC II was found to be fabricating tickets so that he could increase his ticket closure

numbers. (Plt's. Dep. 59:24-25; 60:1) While some of Mr. Lenord's co-workers were known to sleep on the job, (Plt's. Dep 40:5-15) Mr. Lenord was placed on a P.I.P. because Mr. Lenord, according to his supervisor, did not speak up enough. (Plt's. Dep. 36:13-20) Mr. Lenord was the most successful in his department at closing tickets [which is the department's purpose] while Mr. Lenord's similarly situated co-workers did not come close to meeting the ticket closure minimum for which each NOC member was responsible.  (Ex. 12 & 13 ticket numbers and summary) And a Senior Manager, Winston Fitzhugh threatened to slap an employee in a different department. (Plt's. Dep. 157:1-3) Yet, Mr. Lenord was not promoted and in fact, was written up, by this same Senior Manager, placed on a P.I.P. and threatened with termination for not showing "leadership." (Plt's. Dep. 10:22-25; 11:1-8) When Mr. Lenord did attempt to contribute to a departmental meeting, he was disrespected by his immediate supervisor, Greg Oliver as Oliver called Mr. Lenord "bruh," "big dog" and "smart-ass" in the presence of the department members. (Plt's. Dep.148:22-25; 139:2-16) Oliver did not refer to Mr. Lenord's similarly situated co-workers in this same fashion. (Plt's. Decl. ¶9) Such treatment by Oliver was in violation of Defendant's "Core Values," a statement by which Defendant claims to operate. (Plt's. Dep. 143:11-21 and Ex. 4 Core Values) After the departmental meeting where Oliver violated Defendant's "Core Values,"

Oliver asked Mr. Lenord to join him at a Zoom meeting. (Plt's Dep. 14:14-17) Oliver claimed that Mr. Lenord had disrespected him by asking "why." Mr. Lenord told Oliver that no such thing had occurred and that it was he, Oliver who had violated Defendant's "Core Values." (Plt's. Dep. 14:14-17) During the Zoom meeting between, Oliver, Fitzhugh and Mr. Lenord, the message "you are being recorded" popped up.  (Plt's. Dep. 142:102) When Mr. Lenord asked for a copy of the recorded meeting, Oliver admitted that he had deleted the recording. (Plt's. Dep. 142:2-14) Besides Oliver, many of Mr. Lenord's similarly situated co-workers also violated Defendant's Core Values Statement without repercussions. (Plt's. Dep. 143:16-18) The NOC Department had an atmosphere of foul and offensive language.  (Plt's. Dep. 21:17-22) Mr. Lenord tried to refrain from engaging in such language and did not wish to engage in that behavior. (Plt's. Dep. 20:17-22) Many in the department, including Greg Oliver frequently dropped the "f" bomb and on several occasions, the "N" word was used. (Plt's. Dep. 75:18-25; 76:1-2; 126:11-19) Some rather than using the actual "N" word, replaced the actual word with the word "Ninja." (Plt's. Dep. 126:11-19) This word is commonly used on Facebook and Instagram in order to avoid being flagged as racist by using the actual word and the negative bias is the same for both "N" words. (Plt's. Dep. 248:7-20) Regardless of whether or not any of the offending employees were

disciplined for this violation of Defendant's "Core Values," the behavior never stopped, and management continued to participate. (Plt's. Decl. ¶10)

In 2017, Greg Oliver sent out an email stating that there was a "New Company Policy" requiring individuals to find their own replacement for any vacation days that they wanted to use on a Sunday. (Plt's. Dep. 89:1-16) The only person who worked on Sunday was Mr. Lenord. (Plt's. Dep. 92:2-3) The "New Policy" was not for those wanting to take off on a Monday, a Tuesday, a Wednesday, or any other day of the week except Sunday. (Plt's. Dep. 11:19-24) The policy was changed only for Mr. Lenord. (Plt's. Dep. 91:21-25; 92:1-13)

For several years, Mr. Lenord had complained that his similarly situated co-workers (particularly Matthew Croom) failed to correct the situation when stores were left completely down overnight without intervention by the NOC. (Plt's. Dep. 60:10-25) Mr. Lenord who worked on Sundays usually caught those critical down situations and corrected them during his shift. (Plt's. Dep. 201:20-25; 202:1-8) On one occasion, Mr. Lenord failed to catch one of these critical down situations and was reprimanded for failing to correct it on his Sunday shift. (Plt's. Dep. 201:20-25; 202:1-8) The store had been down since the Friday before which meant that three other co-workers had the opportunity to remedy the critical situation but failed to do so. (Plt's. Dep. 202:21-25) Only Mr. Lenord was reprimanded (Plt's.

Dep. 201:12-25; 202:1-21)

In 2019, Mr. Lenord, who reasonably believed that he was suffering discrimination due to race/national origin, complained to Human Resources (H.R.) that he was being harassed and treated differently than his similarly situated non-Haitian co-workers due to race and national origin. (Plt's. Dep. 202:1-8) Prior to that complaint, Plaintiff had received positive evaluations. (Ex. 10, 6,7 &8) Although Mr. Lenord's evaluations mentioned that an area in which he could improve was in leadership, Mr. Lenord was not disciplined, nor did he suffer a negative assessment in prior evaluations. (Ex. 10, 6,7 &8) The leadership criticism did not rise to the top and become an urgent concern by management until after Mr. Lenord made his complaints of harassment and discrimination. (Ex.10, 6,7 & 8)

After the 2019 reports to H.R., some professional training comprised of having the department watch a one-hour video occurred. (Plt's. Dep. 159:17-19) This training was taken as a joke by members if the department. (Plt's. Dep. 243:7-23) Going forward, comments were made such as, "Be careful or you will have to watch another video" were made. (Plt's. Dep. 243:7-23) After the comments about H.R. training, there was laughter throughout the department. (Plt's. Dep. 243:7-23)

~ 7 ~

In Mr. Lenord's 2020 evaluation, he received a "below expectations" rating. (Plt's. Dep. 178:1-12) Again, the issue was working with the team and leadership. (Plt's. Dep. 179:7-23) The evaluation stated that he was expected to train, mentor and assist the team members. (Plt's. Dep. 181:5-20) Previously, when Mr. Lenord asked Oliver why he was not assigned to train others, Oliver's response was that Mr. Lenord is "too busy working on projects." "I don't want to bother you." (Plt's. Dep. 181:8-25; 182:1-6) This represents another "Catch-22" situation for Mr. Lenord. (Plt's. Dep. 181:21-25; 182:1-6)

During Mr. Lenord's 2021 evaluation, Greg Oliver told Mr. Lenord that with regard to his technical work, Mr. Lenord was "knocking it out of the park." (SMF 12) Within forty-eight hours, Mike Campbell, Oliver's manager, met with Mr. Lenord and admitted that Mr. Lenord's technical performance was "stellar." (Ex.17Audio Recording #3, 00:04:18-00:04:31) Campbell went on to state that Mr. Lenord was not meeting expectations with regards to leadership.  (SMF 12) Campbell stated that Mr. Lenord was "burning bridges" with his co-workers by reporting the harassment he was suffering. (SMF 13) Campbell further stated that Mr. Lenord's co-workers did not want to work with him because of Mr. Lenord's reports to H.R. Campbell stated that "it ends here," meaning that Mr. Lenord was to stop making these reports to H.R. (SMF 13) At the same time, Campbell stated

that Mr. Lenord should report to H.R. any discrimination.  (SMF 13) This again caught Mr. Lenord up in a "Catch-22" situation.

In Mr. Lenord's 2022 evaluation, Mr. Lenord was graded as "Not Meeting Expectations." (Plt's. Dep. 21:22-25; 22:1-6, Ex. 6, 7 &8) This negative rating was regarding leadership. (Plt's. Dep. 21:22-25; 22:1-6); Ex. 6,7 & 8) Mr. Lenord had previously been told by managers that he needed to report to management anytime that his peers were failing to follow proper procedures.  (Plt's. Dep. 21:22-25; 22:1-6) Mr. Lenord did make such reports to management.  (Plt's. Dep. 22:12-22) However, management indicated in the 2022 evaluation that what Mr. Lenord was doing, at management's instruction, was faulty. (Plt's. Dep. 22-12-24) This again caught Mr. Lenord in one more "Catch-22" situation. Other NOC II co-workers had also been instructed to make such reports but refused to do so without repercussions, no discipline, no threats of termination, no P.I.P. (Plt's. Dep. 62:7-25) At least one of the NOC II employees stated, "That's not my job" "I am not a manager" and "I'm not going to do that." (Plt's. Dep. 62:7-25) Mr. Lenord was also not trained as a manager and Defendant afforded him no training in Management, leadership or training. (Plt's. Dep. 66:20-25; 67:1-2)

In Q4 2020, Defendant was making plans with H.R. to terminate Mr. Lenord.  (Ex. 15 Fitzhugh's email) There was a meeting between H.R., Winston

Fitzhugh and Mike Campbell. (Ex. 15 email) At the time, Defendant knew that the

NOC was soon to be eliminated. (Def's Supple. Resp. Plt's Rog. #27) However,

John Lukas, V.P. of Information Systems and Technology also knew that he would

need a certain number of technical employees to maintain the stores that had not

yet been converted to the new system. (Lukas Dep. 24:8-23) Some of the positions

were eliminated through attrition. (Lukas Dep. 24:8-23) Just before Mr. Lenord

began his FMLA leave, Travis Stephens was moved to the infrastructure team.

(Plt's. Dep. 237:2-16) Weeks after Mr. Lenord returned from FMLA leave, the

NOC was eliminated and its remaining employees, including Mr. Lenord were

terminated.  (Plt's. Dep. 44:1-19) Mr. Lenord was offered a small severance but

not a transfer. (Plt's. Dep. 48:8-10) He was told that he could apply for other jobs

within the company.  (Plt's. Dep. 47:1) When he applied for HRIS Administrator

Mr. Lenord never received a response to his inquiry.  (Plt's. Dep. 49:6-12)

However, after applying, Mr. Lenord realized that the severance agreement offered

to him stated that he was not to apply to Defendant company again because

Defendant actually wanted Mr. Lenord gone.  (Plt's. Dep. 50:2-8) Because Mr.

Lenord as a top producer he was needed to work in 2022, and by him being out on

FMLA leave, November 2022 was the first chance that Defendant had to retaliate

against him by termination him. (SMF 49 & 50; Plt's Dep. 54:3-24) The decision

to terminate Mr. Lenord had been made long before the actual termination. (Ex. 14 & 15; SMF 49 & 50)

This discrimination and retaliation caused Mr. Lenord to suffer stress and anxiety to the point where he had physical manifestations, heart palpitations. (Plt's. Dep. 27:22-25) Mr. Lenord was placed on medication and directed by his doctor to take time off. Mr. Lenord took Family Medical Leave to recover from the stress and anxiety.  (Plt's. Dep. 29:1-22) Today, a year later, Mr. Lenord is medication-free. Plt's. Dep. 29:21-22)

## III.   <u>STANDARD OF REVIEW</u>

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Genuine issues of fact are those where the evidence is such that a reasonable jury could return a verdict for the non-movant. <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 250 (1986). In ruling on a motion for summary judgment, "'[t]he evidence of the nonmovant is to believed, and all justifiable inferences are to be drawn in his favor.'" <u>Tolan v. Cotton</u>, 134 S.Ct. 1861, 1863 (2014) (*quoting* <u>Anderson</u>, 477 U.S. 242, 255 (1986).

## IV.   <u>LEGAL ARGUMENT</u>

### A. <u>Sufficient Evidence Supports Plaintiff's Race and National Origin Discrimination Claims Against Defendant</u>

Defendant is liable under both Title VII and Section 1981.  Courts employ

the same analytical framework in evaluation claims brought under § 1981 as

brought under Title VII. <u>Standard v. A.B.E.L., Inc.</u>, 161 F.3d 1318, 1330 (11th Cir.

1998); <u>Lewis v. City of Union City</u>, 934 F.3d 1169, 1185 (11th Cir. 2019) ("The

legal elements under any of these frameworks are identical"); <u>CBOCS West, Inc.

v. Humphries</u>, 553 U.S. 442 (2008).

Claims of race and national origin discrimination may also be analyzed

together as "race discrimination and national origin discrimination claims arise out

of the same facts, and because courts have observed that the line between race and

national origin is an extremely difficult one to trace, the Court will analyze these

claims together." <u>Carter v. Fla. Auto. Servs. LLC</u>, No. 8:13-cv-143, 2014 WL

3385048, at *4 n. 3 (M.D. Fla. July 10, 2014) (quotation marks and citation

omitted); <u>Bailey v. DAS N. Am., Inc.</u>, -- F. Supp. 3d --, 2020 WL 4039193, at *6

(M.D. Ala. July 17, 2020). "(citing <u>Bullard v. OMI Ga., Inc</u>., 640 F.2d 632, 634–

35 (5th Cir.1981) (holding that, although § 1981 relates primarily to race, that

national origin discrimination is "so closely related to racial discrimination as to be

indistinguishable")). " <u>Short v. Mando Am. Corp.</u>, 805 F. Supp. 2d 1246, 1263 n.8

(M.D. Ala. 2011) "*Aramburu v. Boeing Co.,* 112 F.3d 1398, 1411 (10th Cir. 1997)

(plaintiff's "claim of discrimination based on his Mexican-American ancestry . . .

fall[s] within section 1981's protection against racial discrimination").” Powell v. Birmingham Heart Clinic, P.C., 2:19-cv-00309-MHH, at *14 n.5 (N.D. Ala. Sep. 13, 2021).

The plaintiff's race and national origin discrimination claims are analyzed together because "[t]he line between discrimination based on ancestry or ethnic characteristics, and discrimination based on place or nation of origin, is not a bright one." (alteration added; quotation marks and citation omitted). Mensah v. Mnuchin, No. 20-22876-CIV-ALTONAGA/Torres, at *25 n.12 (S.D. Fla. Nov. 13, 2020). (See Ex. 16).

A plaintiff survives summary judgment by creating a triable issue using the “convincing mosaic” method of proof which “allow[s] a jury to infer intentional discrimination” by the defendant employer [and/or supervisor]. Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011); Lewis, 934 F.3d at 1185 (genuine issue of material fact raised by “mosaic of circumstantial evidence”).

There exists no fixed formula or framework that a plaintiff alleging employment discrimination must satisfy in order to get his claims before a jury. See International Bhd. Of Teamsters v. United States, 431 U.S. 324, 358 (1977)

~ 13 ~

("[o]ur decision in {McDonnell Douglas] however, did not purport to create an inflexible formulation")Smith, 644 F.3d at 1328 ("[e]stablishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive summary judgment") *See also* Swiekiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002) (requirements of a *prima facie* case were "never intended to be rigid, mechanized or ritualistic").

In addition, a plaintiff is not required to establish a comparator to satisfy the elements of a prima facie case of discrimination. Smith at 1328; *see also* Swierkiewicz v. Sorema N.A., 534 U.S. at 510 (2002); Chapter 7 Trustee v. Gste Gourmet, Inc., 683 F.3d 1249, 1255 (11th Cir. 2012); Rioux v. City of Atlanta, 520 F.3d 1269, 1277 (11th Cir. 2008). In order to state a prima facie case of race discrimination the plaintiff must show 1) that the plaintiff belongs to a protected class; 2) he was subjected to an adverse job action; 3) employees outside the protected class were treated more favorably; and 4) he was qualified to do the job. Lewis, 934 F.3d at 1185; Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997). Plaintiff only needs to "establish facts adequate to permit an inference of discrimination." Holifield, at 1562.

Title VII claims may also be analyzed "totality of the circumstances." " The 'totality of the circumstances' standard requires that the Court view the Plaintiff's

environment as a whole even though no individual episode, viewed by itself, crosses the Title VII threshold." See Robinson, 760 F. Supp. at 1524; see also Vance v. Southern Bell Tel. Tel. Co., 863 F.2d 1503, 1510-11 (11th Cir. 1989) (holding that the district court erred in requiring plaintiff to establish a claim as to each allegation of harassment); Draper v. Coeur Rochester. Inc., 147 F.3d 1104, 1109 (9th Cir. 1998). Just as "A play cannot be understood on the basis of some of the scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents but on the overall scenario." Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1524 (M.D. Fla. 1991).

## 1. **Comparator Evidence**

Even though Mr. Lenord is not required to produce a comparator, he has identified two. Mr. Lenord identified the other two NOC II's as comparators, Gerard Peters and Evan Jones. Mr. Lenord, Mr. Peters and Mr. Jones are "similarly situated in all material respects." Lewis v. City of Union City, 918 F.3d 1213, 1218 (11th Cir. 2019).

- The trio were supervised by Greg Oliver. See Jones v. Gerwins, 874 F.2d 1534, 1541 (11th Cir. 1989) (comparators ordinarily under jurisdiction of same supervisor).

- All three were hired as NOC I's then promoted to NOC II's. See Lewis, 918

F.3d at 1227 (The same job title is not necessary for a comparator).

- The trio were subject to the same RaceTrac, Inc. "workplace rules or policies" including the "Core Values." See Latham, 172 F.3d at 793 (finding comparators valid when all were subject to the same "workplace rules or policies").

- The three share a similar disciplinary history. See Tennial v. United Parcel Serv., Inc., 840 F.3d 292, 304 (6th Cir. 2016) ("[d]ifferences in experience and disciplinary history" can disqualify a plaintiff's comparators).

"The relevant inquiry is not whether the employees hold the same job titles, but whether the employer subjected them to different employment policies." Lewis, 918 F.3d at 1227 (quoting Lathem v. Dep't of Children & Youth Services, 172 F.3d 786, 793 (11th Cir. 1999)). Here, Defendant subjected Mr. Lenord to different terms and conditions of employment, different policies, employment rules and job responsibilities than Jones and Peters. (Plt's. Dep. 66:1-11)

While the task of informing supervisors when co-workers failed to conform to the processes set out by Defendant was made a condition for Mr. Lenord to successfully complete his P.I.P., this responsibility may or may not have been told to Peters and Jones. (Plt's. Dep. 66:1-11) Mr. Lenord did his best to conform exactly as instructed by his supervisors and reported any non-conformance with processes in the Team Chat and to his superiors. (Plt's. Dep. 21:22-25) In contrast, Jones and Peters refused to perform this task. (Plt's. Dep. 66:1-11) The task was

not enforced regarding Jones and Peters and neither suffered any disciplinary measures. (Plt's. Dep. 66:1-11)

Despite Mr. Lenord's conformance with the instruction by his superiors to place his co-workers' failures in following Defendant's processes, in the Team Chat, Mr. Lenord was reprimanded for doing so, once again he was caught in a "Catch-22" situation. It should also be noted that management previously made claims that Mr. Lenord's peers were refusing to work with him because they feared that Mr. Lenord would report them to H.R. (SMF 13) By being required to report the failures of his peers publicly, on the Team Chat, the distrust by Mr. Lenord's peers was unlikely to be repaired, another "Catch-22" situation. In fact, Jeff Stiegler took exception to being reported and launched into a public tirade laced with obscenities. (Plt's. Dep. 77:2-20)

## 2. Convincing Mosaic of Discrimination

Comparator evidence along with other evidence of discriminatory animus by Defendant demonstrates a "convincing mosaic of circumstantial evidence" of intentional discrimination by Defendant that established Defendant's true motive for discrimination and retaliation.

In order to justify the discriminatory and retaliatory acts perpetrated by Defendant, Defendant submits as evidence several statements written by H.R. (Doc.

49) These statements are not signed by the supposed speaker under penalty of perjury and are self-serving for Defendant. A unanimous Supreme Court held:

> although the court should review the record as a whole, **it must disregard** all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, **at least to the extent that the evidence comes from disinterested witnesses**. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 151 (2000)

(emphasis added and internal citations omitted).

Defendant began focusing heavily on leadership aspects that were supposedly part of his job as a NOC II, although the leadership aspect was not part of his job description. (Ex. 18 & 19) Defendant had previously not focused on the leadership aspect as the purpose of the department was to maintain the connectivity of Defendant's stores. (Ex. 20) Defendant did this by placing Mr. Lenord on a P.I.P. and by giving him negative yearly evaluations. (Ex. 10 & 20) Further, Defendant caused Mr. Lenord to publicly report, in the Team Chat, his co-workers for failing to follow Defendant's processes. (Plt's. Dep. 41:6-11) Mr. Lenord was expected to perform this task without the benefit of any training. (Plt's. Dep. 66:22-25) When Mr. Lenord attempted to follow the direction of his supervisors, by performing this task, he was faulted for doing so.

### 3. <u>Totality of the Circumstances</u>

The "totality of the circumstances" standard requires that the Court view the Plaintiff's environment as a whole even though no individual episode, viewed by itself, crosses the Title VII threshold. See Robinson, 760 F. Supp. at 1524; see also Vance v. Southern Bell Tel. Tel. Co., 863 F.2d 1503, 1510-11 (11th Cir. 1989) (holding that the district court erred in requiring plaintiff to establish a claim as to each allegation of harassment); Draper v. Coeur Rochester. Inc., 147 F.3d 1104, 1109 (9th Cir. 1998) (holding "[d]iscriminatory behavior comes in all shapes and sizes, and what might be an innocuous occurrence in some circumstances may, in the context of a pattern of discriminatory harassment, take on an altogether different character, causing a worker to feel demeaned, humiliated, or intimidated on account of her gender."); Williams v. General Motors Corp., 187 F.3d 553, 562-564 (6th Cir. 1999) (holding that the district court erred by dividing and categorizing reported incidents of harassment, divorcing them from their context and depriving them of their full force).

Colon v. Environmental Technologies, Inc., No. 8:00-cv-1219-T-MSS, at *1 (M.D. Fla. Nov. 5, 2001).

This is true in the instant case as well. A holistic approach is necessary in order to appreciate the impact of the accumulation of the incidents "and that the work environment created thereby may exceed the sum of the individual episodes." Robinson v. Jacksonville Shipyards, Inc., 760 F. Supp. 1486, 1524 (M.D. Fla. 1991). "Courts will allow judicial claims that 'amplify, clarify, or more clearly focus' the EEOC complaint allegations, but 'allegations of new acts of discrimination are inappropriate' for a post-charge judicial complaint." EEOC v. STME, LLC, 309 F.Supp.3d 1207, 1211 (M.D. Fla. 2018) (quoting Gregory , 355 F.3d at 1279–80 ). Collier v. Harland Clarke Corp., 379 F. Supp. 3d 1191, 1208 (N.D. Ala. 2019).

Defendant claims that Mr. Lenord failed to exhaust administrative remedies

(Doc 47-1) however:

> The continuing-violation doctrine permits a plaintiff to sue on an
> otherwise time-barred claim if related acts of discrimination continued to
> occur within the limitations period. *See* E.E.O.C. v. Joe's Stone Crabs,
> Inc., 296 F.3d 1265, 1271 (11th Cir. 2002). The Supreme Court has held,
> however, that the continuing-violation doctrine does not apply to discrete
> acts of discrimination. See Nat'l R.R. Passenger Corp. v. Morgan, 536
> U.S. 101, 113 (2002).

Manley v. Dekalb Cnty., 587 F. App'x 507, 8 (11th Cir. 2014).

In this case, the discrimination and the retaliation were ongoing and not

discrete acts because the acts of discrimination and retaliation continued to occur

within the limitations period. (Doc 47-1) Some of the referred to acts of

discrimination and retaliation occurred after Mr. Lenord filed his charge with the

EEOC. (Doc 47-1)

"An adverse employment action alleged after and as a result of filing an

EEOC charge is said to grow out of the original charge of discrimination, such that

a new or amended EEOC charge filing is unnecessary." *See, e.g.,* Baker v. Buckeye

Cellulose Corp. , 856 F.2d 167, 169 (11th Cir. 1988) (A plaintiff does not have to

"exhaust administrative remedies prior to urging a retaliation claim growing out of

an earlier charge; the district court has ancillary jurisdiction to hear such a claim

when it grows out of an administrative charge that is properly before the court.")

(citing <u>Gupta v. East Texas State Univ</u>. , 654 F.2d 411 (5th Cir. 1981) ). <u>Collier v.</u>
<u>Harland Clarke Corp.</u>, 379 F. Supp. 3d 1191, 1208-09 (N.D. Ala. 2019).

It is note-worthy that no member of Human Resources or management in a
superior position to Mr. Lenord was Haitian/Black and that there were no other
Haitian-borne members of the NOC. (Grubbs Dep. 15:9-25)

**B. <u>Defendants Retaliated Against Plaintiff</u>**

"To establish a claim of retaliation, [under Title VII and Section 1981], a
[plaintiff] must prove that she engaged in statutorily protected activity, that she
suffered a [materially] adverse action, and that …. '[her] protected activity was a
but-for cause of the alleged adverse action.'" <u>Jefferson v. Sewon Am., Inc.</u>, 891 F.3d
911, 924 (11th Cir. 2018) (quoting <u>Trask v. Sec.'y, Dep't of Veterans Affairs</u>, 822
F.3d 1179, 1194 (11th Cir. 2016)). "[B]ut for" does not mean "sole cause;" rather, it
means that the protected activity "was the factor that made a difference." <u>Leal v.</u>
<u>McHugh</u>, 731 F.3d 405, 415 (5th Cir. 2013), or "the straw that broke the camel's
back." <u>Burrage v. United States</u>, 134 S.Ct. 881, 888 (2014). Importantly, a plaintiff
is not required to prove the existence of the underlying discrimination claim. <u>See,</u>
<u>Clover v. Total Sys. Servs., Inc</u>., 176 F.3d 1346, 1351 (11th Cir. 1999). The measure
of a retaliation claim is whether the adverse act "well might have dissuaded a
reasonable worker from making or supporting a charge of discrimination."

Burlington N & S.F.R. Co. v. White, 548 U.S. 53, 64, 68 (2006). Plaintiff can show causal connection between the protected speech and adverse act by demonstrating the events are not "wholly unrelated." Goldsmith v. Bagby Elevator Co., Inc., 513 F.3d 1261, 1277 (11th Cir. 2008). In this case, multiple members of Defendant's management team made it clear to Mr. Lenord that Defendant intended to terminate him by repeatedly threatening him with such. (SMF 13) A meeting to discuss Mr. Lenord's "transition" occurred as evidenced by a group email. (Ex. 14 & 15) Multiple threats of terminate, negative evaluations, being placed on a P.I.P. and ultimately being terminated would have dissuaded a reasonable worker from making or supporting a charge of discrimination. Accordingly, Plaintiff has met his burden of a prima facie case of retaliation.

Defendant questions whether Mr. Lenord engaged in protected speech. (Doc. 47-1 at 22). Mr. Lenord absolutely engaged in protected speech. (Doc 47-1) In order to show he engaged in protected speech, Mr. Lenord must show only that he held a good faith, reasonable belief that he was being treated differently and unfairly because of his ethnicity/race and held a good faith belief that discrimination existed. See Jefferson, 891 F.3d at 924; Bryant v. United States Steel Corp., 428 F. App'x 895, 898 (11th Cir. 2011); Taylor v. Runyon, 175 F.3d 861, 869 (11th Cir. 1999); see also, Tipton v. Canadian Imperial Bank of Commerce, 872 F.2d 1491, 1494 (11th

Cir. 1989) (employee's opposition to discrimination is protected if he can reasonably form a good faith belief that discrimination existed). Under Title VII, an employee participates in protected activity when, in the totality of circumstances, she had a good-faith, reasonable belief that the underlying employment practice was unlawful. Harper v. Blockbuster Entertainment Corp., 139 F.3d 1385, 1388 (11th Cir. 1998), *cert. denied,* 525 U.S. 1000, 119 S.Ct. 509, 142 L.Ed.2d 422 (1998); Little v. United Technologies, Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).

It is obvious that Mr. Lenord honestly believed in good faith that he was suffering discrimination and retaliation because of his race/national origin at the hands of Defendant given that he continued reporting and eventually filed a charge with the EEOC. (SMF 13 & SUMF 42) With each report that Mr. Lenord made, Defendant continued its discriminatory treatment of him and increased the frequency and nature of retaliatory actions. (Plt's. Declar. #10) As an example, after Mr. Lenord made his report to H.R. in 2019, Mr. Lenord sought assistance to end what he believed were illegal, discriminatory and retaliatory practices by making multiple complaints to H.R. and to his superiors citing race/ethnicity as the reason. (Plt's. Dep. 10:4-7; 15-18) Some of these complaints can be found on audio recordings provided by Mr. Lenord. (Ex. 17).

[Mr. Lenord's recitation of the many facts in this case are somewhat curtailed by the limitation on the number of pages permitted.]

**1. Pretext**

In order to show pretext, Plaintiff must "demonstrate that the proffered reason was not the true reason for the employment decision… [Plaintiff] may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981). In evaluating a summary judgment motion, the district court must evaluate whether the plaintiff has demonstrated "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir.1997). "[A] plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable." Howard v. BP Oil Co., 32 F.3d 520, 526 (11th Cir.1994) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993)).

Defendant's claims the alleged legitimate reasons for Plaintiff's termination

are elimination of the NOC Department. (Doc 47-1) While it is true that the NOC Department was eliminated, the elimination was not the true reason that Mr. Lenord was terminated.  The decision to terminate Mr. Lenord was made back in 2020 when Defendant initiated its progressive discipline policy against Mr. Lenord.  (Ex. 10, 14 & 15) The fact that the NOC Department would be eliminated was known back in Q1 of 2020. (SMF 49 & 50) In early 2020, Covid caused the employees, other than Mr. Lenord, to work from home. (Plt's. Dep. 245:18-24) An on-site employee was needed, and Mr. Lenord was the employee. (Plt's. Dep. 245:18-24) Once the department returned to working on-site, and after Mr. Lenord reported additional discrimination and retaliation to H.R., Defendant began progressive discipline of Mr. Lenord by placing Mr. Lenord on a P.I.P. and by documenting by email the smallest details. (Plt's. Dep. 202:12-21)

Because of the negative evaluations, Mr. Lenord was not given a raise in 2021 which affected his income going forward so that even if Mr. Lenord did not receive the same dollar amount of bonuses that he had received in the past. And even if Mr. Lenord receive future raises, (Defendant gave everyone a raise at the end of the year) (SUMF #41) Mr. Lenord's base income would cause his future income to fall short of what he could have earned if Defendant hadn't placed him on a P.I.P. or withheld merit raises and bonuses due to negative evaluations. (Ex.

11) "The court recognizes persuasive authority supports the proposition that placement on a PIP can be an adverse employment action under Title VII." *See* Howell v. Compass Grp., 448 Fed. Appx. 30, 36 (11th Cir. 2011) (finding that a reasonable jury could find that a PIP was an adverse employment action because the PIP in that case was "isolated" and directed to the plaintiff "as a disciplinary action"); Smith v. Quintiles Transnat'l Corp., 509 F.Supp.2d 1193, 1203 (M.D. Fla. 2007) (finding that a PIP was an adverse employment action because the PIP "was an explicitly disciplinary measure, the implementation of which had a material adverse effect on the Plaintiff's employment and resulted in an increased workload, increased reporting requirements, and increased supervision," and the PIP "temporarily prevented the Plaintiff from receiving pay raises or bonuses."). But a PIP, like any employment action, is not actionable under Title VII unless it has a tangible and material adverse employment impact. *See* Redd v. United Parcel Serv., Inc., 615 Fed.Appx. 598, 603 (11th Cir. 2015). Milton v. Gray Media Grp., 2:21-cv-00135-ACA, at *16-17 (N.D. Ala. Oct. 18, 2022).

Here, the PIP was a disciplinary measure which resulted in an increased workload and prevented Mr. Lenord from receiving merit raises and bonuses. (Ex. 11) Being on the PIP caused a material and adverse impact to the income of Mr. Lenord.

During the upgrade of technology in Defendant's stores, NOC employees were needed to maintain the old system. (Lukas Dep. 40:9-21) Mr. Lenord, the employee with the highest rate of ticket closure, was perfect for that job. Mr. Lenord continued to work given that he was unaware of Defendant's plans to terminate him. Ex. 14 & 15) Other NOC employees left the employment of Defendant. (Plt's. Dep. 44:1-10) Stephens, who also worked in the department, was promoted to a new position in Defendant company to the Infrastructure Team in August 2022. (SMF 53) During 2022, Mr. Lenord also took FMLA leave due to the stress he was suffering on the job. (Plt's. Dep. 231:2-8) When he returned from FMLA leave, there were just three other employees left in the department and the third employee, Evan Jones, left right away. Plt's. Dep. Only Mr. Lenord, the top producer of the department, Jeff Stiteler, and Prince Phillips who was known to sleep on the job as the only NOC employees still working for Defendant. (Plt's. Dep. 44:7-16) The three were terminated in November 2022. Mr. Lenord is unaware of what Phillips and Stiteler were told but Mr. Lenord was offered a small severance in exchange for signing a severance agreement. (Ex. 20) Signing the severance agreement would have prevented Mr. Lenord from pursuing his claims of discrimination and retaliation any further and prevent him from applying for any other positions with the company. (Ex. 20) Waiting to terminate Mr. Lenord until the elimination of the

department would allow Defendant to proffer a legitimate, non-discriminatory reason for Mr. Lenord's termination and assist Defendant in overcoming his claims of discrimination and retaliation. (Ex. 20) Additionally, the agreement stated that Mr. Lenord would not apply for any other positions with Defendant Company. (Ex. 20) Preventing Mr. Lenord from applying for a position while telling him that he was free to apply for additional positions again caught him in a "Catch-22" situation. In fact, prior to reading the severance agreement, Mr. Lenord applied for a position with Defendant. (Plt. Dep. 47:2-9) Defendant claims that Mr. Lenord was not qualified for the position because according to Defendant, Mr. Lenord lacked the specific, arbitrarily assigned minimum years of experience. (Doc. 49-1) This would also be true of Travis Stephens who was transferred to the Infrastructure Department prior to Mr. Lenord's termination.) (SMF 54) This was a department where Lukas had stated that there would be a significant skills gap with members of the NOC Department (SMF 54) Mr. Lenord never heard back about the position and Defendant never stated, at the time of his application, that Mr. Lenord was not qualified for the job. (Plt's. Dep. 49:6-25)

"The Eleventh Circuit, albeit in unpublished opinions, has held causation may be established through evidence demonstrating the adverse employment action was Defendant's "first opportunity to retaliate."" Pasqualetti v. Unified Gov't of Athens-

Clarke Cnty.,    CIVIL ACTION No. 3:13-CV-13 (CAR), at \*39 (M.D. Ga. Sep. 29,

2015). The November 2022 termination was the first opportunity that Defendant had

to comfortably retaliate against Mr. Lenord. Waiting until November 2022 allowed

Defendant to have its top producer to continue closing tickets on the old system

while Defendant was implementing the new system. (Lukas Dep. 40:9-21) And

waiting until November 2022 allowed Defendant the opportunity to be rid of Mr.

Lenord and his claims of discrimination and retaliation which threatened the

company. (Ex. 20)

### 4.  **CONCLUSION**

For the reasons stated herein, Defendant's Motion for Summary Judgment

should be denied *en toto*.

Respectfully submitted this 7th day of November 2023.

**LUCAS & LEON, LLC**


s/ Beverly A. Lucas
Beverly A. Lucas
Georgia Bar No. 427692
Post Office Box 752
Clarkesville, Georgia 30523
T: (706) 754-2001
beverly@lucasandleon.com

*Counsel for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| FABRICE LENORD, | ) | |
| Plaintiff, | ) | CIVIL ACTION FILE NO.: |
| | ) | No. 1:22-cv-04423-SCJ-RDC |
| v. | ) | |
| | ) | |
| RACETRAC, INC. | ) | |
| Defendant. | ) | |

## CERTIFICATE OF FONT COMPLIANCE REQUIRED BY LOCAL RULE 7.1D AND SERVICE

In accordance with Local Rule 7.1D, I hereby certify that the foregoing PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT was prepared with one of the font and point selections approved by the Court in Local Rule 5.1B. Specifically, it was prepared with Times New Roman, 14 point.

I further certify that I electronically filed with the Clerk of Court using CM/ECF system which will automatically send email or other notification of such filing to the following attorneys of record:

John Monroe                                Charles Hoffman

This 7th day of November, 2023.

s/ Beverly A. Lucas
Beverly A. Lucas
Georgia Bar No. 427692

~ 30 ~