IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| FABRICE LENORD,<br><br>Plaintiff,<br><br>v.<br><br>RACETRAC, INC.,<br><br>Defendant. | CIVIL ACTION NO.<br>1:22-cv-04423-SCJ-RDC |

**FINAL REPORT AND RECOMMENDATION**

This is an employment discrimination case. Plaintiff Fabrice Lenord alleges that Defendant RaceTrac, Inc., his former employer, discriminated and retaliated against him in violation of Title VII[1] and 42 U.S.C. § 1981. Following discovery, Defendant moved for summary judgment. (Doc. 47). For the reasons below, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED**.

## I. BACKGROUND

Plaintiff, a Black man who was born in Haiti, spent more than a decade working for Defendant. He alleges that he was harassed and discriminated against based on his race and national origin, and retaliated against when he complained

[1] 42 U.S.C. § 2000e, *et seq*.

about the mistreatment.

### *A. Factual Background* [2]

Plaintiff started working for Defendant, which operates service stations throughout the southeast, as a help-desk analyst in 2012. (DSMF ¶ 1; PSMF ¶ 16). By 2015 he had been promoted to a Level II technician in the company's Network Operating Center ("NOC"), where he helped resolve network-connectivity issues at Defendant's corporate headquarters and retail locations. (DSMF ¶¶ 2–3; PSMF ¶ 16). On November 30, 2022, after redesigning its network systems, Defendant closed the NOC and terminated Plaintiff's employment. (DSMF ¶¶ 25, 60–61). He challenges his termination along with several earlier employment actions, and he also claims that he experienced a hostile work environment during his tenure.

[2] The relevant facts are taken mainly from the parties' statements of material facts, (Doc. 47-2 [Defendant's Statement of Material Facts, "DSMF"]; Doc. 51-1 [Plaintiff's Statement of Material Facts, "PSMF"]), together with other portions of the record as appropriate. Where the parties offer conflicting accounts, the undersigned draws all reasonable inferences and presents all evidence in the light most favorable to Plaintiff as the non-moving party. The undersigned notes that, although the parties were given an enlarged allotment of facts to submit, (Docs. 43, 50), they each still presented *too many*. The parties were instructed to include one fact per paragraph in their respective statements. (Doc. 36 at 2 ("Each fact must be numbered, and there must be only one sentence per number.")). But they both repeatedly violated that instruction. And Defendant included paragraph 51 twice. *See* (DSMF ¶ 51). Furthermore, Defendant failed to respond to Plaintiff's statement of facts, thus violating the undersigned's directive and this Court's Local Rules. (Doc. 36 at 2–3 ("If the respondent includes a statement of facts, Local Rule 56.1(B) requires the initial movant to file a response to each of respondent's facts.")); LR 56.1(B)(3), NDGa. The undersigned has elected not to sanction these transgressions—for example, by striking, excluding, or deeming admitted any stated facts. But the parties' carelessness has made the Court's task considerably more difficult. They and their counsel are advised to pay closer attention to the Court's directives.

Now is the time, before going any further, to introduce the other persons involved in this dispute. Most important are several individuals in Defendant's chain-of-command, listed here in roughly descending authority:

- John Lukas (White) – Vice President of Information Systems and Technology
- Mike Campbell (White) – Executive Director of Enterprise, Architecture, and Standards
- Chris Shoemake (White) – Director of Store Systems Support
- John Sprayberry (White) – Director of IT Operations and Support
- Winston Fitzhugh (Black) – Senior NOC Manager
- Greg Oliver (Black) – NOC Manager and Plaintiff's immediate supervisor

(Doc. 45-1 ["Grubbs Dep."] at 19–22, 62–63, 99, 109–11, 146–48, 155; Doc. 46-1 ["Lukas Dep."] at 5). Plaintiff's NOC teammates also played a role, but more on that below.

The facts are organized around Plaintiff's claims rather than in chronological order.

***i. Harassment and Complaints***

As far back as 2016 (perhaps earlier), Plaintiff complained to management and the HR department about what he perceived to be workplace misconduct and

mistreatment. *See* (Doc. 44-2 ["Pl. Dep."] Exh. 4).[3] For instance, in March 2016, he protested because he felt overworked and unfairly treated, while two NOC teammates were "goofing off" and sleeping on the job. (*Id.*). In September 2017, he complained after Oliver instructed him to find his own replacement coverage for any absences on Sundays. (DSMF ¶ 7; Pl. Dep. Exh. 6). And when HR got involved, he reported that a Black teammate had been playing with a knife in the office for more than a year.[4] (DSMF ¶ 7; Pl. Dep. at 24–25, Exh. 6). In November 2017, Plaintiff complained and went home because he believed someone had unplugged his computer monitor and disheveled his desk. (PSMF ¶ 43; Pl. Dep. Exh. 8).

In February 2019, Plaintiff complained that another Black teammate had used offensive language during a team meeting. (DSMF ¶ 9). In his email to management, Plaintiff alleged that the teammate had "used a racial slur 'f*** that N****[']' towards me. [sic]" (Pl. Dep. Exh. 9). Later, however, at his deposition, he clarified. (*Id.* at 16, 109). Rather than directing profanity at him, as Plaintiff's email had suggested, the teammate instead described his own impressions after he believed

---

[3] Defendant filed Plaintiff's deposition transcript and the corresponding exhibits as two separate documents. (Docs. 44-1 & 44-2). The documents are referred to collectively as "Pl. Dep."

[4] At his deposition, Plaintiff explained that the teammate would regularly open, close, and flip a knife at his desk. (Pl. Dep. at 23–27). The teammate did not, however, threaten to harm him with the knife and the pair didn't sit next to each other. (*Id.* at 94). In any event, HR followed up with an email to Plaintiff days after his complaint in September 2017, explaining that management had spoken with the teammate about the conduct. (*Id.* Exh. 7). And there is no evidence that the teammate continued to play with the knife thereafter. *See* (*id.* at 101).

Plaintiff had ignored a phone call. (DSMF ¶ 9). According to Plaintiff's testimony:

> The phrase was—[the teammate] said he called me. I didn't answer my phone. This is after I left work and [the teammate] said [at the meeting], "It's like Fab [*i.e.*, Plaintiff] said, 'Fuck this nigger.'" [sic]

(Pl. Dep. at 109). In other words, the teammate wasn't describing Plaintiff, but referring to himself in the third person while recounting an incident. (DSMF ¶ 9).

In any event, Sprayberry investigated the complaint and determined that the allegation was unfounded. (DSMF ¶ 10; Pl. Dep. Exh. 10). According to Sprayberry, the teammate denied making the statement and three others present at the meeting corroborated that account. (Pl. Dep. Exh. 10). After speaking with Plaintiff, Sprayberry summarized the conversation in an email, pointing out to him that "there is a prevailing perception amongst your teammates that you look for conflict, that you do not want to work with them and that you want to keep to yourself as much as you can." (*Id.*). Sprayberry concluded his missive by underscoring that Plaintiff must "figure out a way to work better with [his teammates] and that a drastic improvement is needed immediately." (*Id.*).

In October and November 2019, Plaintiff met with HR to again report frustrations with Oliver and his NOC teammates. (DSMF ¶¶ 12, 16). He complained about several issues, including work assignments, teammates sleeping on the job, the just-described February 2019 incident, and past comments and jokes about his national origin. (*Id.*). For instance, according to Plaintiff, before Oliver became NOC

manager, he remarked that "Haitians love to work." (*Id.* ¶ 16). He added that teammates occasionally made fun of his Haitian accent, once referred to the catastrophic 2010 earthquake in Haiti, and introduced him to a Dominican vendor for no apparent reason (even though, Plaintiff explained, Haiti and the Dominican Republic have had a violent relationship). (*Id.* ¶ 12; PSMF ¶ 42; Pl. Dep. at 119–24). Someone even joked one time about placing a Dominican flag on his desk. (DSMF ¶ 16). By Plaintiff's admission, however, only the flag comment had occurred *after* 2016. (Doc. 52 ¶ 16; Pl. Dep. at 118–23).

HR investigated the allegations, interviewing nine individuals including Plaintiff, Oliver, Fitzhugh, and several other NOC technicians. (DSMF ¶ 13). HR found no evidence that he had been discriminated against. (*Id.* ¶ 15; Doc. 47-3 ["Lewandoski Decl."]). In fact, several teammates reported that Plaintiff himself caused conflict in the NOC. (DSMF ¶ 15). At any rate, in December 2019, HR arranged for the entire NOC team (including Plaintiff) to undergo professional conduct training to address issues such as workplace conduct, accountability, and performance expectations. (*Id.* ¶ 18).

Later, during a team meeting in August 2020, Plaintiff and Oliver disagreed over work protocols. (*Id.* ¶ 27). Throughout their exchange, Oliver called Plaintiff "bro," "big dog," and a "smart ass." (*Id.*; Pl. Dep. at 139, 145–48). Plaintiff met with Oliver and Fitzhugh to discuss the incident. (DSMF ¶ 28). Oliver apologized. (*Id.*).

Still, several days later, Plaintiff emailed Fitzhugh and Campbell to again report the incident together with what he believed was general disparate treatment based on his race and nationality. (DSMF ¶ 29; Pl. Dep. Exh. 14). According to him: "[B]ecause I'm a Haitian I'm consistently being insulted, look down up on, making fun of because of my accent, my spelling, my tone, they are not being sensitive to my work ethics, my culture. . . . I don't think [Oliver] or the team respects me as a black life. [sic]" (Pl. Dep. Exh. 14).

To support his discrimination complaint, Plaintiff referred specifically to a White teammate who, in his words, had called him a "Haitian N**** [sic]" several times the year before, in 2019. (DSMF ¶¶ 30, 32; Pl. Dep. Exh. 14). At his deposition, however, Plaintiff admitted that his teammate had called him "Haitian *Ninja*," not "Haitian *Nigger*," as his email implied. (Pl. Dep. at 117, 126–29, 149–53). A text message that came out during discovery provides some context—after completing a work task, the White teammate texted Plaintiff: "Excellent. Just the way I like it. Flying under the radar. Just call me a Haitian Ninja in training." (DSMF ¶ 33; Pl. Dep. Exh. 15). Notably, in an unsent email draft, Plaintiff had originally used the word "Ninja" rather than the elliptical term "N****." (DSMF ¶ 31; Pl. Dep. Exh. 13). But for some reason he changed the wording in the email sent to Fitzhugh and Campbell. (Pl. Dep. at 149–50). Fitzhugh expressed frustration with Plaintiff's portrayal of events but confided to HR that "it really might just be a foundational

language barrier." (Grubbs Dep. Exh. 4).

HR met with Plaintiff and investigated his allegations, but once again could not substantiate his discrimination claims. (DSMF ¶¶ 34–35; Grubbs Dep. at 53). Fitzhugh, Campbell, and HR discussed the possibility of terminating Plaintiff's employment at that time because his mistrust and poor collaboration had become a distraction, but they decided to give him a chance to move forward. (Grubbs. Dep. at 225, Exh. 5).

In October 2020, Plaintiff met with Fitzhugh, Campbell, and HR to discuss his conflicts with the NOC team. (DSMF ¶ 36). Campbell urged him to be a "team player," advising that his unsubstantiated complaints negatively impacted his workplace relationships. (*Id.* ¶ 37). Campbell also warned Plaintiff that if he didn't commit to being a team player it could result in termination. (Doc. 47-5 Exh. H; Doc. 48 Exh. H at 00:12:07–00:12:20).[5] Campbell explained, however, that he wasn't directing Plaintiff not to report discriminatory treatment, only that he must cooperate with any ensuing investigations to substantiate his claims. (DSMF ¶ 38). When Campbell noted that NOC team members had not corroborated his past allegations, Plaintiff suggested that "the whole team is in on it." (*Id.*). A day after the

[5] Plaintiff secretly recorded many conversations with management and HR. The parties have submitted fifteen of those recordings along with their summary-judgment filings. (Docs. 47-5, 48, 51-14, 56).

meeting, Fitzhugh emailed Plaintiff a recap, reiterating that his allegations "could not be verified or corroborated." (Pl. Dep. Exh. 16). And Fitzhugh echoed Campbell's sentiment from the day before: "Being a positive, helpful, and effective NOC team member is critical to the success of the team, department, and organization, and if these expectations are not met, it could result in additional disciplinary action, up to and including termination." (*Id.*).

On April 8, 2021, Plaintiff filed a charge with the EEOC alleging race and national-origin discrimination as well as retaliation. (DSMF ¶ 42; Pl. Dep. Exh. 17). He then continued to file internal complaints. For instance, in February 2022, he reported that others weren't providing adequate phone assistance. (Pl. Dep. Exh. 27). And a couple months later in April 2022, he reported that a teammate was fabricating his work results.[6] (DSMF ¶ 51; Pl. Dep. Exh. 28). In July 2022, Plaintiff and a White teammate had a verbal disagreement during a team meeting. (DSMF ¶ 52; Pl. Dep. at 45). The teammate used the words "shit" and "fuck" during the exchange. (DSMF ¶ 52). Plaintiff promptly exited the meeting and reported the incident to Oliver, who directed the teammate to apologize for the offensive language. (*Id.* ¶¶ 52–53; Pl. Dep. Exh. 29).

In August 2022, Plaintiff received his right-to-sue letter from the EEOC. (DSMF ¶ 54). That same month, he emailed HR to describe his "ongoing

[6] The teammate was written up for the incident. (DSMF ¶ 51).

mistreatment"—specifically from Oliver. (*Id.* ¶ 55; Pl. Dep. Exh. 31). He complained that Oliver had unilaterally changed his job description without notice, unfairly directed him to communicate with and mentor teammates, and then issued him a performance improvement plan ("PIP")—more on that soon—when he failed to meet the new, adjusted performance expectations. (DSMF ¶ 55; Pl. Dep. Exh. 31). Plaintiff again raised the specter of discrimination, stating: "It is clear my national of origin (Haitian) is the reason Mr. Oliver has been targeting me and has displayed a different set of rules and job description pertaining to me. [sic]" (Pl. Dep. Exh. 31). This time, Defendant hired outside counsel to investigate the allegations. (DSMF ¶ 56). But the investigation reached the same conclusion—there was no evidence that Plaintiff had been discriminated against. (*Id.*).

***ii. Performance Reviews, Discipline, and Termination***

Beyond the alleged harassment he endured, Plaintiff insists that Defendant also targeted him with several adverse employment actions—negative performance reviews, a PIP, and termination.

<u>Performance Reviews</u>

Here are Plaintiff's annual performance ratings from 2017 through 2021 (the last year he received a review):

- 2017 – Sometimes Exceeds Expectations
- 2018 – Sometimes Exceeds Expectations

- 2019 – Above Expectations
- 2020 – Below Expectations
- 2021 – Below Expectations

(Pl. Dep. Exh. 20). Oliver issued each rating.

In 2020 and 2021, the two years about which Plaintiff complains, Oliver flagged him for poor teamwork and leadership.[7] In 2020, for instance, Oliver explained: "[Plaintiff] ha[s] issues with working with his team which is highly necessary for our NOC team to do everyday. The NOC Tech 2 is expected to help train, mentor, and assist NOC Tech 1 team members. . . . Due to this deficiency, [he] is not meeting a key expectation of his role." (*Id.*, Bates No. RaceTrac000105). Oliver added that Plaintiff "does help and resolve issues that others have worked on and didn't complete, but the other side of team work where he can teach and mentor others needs improvement. I know his relationships with the team isn't the best and

[7] Plaintiff argues that Defendant's emphasis on leadership was suspicious since that trait was not included in his job description. (Doc. 51 at 18). He's wrong. Although not in so many words, his job description catalogued several competencies that fall under the umbrella of leadership. *See* (Pl. Dep. Exh. 1). To illustrate, NOC technicians were required to be "tolerant with people and processes," to "wait[] for others to catch up before acting," "zero[] in on the critical few and put[] the trivial many aside," "eliminate roadblocks," and "quickly sense what will help or hinder accomplishing a goal." (*Id.*). At any rate, "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Garcetti v. Ceballos*, 547 U.S. 410, 424–25 (2006). And there is nothing suspicious about asking an experienced employee to lead his peers, regardless of his job description. *See Small v. City of Hollywood*, 661 F. Supp. 3d 1187, 1207–08 (S.D. Fla. 2023) (observing that the plaintiff's claim that she wasn't given information necessary to perform because she never received a job description bolstered, rather than rebutted, the employer's argument that she was fired because she did not understand her role).

that holds up his progress for improving his leadership skills." (*Id.*, Bates No. RaceTrac000107). When awarding the same subpar rating a year later in 2021, Oliver repeated the refrain: "[Plaintiff's] role as a [Level II] NOC Tech has the expectation to function as a peer leader and collaborate with all of his teammates to resolve issues . . . [and] teach his peers how to solve these issues. Throughout the year, [he] was not meeting that expectation fully." (*Id.*, Bates No. RaceTrac000108). Oliver had voiced the same concerns when completing his 2018 and 2019 performance reviews, though Plaintiff does not allege those earlier reviews were unlawfully motivated. (DSMF ¶ 19).[8] Despite his poor reviews in 2020 and 2021, Plaintiff still received annual raises after each year. (*Id.* ¶¶ 41, 51).

Although Plaintiff was terminated before he could receive a 2022 performance review, Oliver again admonished him in July of that year for poor leadership. (Pl. Dep. Exh. 2). Plaintiff apparently continued to complain about teammates using curse words in meetings, even after the conduct had been addressed. (*Id.*). Following a discussion, Oliver urged him to show patience and build relationships with his peers. (*Id.*). In Oliver's view, however, he "continue[d] to exhibit behaviors that d[id]

---

[8] To illustrate, in Plaintiff's 2018 review, Oliver wrote: "I would like for [Plaintiff] to share more of his knowledge with the lower NOC techs to help build their skills in troubleshooting. [He] has the knowledge and skills to be a leader. I would like for him to be more vocal and interactive with the team." (Pl. Dep. Exh. 20, Bates No. RaceTrac000409). And in Plaintiff's 2019 review, Oliver stressed the same point, noting under "Areas of Improvement" that Plaintiff "can work on his relationships with his team members. . . . I would also like for [him] to work on being more vocal." (*Id.*, Bates No. RaceTrac000413).

not comport with [the] expectations of a NOC Tech II." (*Id.*). For instance, according to Oliver, rather than trying to get along with and mentor his teammates, Plaintiff insisted on publicly airing work-assignment disputes (rather than working directly with peers for resolution), tracking his teammates' time and attendance, "going behind [them] and checking their work, [and] trying to manage the[ir] performance." (*Id.*). After reminding Plaintiff that similar issues had been addressed "multiple times before," Oliver warned that the next disciplinary action would be termination. (*Id.*). It should be noted that, from at least 2019 through his termination in 2022, Plaintiff was the highest paid NOC technician. (DSMF ¶ 20).

PIP

In August 2021, Plaintiff met with Campbell and Shoemake. (*Id.* ¶ 46). Campbell explained that he wanted to develop a plan to improve Plaintiff's soft skills, and on August 18, 2021, he placed Plaintiff on a PIP to address his workplace leadership and communication. (*Id.* ¶¶ 46–47; PSMF ¶ 7; Pl. Dep. Exh. 21). There is no dispute that Plaintiff was a technically proficient and productive employee. But the PIP listed leadership and communication as two "Areas of Concern." (Pl. Dep. Exh. 21). The PIP directed him to "[p]rovide support/mentorship," "be more vocal in team meetings," "communicate with [his] teammate[s]," and "[h]elp train/mentor NOC Tech I" teammates. (*Id.*). Over the next several weeks, Plaintiff met each week with Shoemake and Oliver to monitor and discuss his progress. (DSMF ¶ 47; Pl.

Dep. Exh. 26).

In September 2021, Defendant took Plaintiff off the PIP. (DSMF ¶ 49). Shoemake praised his progress but warned him that regression could result in discipline up to and including termination. (*Id.*). Although he showed improvement during the PIP period, as noted above, Plaintiff still received a "Below Expectations" rating for the year based on his deficiencies in collaboration and leadership skills. (Pl. Dep. Exh. 20).

<u>Termination</u>

In February 2020, Defendant hired Lukas—as a reminder, he was the company's Vice President of Information Systems and Technology—to assess and overhaul its network systems. (DSMF ¶¶ 21–23). He identified several processes, specifically with respect to Defendant's many retail store locations, that he believed could be streamlined and improved. (*Id.* ¶ 23). By the third quarter of 2020, Lukas began implementing an automation strategy to improve the company's organizational capabilities. (Lukas Dep. at 20–21). As relevant, the strategy involved three major elements designed to aid with store support: (1) updated hardware, which reduced the number of connection outages; (2) redundant network connections, which provided back-up when outages occurred; and (3) remote hardware imaging, which allowed outsourced field technicians—rather than centralized NOC staff—to program replacement hardware. (DSMF ¶ 25). Together,

these changes significantly reduced the NOC's workload. (*Id.* ¶ 26).

In October 2022, in light of the changes, Lukas decided that the NOC team was no longer necessary. (*Id.* ¶¶ 58–59). In his view, any residual connection-support work could be distributed across other positions and outside partners. (*Id.* ¶ 59). So, he implemented a so-called "reduction in force." (*Id.*). On November 30, 2022, Defendant officially eliminated the NOC team. (*Id.* ¶ 60; PSMF ¶ 2). Plaintiff and two others (one of whom was White)—the last remaining NOC technicians—were terminated. (DSMF ¶ 60). Defendant didn't offer Plaintiff another position in the company, but he nevertheless applied for an HR-related position after termination.[9] (*Id.* ¶ 61; PSMF ¶¶ 51, 54). Defendant, however, chose an in-house candidate familiar with its HR software who had administrative experience. (DSMF ¶ 61).

***B. Procedural History***

Plaintiff filed a charge with the EEOC on April 8, 2021, alleging race and national-origin discrimination as well as retaliation. (Pl. Dep. Exh. 17). He claimed that—based on his race, Haitian origin, and/or his regular complaints—he had been harassed and given a poor performance review. (*Id.*). Because it will come up later, Plaintiff's charge narrative is presented here in full:

> I began my employment with [Defendant] on October 15, 2012, with my most recent position as a Network Technician. For the past 4 years, since Greg Oliver, Manager, became my supervisor I have been

[9] RaceTrac has no record of Plaintiff submitting any applications after his termination. (Doc. 47-4 ["Grubbs Decl."] ¶ 13).

> harassed, called racist names and have been written up twice. On or about February 1, 2019, and continuing I have complained to Directors, senior managers and human resources but the harassment and hostile environment has continued. I complained again on or about August 1, 2020, to management and I was given a substandard appraisal. On or about October 1, 2020, I was told by senior management that if I made anymore "baseless" claims it could lead to termination. The reason that I was given for my poor appraisal was for leadership. No actions have been taken regarding my complaints. I believe that I have been discriminated against because of my National Origin (Haitian) race (African American) and in retaliation for opposing unlawful employment practices in violation of Title VII. [sic]

(*Id.*). He received his EEOC right-to-sue letter in August 2022. (DSMF ¶ 54).

In November 2022, Plaintiff initiated this action. (Doc. 1). In his amended complaint, the current operative pleading, he asserts the following claims: (1) race discrimination, in violation of Title VII (Count I); (2) national-origin discrimination, in violation of Title VII (Count II); (3) race discrimination, in violation of 42 U.S.C. § 1981 (Count III); (4) retaliation, in violation of Title VII (Count IV); and (5) retaliation, in violation of § 1981 (Count V). (Doc. 19-1).

After discovery, Defendant moved for summary judgment. (Doc. 47). The motion is fully briefed and ripe for review.

## II. LEGAL STANDARD

A reviewing court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "bears the initial burden to show the district court, by reference to materials on file, that there

are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark*, 929 F.2d at 608.

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quotation marks omitted). If the non-moving party does not support an essential element of his case, summary judgment is appropriate. *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 840 (11th Cir. 2000). Moreover, "[t]he mere existence of a scintilla of evidence" supporting the non-moving party's case is not enough to advance the case to a jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

Genuine issues in dispute are those for which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "In determining whether genuine issues of material fact exist, [the reviewing court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party." *Rice-Lamar*, 232 F.3d at 840 (citing *Anderson*, 477 U.S. at 255). When the record "taken as a whole" could not reasonably support a finding in the non-moving party's favor, however, there is no "genuine issue for trial." *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. DISCUSSION

Defendant argues that it is entitled to summary judgment for two main reasons.[10] First, Plaintiff failed to administratively exhaust his Title VII claims. Second, it says his claims—whether asserted under Title VII or § 1981—fail for lack of evidence. The undersigned largely agrees with Defendant. The discussion is arranged by statute, starting with the claims and defenses under Title VII.

### *A. Title VII*

Because exhaustion is a threshold issue, the discussion begins there.

#### *i. Administrative Exhaustion*

Defendant first argues that Plaintiff's Title VII claims are barred because he failed to exhaust his administrative remedies. That is correct for some—*but not all*—of the claims.

Before filing a Title VII action in court, a plaintiff must first file a timely discrimination charge with the EEOC.[11] *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001) (citing 42 U.S.C. § 2000e-5(b)). The ensuing judicial

[10] The undersigned pauses once more to note that Defendant disregarded the Court's prior instructions on briefing citations. The parties were told that "[c]itations in briefs should not be made to the parties' statement of material facts or response thereto," but should instead include citations to the record. (Doc. 36 at 3). Defendant did just the opposite.

[11] This is a mandatory claim-processing rule, not a jurisdictional prerequisite, and a defendant may forfeit it as a defense if the issue is not timely raised. *Fort Bend Cnty. v. Davis*, 139 S.Ct. 1843, 1846, 1849, 1851 (2019).

complaint "is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004) (citation omitted). In other words, a plaintiff generally cannot make claims in court if he failed to articulate support for such claims in his administrative charge. *Id.* at 1279–80 ("[A]llegations of new acts of discrimination are inappropriate."). In a non-deferral state such as Georgia, the charge must be filed within 180 days after the discriminatory act or practice. *Wilkerson*, 270 F.3d at 1317; *see also* 42 U.S.C. § 2000e-5(e)(1). A discrete employment act—for example, a failure to promote, transfer denial, or termination—occurs on the date that it happened. *Nat'l R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 110, 114 (2002). If a plaintiff does not file a timely charge, then he "lose[s] the ability to recover for it." *Id.* at 110; *see also Stewart v. Jones Util. and Contracting Co.*, 806 F. App'x 738, 740 (11th Cir. 2020) ("Only unlawful employment practices complained of in a timely filed charge of discrimination to the EEOC can form the basis for liability.").

Notwithstanding the preceding, courts are "extremely reluctant to allow procedural technicalities to bar claims brought under Title VII." *Gregory*, 355 F.3d at 1280 (alteration adopted, citation omitted). And there are two pertinent caveats to the charge-filing rules—one concerns hostile-work-environment claims, the other concerns retaliation claims. First, because a hostile-work-environment claim is

"composed of a series of acts that collectively constitute one 'unlawful employment practice,'" *Morgan*, 536 U.S. at 117, the administrative-exhaustion requirement demands only that an act contributing to the claim occurred within the statutory period. That means that, so long as the plaintiff's charge points to *at least one* such act that happened within the 180-day filing period, "the entire time period of the hostile environment may be considered by the court for the purposes of determining liability." *Id.* It doesn't matter if some component acts occurred outside the filing window. *Id.* Second, regarding retaliation claims, "it is unnecessary for a plaintiff to exhaust administrative remedies prior to raising a judicial claim of retaliation that grows out of an earlier [EEOC] charge." *Basel v. Sec'y of Def.*, 507 F. App'x 873, 876 (11th Cir. 2013). "Where a retaliation claim grows out of an administrative charge that the plaintiff properly presented to the court, the district court has ancillary jurisdiction over the claim." *Id.* (citing *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 168–69 (11th Cir. 1988)); *see also Thomas v. Miami Dade Pub. Health Trust*, 369 F. App'x 19, 23 (11th Cir. 2010) (following *Baker); Houston v. Army Fleet Servs., LLC*, 509 F. Supp. 2d 1033, 1043 (M.D. Ala. 2007) ("[W]hen a retaliation claim is based on adverse actions taken against the employee *after* the initial EEOC charge is filed, it can be said that the retaliation claim grows out of a properly filed employment discrimination charge, and it is not necessary for a plaintiff to file a second charge specifically alleging retaliation." (emphasis in original)).

Plaintiff filed his EEOC charge on April 8, 2021—meaning that *only* those acts or practices that happened on or after October 10, 2020 are actionable under Title VII. There is just one such act included in Plaintiff's charge. He alleged in his charge that he received a "substandard appraisal" in 2020. (Pl. Dep. Exh. 17). He received his 2020 performance review in December of that year, (*id.* Exh. 20, Bates No. RaceTrac000105), so any claims predicated on that event have been properly exhausted.[12] But that's it. Though Plaintiff also alleged a continuing hostile work environment—which, as noted, is treated a bit more generously for exhaustion purposes—the trouble is that he cited no specific acts of harassment that occurred within the 180-day filing period. *See* (*id.* Exh. 17). So, any hostile-work-environment claim is untimely. *See Stanford v. Honda Manuf. of Ala. LLC*, No. 1:17-cv-00951, 2018 WL 5807518, at *6 (N.D. Ala. Nov. 6, 2018) (rejecting the plaintiff's hostile-work-environment claim as administratively barred because none of the component acts occurred within the 180-day filing period). As for the rest of his

[12] Defendant points out that, in his EEOC charge, Plaintiff listed the dates of discrimination as occurring between October 1, 2019 and October 1, 2020. (Doc. 47-1 at 15; Pl. Dep. Exh. 17). For that reason, it maintains that *all* allegations in the EEOC charge were untimely. Plaintiff did indeed record that the latest discriminatory action took place on October 1, 2020, outside the 180-day filing period. That said, he also noted—somewhat inconsistently—that the discrimination was "continuing." (Pl. Dep. Exh. 17). Furthermore, EEOC charges prepared without the assistance of counsel (as here), should be liberally construed. *See Gregory*, 355 F.3d at 1280 (finding that the plaintiff's retaliation claim was not administratively barred by her failure to mark the retaliation box on her EEOC charge). The undersigned finds that Plaintiff's claims regarding the 2020 performance review—which was in fact issued within the filing period—are not administratively barred, despite the inconsistent date information listed on his EEOC charge.

charge allegations, they likewise concern events that took place outside the statutory period.[13]

So much for the events that occurred *before* Plaintiff filed his EEOC charge in April 2021. What about the actions that happened *later*? According to Plaintiff, these five events took place after he filed his EEOC charge: (1) in August 2021, Campbell placed him on a PIP, (Doc. 19-1 ¶ 46; PSMF ¶ 7); (2) in September 2021, Shoemake threatened to terminate him if his conduct regressed, (Doc. 19-1 ¶ 30; PSMF ¶ 31); (3) in December 2021, Oliver graded him as "Below Expectations" on his 2021 annual performance review, (Doc. 19-1 ¶ 45; Pl. Dep. at 199–201, Exh. 20); (4) in July 2022, Oliver warned him that if his teamwork didn't improve he would be terminated, (Doc. 19-1 ¶ 45; PSMF ¶ 32); and (5) in November 2022, he was terminated along with the other NOC technicians, (Doc. 19-1 ¶ 11; PSMF ¶ 2). Although Plaintiff did not amend his EEOC charge—or file a new one—to reflect these later events, the undersigned will consider his corresponding retaliation claims. To begin with, he expressly claimed retaliation on his EEOC charge. (Pl. Dep. Exh. 17). And his charge narrative, while mostly concerning events outside the statutory

[13] To illustrate, Plaintiff alleged in his charge that he had been called racist names at some unidentified time (other portions of the record indicate that the remarks at issue occurred no later than 2019, *see* (Pl. Dep. at 118–23, Exhs. 9, 14–15, 18)); that he complained in February 2019 and was subsequently harassed in an unspecified way; and that he was warned by senior management on October 1, 2020 that he could be fired if he continued to make unsubstantiated complaints. (Pl. Dep. Exh. 17).

period, still included retaliation allegations. Minding these considerations, along with the reluctance to bar Title VII claims on procedural grounds, the undersigned finds that the five just-described events could—under a charitable view—be deemed to grow out of the charge itself.[14] *Cf. Basel*, 507 F. App'x at 876; *Thomas*, 369 F. App'x at 23; *Houston*, 509 F. Supp. 2d at 1043.

Here's the upshot. Plaintiff exhausted his administrative remedies with respect to a single employment action—his 2020 performance review. The Court may therefore consider his related Title VII discrimination and retaliation claims. In addition, because the five post-charge actions described in the previous paragraph could be considered, at first blush anyway, to have been retaliatory actions growing out of Plaintiff's charge itself, the Court may consider his corresponding retaliation claims—though *not* any related discrimination claims. *See Croley v. United Airlines, Inc.*, No. 1:17-cv-04722-ELR-JFK, 2018 WL 11486862, at *7 (N.D. Ga. Apr. 24, 2018) ("[W]hile new, discrete *discrimination* claims must be asserted in an EEOC charge in order to [be] preserved, . . . new *retaliation* claims occurring after the filing

---

[14] The undersigned recognizes that there is some disagreement among courts in this Circuit about whether retaliation claims based on post-charge employment actions, like those described above, must be exhausted. *See Ivey v. Savannah-Chatham Pub. Sch.*, No. 4:20-cv-16, 2021 WL 3549901, at *9 n.7 (S.D. Ga. Aug. 11, 2021) (collecting cases and discussing the judicial split on the issue); *Baskerville v. Sec'y of Dep't of Veteran Affs.*, 377 F. Supp. 3d 1331, 1335–36 & n.5 (M.D. Fla. 2019) (same). As explained, the undersigned has elected to apply the charge-filing rules charitably in Plaintiff's favor. That said, if the District Judge finds that the rules should be applied more strictly, that would provide even further grounds—in addition to those detailed in this report—to reject Plaintiff's post-charge Title VII claims.

of an EEOC charge are considered to grow out of the original discrimination itself and any protected activity taken in response to it." (emphasis in original, citation omitted)), *R&R adopted*, 2018 WL 11486859 (N.D. Ga. Jun. 13, 2018).

Summing up, then, Plaintiff has properly presented *one* discrimination claim and *six* retaliation claims under Title VII, listed here for clarity:

1. Discrimination (Counts I & II) and retaliation (Count IV) based on the December 2020 performance review;

2. Retaliation (Count IV) based on the August 2021 PIP;

3. Retaliation (Count IV) based on Shoemake's September 2021 termination warning;

4. Retaliation (Count IV) based on the December 2021 performance review;

5. Retaliation (Count IV) based on Oliver's July 2022 termination warning; and

6. Retaliation (Count IV) based on his November 2022 termination.

These claims will be reviewed in turn.

As for the rest of his Title VII claims in Counts I, II, and IV, the undersigned finds that he failed to exhaust his administrative remedies. Based on such failure, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to all but the above-enumerated Title VII claims.

***ii. Discrimination***

As just explained, Plaintiff has properly presented just a single Title VII discrimination claim premised on his 2020 performance review. Title VII outlaws

employment discrimination based on race or national origin. *See* 42 U.S.C. § 2000e-2(a)(1). Plaintiff asserts both grounds. A Title VII plaintiff relying on circumstantial evidence, as is the case here, can survive summary judgment in either of two ways. He can navigate through the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Or, alternatively (and more linearly), he can advance under the so-called "convincing mosaic" approach by presenting the court with "enough evidence for a reasonable factfinder to infer intentional discrimination." *Tynes v. Fl. Dep't of Juv. Justice*, 88 F.4th 939, 946 (11th Cir. 2023). Regardless of the analytic framework, however, the ultimate question for the court is the same: has the plaintiff created a triable issue concerning the employer's intent? *See id.* at 946–47. In this case, the answer is no.

To start, Plaintiff's discrimination claim falls short under *McDonnell Douglas*. The burden-shifting framework requires the plaintiff to start by presenting evidence that (1) he belongs to a protected class, (2) he experienced an adverse employment action, (3) he was qualified to perform the job, and (4) his employer treated similarly situated employees outside his class more favorably. *McDonnell Douglas*, 411 U.S. at 802; *see also Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*). Whether invoking his race (Count I) or national origin (Count II), Plaintiff belongs to a protected class. That much is clear. The undersigned will assume for

now that his 2020 performance review was an adverse employment action,[15] and there is no dispute about his qualification. That takes us to the fourth element of Plaintiff's prima facie case—comparator evidence. It is at this point that his discrimination claim stalls.

A plaintiff and his comparators must be "sufficiently similar, in an objective sense, that they cannot reasonably be distinguished." *Lewis*, 918 F.3d at 1228 (quotation marks and citation omitted). That is not the case here. Plaintiff points to two Black teammates—Gerard Peters and Evan Jones—who received better 2020 performance reviews.[16] Because these teammates are within Plaintiff's protected racial class, they cannot serve as comparators for his race-discrimination claim. *See id.* at 1221, 1224 (explaining that a valid comparator must be outside the plaintiff's

[15] The Eleventh Circuit has held that poor performance reviews do not constitute adverse employment actions, particularly where—as here—the plaintiff hasn't shown that such reviews resulted in any "serious and material" change in working conditions. *See, e.g., Davis v. Town of Lake Park*, 245 F.3d 1232, 1239, 1242 (11th Cir. 2001) ("Simply put, the loss of prestige or self-esteem felt by an employee who receives what he believes to be unwarranted job criticism or performance review will rarely—without more—establish the adverse action necessary to pursue a claim under Title VII's anti-discrimination clause."); *Anderson v. United Parcel Service, Inc.*, 248 F. App'x 97, 100 (11th Cir. 2007) (following *Davis*). Having said that, the U.S. Supreme Court recently clarified that Title VII prohibits any discriminatory employment action that leaves an employee from a protected class "worse off." *Muldrow v. City of St. Louis*, 144 S.Ct. 967, 977 (2024). In other words, contra some Eleventh Circuit precedent, a plaintiff need not show that his injury was "significant," "material," or "serious." *Id.* at 975 n.2. Rather than parse the issue in light of *Muldrow*, the undersigned has elected simply to assume that the 2020 performance review constituted an adverse employment action for Title VII purposes. Very little if anything is lost by doing so, as Plaintiff's discrimination claim fails in any event.

[16] On their respective 2020 performance reviews, Peters and Jones each received a rating of "Meets Expectations." (Grubbs. Decl. at 11, 19).

protected class). In any event, they are inapt comparators—whether for Plaintiff's race *or* his national-origin claims—because he hasn't established the requisite material similarity. True, Peters and Jones held the same title and reported to the same manager as Plaintiff. The comparator analysis, however, requires more. Ordinarily, for instance, a plaintiff and his comparators will have "engaged in the same basic conduct (or misconduct)" and share similar disciplinary histories. *See id.* at 1227–28. On these points, Plaintiff and his proposed comparators diverge.

Plaintiff's teamwork and leadership deficiencies were noted repeatedly—including, for example, in his 2018 and 2019 performance reviews. And Campbell warned him again in October 2020, just a couple months before the 2020 performance review was issued, that if he didn't improve he would be fired. Yet he hasn't presented evidence that Peters and Jones exhibited similar conduct or received similar censure. That is particularly problematic because the employment action at issue was a performance review.[17] *See Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 n.17 (11th Cir. 2011) ("In order to be considered 'similarly situated,' the compared employees must have been involved in or accused of the same or similar conduct, yet disciplined in different ways for that conduct." (quotation marks and

---

[17] Despite insisting in his brief that Peters was "similarly situated to Plaintiff in all material respects," Plaintiff didn't include any facts about Peters' employment or disciplinary history in his statement of facts, or in his response to Defendant's statement. *See generally* (PSMF; Doc. 52). He said a bit more about Jones—but not much. And what little evidence there is does not establish the requisite similarity. *See* (PSMF ¶ 10; Doc. 52).

citation omitted)).

The undersigned finds that Peters and Jones are not valid comparators. Thus, Plaintiff cannot make out a prima facie case of discrimination based on his 2020 performance review. *See Lewis*, 918 F.3d at 1231 ("[W]e hold that when a plaintiff relies on the *McDonnell Douglas* burden-shifting framework to prove an intentional-discrimination claim using circumstantial evidence, []he must demonstrate—as part of [the] *prima facie* case—that []he was treated differently from other individuals with whom []he was similarly situated in all material respects.").

But let's assume for the moment that Plaintiff could make out a prima facie showing—even in that case, his discrimination claim *still* fails because he hasn't rebutted Defendant's legitimate explanation for the subpar 2020 review. When a plaintiff satisfies each prima facie element, the defendant must justify its action with evidence of a legitimate, nondiscriminatory reason. *Lewis*, 918 F.3d at 1221. If the employer does so, the plaintiff must then show "not only that the employer's justification was pretextual, but that the real reason for the employment action was discrimination." *Tynes*, 88 F.4th at 944. Defendant has presented evidence of Plaintiff's longstanding leadership shortcomings and friction with his NOC teammates. That legitimately justified the "Below Expectations" rating. *See EEOC v. Atlanta Gastroenterology Assocs., LLC*, No. 1:05-cv-2504-TWT, 2007 WL 602212, at *20 n.29 (N.D. Ga. Feb. 16, 2007) ("[T]he Eleventh Circuit has made it

clear that insubordination, a poor attitude, disruptive conduct, or any combination thereof, are legitimate, nondiscriminatory reasons for [an adverse employment action]."). Plaintiff has his own take on the matter, but "[t]he inquiry into pretext centers on the employer's beliefs, not the employee's beliefs, and to be blunt about it, not on reality as it exists outside of the decision maker's head." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010); *see also Baker v. City of Delray Beach*, No. 23-10760, 2024 WL 1107093, at *1 (11th Cir. Mar. 14, 2024) ("If the employer was dissatisfied with the employee for non-discriminatory reasons, summary judgment should be awarded to the employer, even if those reasons were unfair or based on a mistaken belief."); *Callahan v. Emory Healthcare, Inc.*, No. 23-10604, 2024 WL 3027684, at *9 (11th Cir. June 17, 2024) (no pretext where the plaintiff declined certain work duties that she believed were unnecessary and against policy because evidence showed the employer repeatedly ordered her to assume the duties and she "refused to do so despite multiple warnings and reprimands").

The issue, in other words, is not whether the employer's actions were prudent or fair, but *only* whether they were motivated by discrimination. *See Alvarez*, 610 F.3d at 1266 ("[W]e must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees."); *Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338 (11th Cir. 2015) ("Put frankly, employers are free to [act] for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as

long as its action is not for a discriminatory reason." (quotation marks and citation omitted)). Yet Plaintiff has identified nothing to cast doubt on Defendant's rationale and suggest that he was discriminated against.

There is simply no evidence that Oliver was dishonest. Indeed, the explanation he gave aligns with feedback and admonishments that Plaintiff received over several years, extending before and after the review. Nor is there evidence that Oliver acted with any discriminatory animus. For starters, Oliver is Black. *See Holston v. Sports Auth., Inc.*, 136 F. Supp. 2d 1319, 1335 (N.D. Ga. 2000) ("As the Eleventh Circuit has noted, when the decision makers are in the same protected class as the employee complaining about an adverse employment decision, the employee faces a more difficult burden in establishing that a discriminatory animus played a role in the decision complained about."). And he made just a single innocuous comment about Plaintiff's national origin—remarking that Haitians love to work—several years earlier, *before* he became Plaintiff's manager. *See Weatherly v. ABC Legal, Inc.*, No. 23-11143, 2024 WL 2698023, at *6 (11th Cir. May 24, 2024) (finding that a supervisor's derogatory remarks were not enough to raise a genuine issue of pretext because the comments were unrelated to the circumstances of the employer's adverse action). While Plaintiff's NOC teammates made a handful of comments implicating his race and national origin, most of those remarks also occurred several years before the 2020 performance review was issued. And there is no suggestion

that his coworkers influenced Oliver. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1270 (11th Cir. 2001) ("Where a decisionmaker conducts his own evaluation and makes an independent decision, his decision is free of the taint of a biased subordinate employee."). Finally, Plaintiff hasn't presented any comparator, "me-too," or statistical evidence otherwise tending to show that NOC employees outside of his protected class—whether based on race or national origin—were treated better. His discrimination claim thus doubly fails under *McDonnell Douglas*—that is, he hasn't made out a prima facie case and he cannot show that Defendant acted pretextually.

Plaintiff's discrimination claim isn't necessarily doomed, however. As noted above, he will survive summary judgment if, burden-shifting aside, the collected evidence could reasonably support an inference of intentional discrimination. *Tynes*, 88 F.4th at 946. Here, it cannot. The "convincing mosaic" approach provides no rescue. For the reasons noted above in the pretext discussion, the record would not allow a reasonable jury to find in Plaintiff's favor. *See Copeland v. Ga. Dep't of Corr.*, 97 F.4th 766, 782 n.8 (11th Cir. 2024) ("In some cases, a plaintiff's failure to prove a prima facie case under *McDonnell Douglas* often also reflects a failure of the overall evidence." (quotation marks and citation omitted)). Defendant had a legitimate reason to issue a subpar 2020 performance review—indeed, by 2020, it had echoed the same rationale several times. And there is no evidence that Oliver

lied when he cited Plaintiff's poor teamwork and leadership as justification, that he harbored any unlawful animus towards Plaintiff, or that he treated non-Blacks and non-Haitians more favorably.

In sum, Plaintiff's discrimination claim based on his 2020 performance review fails for multiple independent reasons. He cannot make out a prima facie case of discrimination because he hasn't identified any valid comparators. Nor has he presented evidence to show that Defendant acted pretextually. And finally, the aggregate record does not suggest discriminatory intent. For these reasons, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's Title VII discrimination claims in Count I (race) and Count II (national origin) based on his 2020 performance review.[18]

***iii. Retaliation***

As detailed above, Plaintiff has properly asserted six discrete retaliation claims under Count IV. Title VII prohibits retaliation against an employee who

---

[18] For the reasons stated, the undersigned also finds that Plaintiff's discrimination claim cannot survive summary judgment even under a mixed-motive theory. To survive summary judgment under a mixed-motive theory, the plaintiff must show that illegal bias was a "motivating factor" for an adverse employment action, even though other factors also motivated the action. *See Quigg v. Thomas Cnty. Sch. Dist.*, 814 F.3d 1227, 1232–33 (11th Cir. 2016); 42 U.S.C. § 2000e-2(m). The complete lack of evidence suggesting intentional discrimination defeats Plaintiff's claim, whether he alleges that unlawful bias played a determinative or lesser role in his performance review. *See Campbell v. Mayo Clinic Inc.*, No. 23-10966, 2024 WL 713921, at *3 (11th Cir. Feb. 21, 2024) ("[F]or the same reasons that Campbell cannot piece together a convincing mosaic of intentional discrimination, she also cannot show that discrimination played any [motivating] role in Robinson's decision to terminate her employment.").

engages in statutorily protected activity. *See* 42 U.S.C. § 2000e-3(a). Retaliation claims, like discrimination claims, are reviewed at the summary-judgment stage under either the *McDonnell Douglas* burden-shifting framework (specifically, a modified version thereof) or the mosaic standard. *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1337, 1342 (11th Cir. 2023).

To establish a prima facie case in this context, the plaintiff must present evidence that (1) he engaged in statutorily protected activity, (2) he suffered an adverse action, and (3) the adverse action was causally related to the protected activity. *Id.* at 1337. If the plaintiff satisfies these initial elements but the employer presents evidence that it acted legitimately, then the plaintiff must show the employer acted pretextually. *Id.* In doing so, the plaintiff must prove that "the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). The mosaic standard, meanwhile, requires the plaintiff to "present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful retaliation against the employee." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023). Regardless of approach, none of Plaintiff's Title VII retaliation survive.

***a. Prima Facie Elements***

The undersigned finds as a general matter that Plaintiff cannot satisfy the prima facie elements with respect to *any* of his retaliation claims.

Recall that only one of the properly presented employment actions happened before Plaintiff filed his EEOC charge—namely, his 2020 performance review. Let's start there. With respect to that lone action, the undersigned concludes that he hasn't shown he engaged in any precipitating protected activity. To qualify as protected activity shielded by Title VII, a plaintiff's complaints "must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." *Little v. United Technologies*, 103 F.3d 956, 959 (11th Cir. 1997) (citation omitted). Moreover, the plaintiff "must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented." *Id.* (emphasis in original). Objective reasonableness is measured against existing substantive law. *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1351 (11th Cir. 1999).

Although Plaintiff regularly complained about what he perceived to be harassment and mistreatment at work before he received the 2020 performance review, he has failed to demonstrate that he had an objectively reasonable belief that Defendant acted unlawfully. There is, to start, no evidence that any of the relevant decisionmakers harbored or was motivated by unlawful reasons. The discussion above touched on that deficiency. Nor did Plaintiff's workplace approximate a hostile work environment. He encountered only sporadic remarks from coworkers

about his race and/or national origin during his ten-year employment, none of which came with threats or physical intimidation. And, as he himself touts, he continued to be an efficient and productive employee. These points have been or will be fleshed out more in the context of Plaintiff's specific claims.

But suffice it to say for now that Plaintiff's beliefs about the legality of Defendant's actions before he received the 2020 performance review were not well founded. Not only has he failed to present enough evidence to push his claims past summary judgment, but the evidence falls so far short under the prevailing legal standards that it was not objectively reasonable for him to believe that he was the target of unlawful activity.[19] Thus, he didn't engage in protected activity before receiving his 2020 review. *See Clover*, 176 F.3d at 1351 (concluding that the plaintiff didn't engage in protected activity because his belief that workplace conduct created a hostile work environment "misse[d] the mark by a country mile").

Turning now to Defendant's post-charge actions, the undersigned finds that Plaintiff did indeed engage in protected activity before they occurred. He filed an EEOC charge—that gets him past the first prima facie element. *See Birdyshaw v.*

[19] Plaintiff seems to have either missed this crucial point or come close to conceding that he's come up short. In his brief, he insists that he "honestly believed in good faith" that Defendant acted unlawfully. (Doc. 51 at 23). But to repeat, a good-faith subjective belief is *not enough* to qualify a complaint for protected activity. *See Little*, 103 F.3d at 960. The belief must *also* be objectively reasonable under the existing substantive law. *See Clover*, 176 F.3d at 1351. Plaintiff hasn't shown as much and, apart from some string cites, he doesn't even attempt to. *See United States v. Batista*, 558 F. App'x 874, 877 (11th Cir. 2014) (noting that courts "routinely decline to address" cursory arguments made only with string cites).

*Dillard's Inc.*, 308 F. App'x 431, 436 (11th Cir. 2009) (observing that filing an EEOC charge is statutorily protected activity under Title VII's participation clause); *Adams v. Cobb Cnty. Sch. Dist.*, 242 F. App'x 616, 621 (11th Cir. 2007) (same). Here, however, Plaintiff encounters another critical shortcoming—he can't show that the five post-charge actions at issue were causally connected to the EEOC charge filing.

He filed his charge on April 8, 2021. But the post-charge actions he complains about happened in August 2021 (PIP), September 2021 (Shoemake's termination warning), December 2021 (2021 performance review), July 2022 (Oliver's termination warning), and November 2022 (termination). Calendar math tells us that these actions occurred between four and nineteen months after he filed his EEOC charge. Such remoteness in time between a plaintiff's protected activity and subsequent employment actions cannot sustain a prima facie causal connection. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (explaining that temporal proximity must be "very close" to establish causation, and concluding that a three-to-four month gap is "not enough"); *accord Ivey v. Crestwood Med. Ctr.*, No. 23-11936, 2024 WL 1269765, at *2 (11th Cir. Mar. 26, 2024) (finding that a "nearly-three-month gap" between protected activity and an adverse employment action is not enough to sustain a causal connection).

The bottom line is that Plaintiff can't make out a prima facie case as to any of his Title VII retaliation claims.

***b. Pretext and Circumstantial Mosaic***

But even if Plaintiff satisfied the prima facie elements, he still hasn't shown that the six actions at issue were motivated by an unlawful retaliatory intent.

*First*, for reasons already stated when discussing Plaintiff's discrimination claim, he cannot show that his 2020 performance review was unlawfully motivated. Defendant presented a legitimate rationale for the subpar review. Meanwhile, there is no evidence that it acted pretextually. There is, in short, just as little evidence to suggest retaliation as discrimination. *See Stevenson v. City of Sunrise*, No. 20-12530, 2021 WL 4806722, at *10 (11th Cir. Oct. 15, 2021) ("Where a plaintiff fails to show pretext as to a discrimination claim, 'that conclusion applies with equal force to [that plaintiff's] retaliation claim' based on the same employer conduct" (quoting *Smelter v. S. Home Care Servs. Inc.*, 904 F.3d 1276, 1293 (11th Cir. 2018)).

*Second*, Campbell had a legitimate reason to place Plaintiff on the PIP in August 2021. It was the same reason Oliver issued a subpar 2020 performance review—Plaintiff exhibited poor teamwork and leadership. There are no suspicious circumstances surrounding the PIP. For instance, the PIP did not fall closely on the heels of Plaintiff's complaints, it didn't hinge on novel or shifting reasons, and there is no evidence that Campbell—the person responsible for issuing the PIP—ever said or did anything to suggest he was being dishonest or was motivated to retaliate. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts

do not sit as a super-personnel department that reexamines an entity's business decisions . . . . Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior." (quotation marks omitted)).

*Third*, Shoemake had a legitimate reason to warn Plaintiff in September 2021 that he could be fired if he regressed. Let's assume—charitably, and without deciding—that Shoemake's warning constituted an adverse action. *Cf. Williams-Evans v. Advance Auto Parts*, 843 F. App'x 144, 149 (11th Cir. 2021) ("[A] threat of termination, without more, is not a 'materially adverse' employment action [for retaliation purposes]."). Even so, for the reasons described in the preceding paragraph, the PIP and Shoemake's concomitant warning had a legitimate rationale and there is simply no evidence that Shoemake lied or was motivated to retaliate.

*Fourth*, Oliver had a legitimate reason to issue Plaintiff another subpar performance review in 2021. The reason—the same as the year before—was that Plaintiff continued to, in Oliver's words, have trouble "function[ing] as a peer leader and collaborat[ing] with all of his teammates to resolve issues." (Pl. Dep. Exh. 20, Bates No. RaceTrac000108). Again, just as with the 2020 performance review, Plaintiff failed to present evidence that Oliver acted pretextually and unlawfully.

*Fifth*, Oliver had a legitimate reason to warn Plaintiff in July 2022 that he could be terminated if he didn't improve his leadership and workplace relationships. Assuming again that the warning was an adverse action, evidence shows that Oliver

acted for the same reasons cited in Plaintiff's 2020 performance review, his 2021 performance review, and the PIP. Specifically, Plaintiff's "challenges in serving as a peer leader," including his inability to show patience with his teammates and managers, or to build strong relationships at the workplace. (Pl. Dep. Exh. 2). Here again, there is no evidence that Oliver lied or wanted to retaliate against Plaintiff.

*Sixth*, and lastly, Lukas had a legitimate reason to terminate Plaintiff's employment in November 2022. As Lukas testified, he eliminated all remaining NOC technicians after the company implemented several technological improvements. The changes were motivated by legitimate business reasons, they took years to complete, and they eliminated large portions of Plaintiff's work. Plaintiff admits all this. And he wasn't the only employee let go—the entire NOC team, which included a White technician, was disbanded. Moreover, nothing suggests that Lukas even knew about Plaintiff's many complaints when he eliminated the NOC team. *See Martin v. Fin. Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1050 (11th Cir. 2020) (explaining that a plaintiff cannot sustain a retaliation claim without evidence that the decisionmaker knew about his complaints). Nor is there any other evidence that Lukas was motivated to retaliate against Plaintiff.

With respect to Plaintiff's Title VII retaliation claims, then, here's where things stand. Of the six discrete claims that have been properly presented, none survive under *McDonnell Douglas*. Plaintiff hasn't shown that his pre-charge

complaints qualified as protected activity, nor that the filing of his EEOC charge prompted the post-charge actions. So he cannot make out any prima facie showings. Separately, in any event, Plaintiff hasn't presented evidence that Defendant's legitimate explanations were pretextual and that retaliation was the but-for cause of Defendant's actions. Moreover, when examined as a whole, the collected evidence does not exhibit a mosaic of unlawful retaliation. *See Tsavaris v. Savannah Law Sch., LLC*, 847 F. App'x 634, 642 (11th Cir. 2021) (concluding that the plaintiff failed to present a convincing mosaic to survive summary judgment for the same reasons she failed to establish pretext). Accordingly, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to all of Plaintiff's Title VII retaliation claims in Count IV.

***iv. Title VII Summary***

A lot has been said up to this point, so a quick look back might be helpful before moving on to Plaintiff's § 1981 claims. First, because his EEOC charge was untimely, he failed to exhaust administrative remedies under Title VII with respect to all but one pre-charge employment action—*i.e.*, his 2020 performance review. As to that performance review, he hasn't made out prima facie showings of either discrimination (no comparators) or retaliation (no protected activity). Moreover, he hasn't rebutted Defendant's legitimate explanation for the subpar review or otherwise presented circumstantial evidence suggesting that Defendant intended to

discriminate or retaliate against him.

Separately, although Plaintiff didn't exhaust his remedies with respect to several post-charge employment actions, the undersigned has considered his corresponding Title VII retaliation claims because courts are loath to bar claims on procedural grounds alone, and the claims may be understood to have arisen out of his charge. The trouble for Plaintiff, however, is that he hasn't plausibly shown that the post-charge actions were causally connected to his charge filing, that Defendant acted pretextually, or that retaliation was a determinative influence on the employment actions at issue. For these varied reasons, Defendant is entitled to summary judgment on Plaintiff's Title VII claims in Counts I, II, and IV.

***B. Section 1981***

That brings us to Plaintiff's § 1981 discrimination (Count III) and retaliation (Count V) claims. Although Title VII and § 1981 claims are generally reviewed the same way, there are some key differences that should be addressed before advancing.

***i. Preliminary Matters***

Title VII and § 1981 both outlaw kinds of employment discrimination. But there are key differences, two of which are noteworthy—one cuts in Plaintiff's favor, the other against him. To begin, a plaintiff is not required to exhaust his administrative remedies before bringing a § 1981 claim in federal court. *See Price v. M&H Valve Co.*, 177 F. App'x 1, 9 (11th Cir. 2006). So, the exhaustion discussion

above—which had the effect of barring most of Plaintiff's discrimination claims—has no bearing here. There is no administrative hurdle to clear. In the abstract, that helps him. On the other hand, however, § 1981 only prohibits employment discrimination based on race, *not* national origin. *See* 42 U.S.C. § 1981(a)[20]; *Tippie v. Spacelabs Med., Inc.*, 180 F. App'x 51, 56 (11th Cir. 2006) ("By its very terms, § 1981 applies to claims of discrimination based on race, not national origin."). That means evidence related solely to Plaintiff's national origin—for example, workplace remarks, workplace complaints, or comparator evidence—isn't relevant here.[21] Section 1981's comparatively narrow scope thus hives off some evidence, making it harder for him to present a triable issue. Alright, let's move on.

***ii. Discrimination***

Plaintiff claims that he experienced a racially hostile work environment, and that he experienced several discriminatory adverse actions.

---

[20] The statue provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." 42 U.S.C. § 1981(a).

[21] The undersigned recognizes that "the line between national origin discrimination and racial discrimination is an extremely difficult one to trace." *Bullard v. OMI Ga., Inc.*, 640 F.2d 632, 634 (5th Cir. 1981). Even so, Plaintiff's arguments and the record he developed demonstrate that his principal complaint is that he was discriminated against based on his Haitian national origin. To be sure, he has presented some arguments and evidence to support his race-discrimination claims, which will be addressed momentarily. But the thrust of Plaintiff's case points to national-origin rather than race discrimination, as evinced by his alleged harassment (mostly concerning his Haitian origin rather than his race), his workplace complaints (mostly alleging national-origin discrimination), and his proposed comparators (both Black).

***a. Hostile Work Environment***

Whether viewed under Title VII or § 1981, a workplace is considered unlawfully "hostile" when it is "permeated with discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations omitted); *see also Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir. 2009) (noting that hostile-work-environment claims under Title VII and § 1981 are reviewed under the same analytical framework). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Even if offensive or derogatory, "sporadic and isolated" comments aren't enough to create a hostile work environment. *See McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008).

Here, Plaintiff has presented only two examples of arguably race-related harassment. He first says that in February 2019, a Black teammate used the word "nigger" when referring to himself in the third person. The teammate did not, to underscore the point, direct the term *at* Plaintiff. *See Yelling*, 82 F.4th at 1336 ("[O]verhearing offensive comments is less severe or humiliating than being the intended target of direct harassment."); *Weatherly*, 2024 WL 2698023, at *9 (observing that objectionable comments are less severe when made neither to nor

about the plaintiff). Next, he says that in 2019, a White teammate several times referred to him as a "Haitian *Ninja*." On its face, that phrase isn't racist. In Plaintiff's view, however, "ninja" oftentimes serves as a euphemism for the word "nigger." The undersigned observes that the context of the remarks runs against his interpretation.

But even crediting Plaintiff's account, these collected incidents—amounting to just a handful of arguably offensive remarks—don't come close to the requisite level of severity. There is no shortage of decisions demonstrating as much. *See, e.g., McCann*, 526 F.3d at 1378–79 (harassment was not severe or pervasive where a White supervisor called a Black employee "girl" and called two Black male coworkers "boys," and the employee's boss twice used the term "nigger"); *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1254 (11th Cir. 2014) (harassment was not severe or pervasive where a Black employee saw his coworkers regularly wear the Confederate flag, saw racist graffiti in the restroom that he used every day, heard people say the term "nigger" a few times, and heard about a noose being left in the breakroom); *Barrow v. Ga. Pac. Corp.*, 144 F. App'x 54, 57–58 (11th Cir. 2005) (harassment was not severe or pervasive where a Black employee saw displays of the rebel flag on tool boxes and the letters "KKK" on a bathroom wall, a coworker had a noose hanging in his locker, his supervisor called him "nigger" and threatened to "cut" him, a superintendent called him "nigger" three times and told him multiple times that he would kick his "black ass," and another superintendent called him

"black boy" one time).[22]

To sum up, the record includes very little evidence of any race-related harassment that is actionable under § 1981. And that evidence would not allow a reasonable jury to find in Plaintiff's favor.[23] Thus, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's § 1981 hostile-work-environment claim in Count III.

---

[22] To be clear, *even if* the additional evidence of alleged harassment related to Plaintiff's national origin were considered, his § 1981 hostile-work-environment claim would *still* fail. Remember, such evidence—which happened over a decade—includes Oliver's statement that "Haitians love to work," occasional jokes about Plaintiff's Haitian accent, a joke about placing the Dominican flag on his desk, an unsolicited introduction to a Dominican vendor, and a reference to the 2010 Haitian earthquake. These incidents were infrequent, insensitive or clownish (but not severe), and non-threatening. Their inclusion does not change the result, as demonstrated by the cases cited above. Although Plaintiff complained about a teammate flipping a knife in the office and several others using curse words, these incidents had nothing to do with Plaintiff's race or national origin. So they are not considered. *See Jones v. UPS Ground Freight*, 683 F.3d 1283, 1297 (11th Cir. 2012).

[23] Circling back briefly to the Title VII discussion, the undersigned ties the knot on a couple additional points. First, for the reasons just discussed above and in the prior footnote, Plaintiff's Title VII hostile-work-environment claim would fail *even if* it were not administratively barred. *See Bryant*, 575 F.3d at 1296 n.20 (noting that hostile-work-environment claims under Title VII and § 1981 are reviewed under the same analytical framework). Recall that the undersigned previously concluded that he failed to administratively exhaust such a claim because he didn't cite any timely harassment in his EEOC charge. But for the reasons just discussed, the claim fails in any case, even if not administratively barred. Second, as alluded to previously in the Title VII retaliation discussion, the undersigned finds that Plaintiff's hostile-work-environment claim—inclusive of *all* alleged harassment, whether based on race or national origin—falls so far short of the prevailing legal standard that his related workplace complaints did not constitute protected activity. *See Clover*, 176 F.3d at 1351; *Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005) (concluding that the plaintiff did not have a reasonable belief she was being discriminated against and therefore did not engage in protected activity where "almost all of [her] complaints had no relationship to race; rather, they stemmed from a personality conflict [with a co-worker]").

***b. Adverse Actions***

Next, Plaintiff claims that the following six employment actions were racially discriminatory: (1) his 2020 performance review; (2) his 2021 performance review; (3) the PIP; (4) Shoemake's termination warning; (5) Oliver's termination warning; and (6) his termination. These actions should be familiar by now, as they have all been discussed and scrutinized at least once already.

Discrimination claims asserted under § 1981 generally "are subject to the same standards of proof and employ the same analytical framework" as Title VII claims.[24] *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 & n.5 (11th Cir. 2023). In other words, a plaintiff must successfully navigate the *McDonnell Douglas* burden-shifting framework or otherwise present a convincing mosaic of intentional discrimination. *See Jenkins v. Nell*, 26 F.4th 1243, 1249–50 (11th Cir. 2022). As a reminder, the burden-shifting framework requires the plaintiff to start out by presenting prima facie evidence that (1) he belongs to a protected class, (2) he

---

[24] The qualifier "generally" is used here for two reasons. To start, because § 1981 requires a showing of "but-for" causation, mixed-motive claims are not available under § 1981. *See Phillips*, 87 F.4th at 1321 (citing *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 40 S. Ct. 1009, 1019 (2020)). That means discrimination claims under § 1981 share an analytic framework *only* with the single-motive type of Title VII discrimination claims. *Id.* Next, as previously noted, *see supra* Note 15, the Supreme Court in *Muldrow* recently clarified the adverse-action requirement for Title VII discrimination claims. It is at least possible, then, in the wake of *Muldrow*, that the adverse-action requirements under Title VII and § 1981 are no longer entirely aligned. But that is doubtful. The undersigned expects that the Eleventh Circuit or Supreme Court will at some point officially extend *Muldrow* to § 1981 discrimination claims (*Muldrow*'s reasoning and the plain text of § 1981 seem to make such an extension likely).

experienced an adverse employment action, (3) he was qualified to perform the job, and (4) his employer treated similarly situated employees outside his class more favorably. *McDonnell Douglas*, 411 U.S. at 802; *Lewis*, 918 F.3d at 1220–21.

Plaintiff's § 1981 discrimination claims fail for several reasons, but the first problem is the same one encountered above—he hasn't presented any valid comparators. A comparator must be someone outside the plaintiff's protected class who is similarly situated in all material respects. *See Lewis*, 918 F.3d at 1224. As earlier discussed, however, both of Plaintiff's purported comparators are—like him—Black. For § 1981 purposes, then, they are not outside of his protected racial class and cannot fit the bill. Plaintiff can't satisfy the final prima facie element with respect to his § 1981 discrimination claims, and the claims all fail as a result. *See id.* at 1218.

But continuing on for completeness, his § 1981 discrimination claims also come up short for the reasons discussed in the context of his Title VII retaliation claims. Defendant has presented legitimate explanations for the challenged employment actions—its explanations relate each time to Plaintiff's poor teamwork and leadership—yet he has failed to show that Defendant acted pretextually. And there is simply no evidence that the relevant decisionmakers ever harbored or acted on racially discriminatory motives. To quickly recap, here's what the record shows. Plaintiff's direct manager (Oliver) and senior manager (Fitzhugh) were both Black.

Neither—nor anyone else in Defendant's chain of command, for that matter—ever made any racially offensive remarks. What's more, even on the most charitable rendering, only a handful of such remarks were made during Plaintiff's entire decade-long tenure. But those remarks were made by just two teammates (one of whom was himself Black), and there is no sign that either teammate had any influence on the employment actions at issue. Plaintiff hasn't presented any valid comparators, and the record is likewise empty of any other evidence (*e.g.*, "me-too" or statistical) tending to show that Defendant treated non-Black employees more favorably. What the evidence *does* show is this: management repeatedly chided Plaintiff, over several years, for his poor teamwork and leadership. *That* is the conspicuous throughline connecting the relevant events.

With the preceding in mind, Plaintiff cannot survive summary judgment under either the *McDonnell Douglas* framework or the mosaic approach. Thus, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's § 1981 discrimination claims in Count III.

***iii. Retaliation***

Finally, Plaintiff claims that the six employment actions discussed immediately above and throughout this report were retaliatory, this time in violation of § 1981. The same analysis applies here as it did under Title VII. *See Gogel v. Kia Motors Manuf. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (*en banc*)

("Retaliation claims are also cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims."). Ditto for the outcome. The claims all fail. The short version is that Plaintiff hasn't made out the requisite prima facie showings, hasn't shown that Defendant acted pretextually, and, moreover, hasn't otherwise presented enough evidence to suggest that Defendant would not have acted but for his complaints. Accordingly, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** as to Plaintiff's § 1981 retaliation claims in Count V.

***iv. Section 1981 Summary***

Taking stock, Plaintiff's § 1981 claims fare no better than his Title VII claims. Although administrative exhaustion poses no obstacle here, he hasn't presented enough evidence to advance his claims to a jury. The minimal evidence of (arguably) race-related comments under consideration did not create an objectively hostile work environment. And there is no hint that unlawful discriminatory or retaliatory intent served as a determinative influence on Defendant's employment actions. Those actions were legitimately explained, yet Plaintiff hasn't shown that the relevant decisionmakers were dishonest or unlawfully biased against him. In the end, whether sifted through the burden-shifting framework or viewed in the aggregate, the evidence simply cannot support an inference in his favor. Therefore, for multiple independent reasons, Defendant is entitled to summary judgment on Plaintiff's

§ 1981 claims in Counts III and V.

## IV. CONCLUSION

For the reasons above, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment, (Doc. 47), be **GRANTED** in full. The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

IT IS SO **RECOMMENDED** on this 21st day of June 2024.

R. Cannon
REGINA D. CANNON
United States Magistrate Judge