IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**FABRICE LENORD,**

    **Plaintiff,**

**v.**

**RACETRAC, INC.,**

    **Defendant.**

**CIVIL ACTION FILE**

**No. 1:22-CV-04423-SCJ**

## O R D E R

This matter is before the Court on the Magistrate Judge's Report and Recommendation ("R&R"). Doc. No. [61]. [1] The R&R recommends that Defendant's Motion for Summary Judgment be granted. Plaintiff has filed Objections (Doc. No. [64]), and Defendant has filed a response to the Objections (Doc. No. [67]). Therefore, the matter is fully briefed and ripe for consideration by this Court.

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

**I. STANDARD OF REVIEW**

To challenge the findings and recommendations of the Magistrate Judge, a party must file with the Clerk of Court written objections which "shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis of the objection." Heath v. Jones, 863 F.2d 815, 822 (11th Cir. 1989). If timely and proper objections are filed, the district court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). The portions of an R&R to which no objection is made are reviewed for clear error only. Macort v. Prem, Inc., 208 F. App'x 781, 784 (11th Cir. 2006).

Because the underlying motion addressed by the R&R is for summary judgment, the Court will also include the standard of review applicable to a motion for summary judgment. Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is "'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen

v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). And a factual dispute is "genuine" if the evidence would allow a reasonable jury to find for the nonmovant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The movant bears the initial burden of showing the court, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).

The movant meets its burden merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." Celotex Corp., 477 U.S. at 325. In determining whether the movant has met this burden, the district court views the evidence and all factual inferences in the light most favorable to the non-movant. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

Once the movant has adequately supported its motion, the non-movant then has the burden of showing specific facts of a genuine dispute that render summary judgment improper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court resolves all reasonable doubts and draws all justifiable inferences in the non-movant's favor. Fitzpatrick v. City of Atlanta,

2 F.3d 1112, 1115 (11th Cir. 1993). In addition, the court "avoid[s] weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 848 (11th Cir. 2000). When the record could not lead a rational trier of fact to find for the non-movant, there is no genuine dispute for trial. See Fitzpatrick, 2 F.3d at 1115–16.

## II. BACKGROUND

### A.    Facts

There are no objections to much of the Factual Background section of the R&R; therefore, the Court has included the uncontested content of that section below. For the most part, the Magistrate Judge drew the facts from the Parties' Statements of Material Facts—Defendant's Statement of Material Facts ("DSMF") (Doc. No.[47-2]) and Plaintiff's Statement of Material Facts ("PSMF") (Doc. No. [51-1]).

Plaintiff is a Black man who was born in Haiti. He started working for Defendant, a company that operates service stations throughout the southeast, as a help-desk analyst in 2012. DSMF ¶ 1; PSMF ¶ 16. By 2015 he had been promoted to a Level II technician in the company's Network Operating Center ("NOC"), where he helped resolve network-connectivity issues at Defendant's corporate

4

headquarters and retail locations. DSMF ¶¶ 2–3; PSMF ¶ 16. On November 30, 2022, after redesigning its network systems, Defendant closed the NOC and terminated Plaintiff's employment. DSMF ¶¶ 25, 60–61.

The following are individuals in Defendant's chain-of-command:

• John Lukas (white) – Vice President of Information Systems and Technology

• Mike Campbell (white) – Executive Director of Enterprise, Architecture, and Standards

• Chris Shoemake (white) – Director of Store Systems Support

• John Sprayberry (white) – Director of IT Operations and Support

• Winston Fitzhugh (Black) – Senior NOC Manager

• Greg Oliver (Black) – NOC Manager and Plaintiff's immediate supervisor

Doc. No. [45-1] ("Grubbs Dep.") at 19–22, 62–63, 99, 109–11, 146–48, 155; Doc. No. [46-1] ("Lukas Dep.") at 5.

### 1. Harassment and Complaints

As far back as 2016, Plaintiff complained to management and the Human Resources ("HR") department about what he perceived to be workplace

5

misconduct and mistreatment. Doc. No. [44-2] ("Pl. Dep."), Ex. 4.[2] For instance, in March 2016, he protested because he felt overworked and unfairly treated, while two NOC teammates were "goofing off" and sleeping on the job. Id. In September 2017, he complained after Oliver instructed him to find his own replacement coverage for any absences on Sundays. DSMF ¶ 7; Pl. Dep., Ex. 6. And when HR got involved, he reported that a Black teammate had been playing with a knife in the office for more than a year. DSMF ¶ 7; Pl. Dep. at 24–25, Ex. 6. In November 2017, Plaintiff complained and went home because he believed someone had unplugged his computer monitor and disheveled his desk. PSMF ¶ 43; Pl. Dep., Ex. 8.

In February 2019, Plaintiff complained that another Black teammate had used offensive language during a team meeting. DSMF ¶ 9. In his email to management, Plaintiff alleged that the teammate had "used a racial slur 'f*** that N****['] towards me. [sic]." Pl. Dep., Ex. 9. At his deposition, Plaintiff clarified that rather than directing profanity at him, as his email had suggested, the

---

[2] Defendant filed Plaintiff's deposition transcript and the corresponding exhibits as two separate documents. Doc. Nos. [44-1]; [44-2]. The documents are referred to collectively as "Pl. Dep."

teammate instead haddescribed his own impressions after he believed Plaintiff

had ignored his phone call. DSMF ¶ 9. Plaintiff explained:

> The phrase was—[the teammate] said he called me. I didn't answer my
> phone. This is after I left work and [the teammate] said [at the meeting],
> "It's like Fab [Plaintiff] said, 'Fuck this nigger.'"

Pl. Dep. at 109. In other words, the teammate was not using a slur to describe

Plaintiff, but was referring to himself in the third person while recounting an

incident. DSMF ¶ 9.

In any event, Sprayberry investigated the complaint and determined that

the allegation was unfounded. DSMF ¶ 10; Pl. Dep. Ex. 10. According to

Sprayberry, the teammate denied making the statement and three others present

at the meeting corroborated that account. Pl. Dep. Ex. 10. After speaking with

Plaintiff, Sprayberry summarized the conversation in an email, pointing out to

him that "there is a prevailing perception amongst your teammates that you look

for conflict, that you do not want to work with them and that you want to keep

to yourself as much as you can." Id. Sprayberry concluded his communication

by underscoring that Plaintiff must "figure out a way to work better with [his

teammates] and that a drastic improvement is needed immediately." Id.

In October and November 2019, Plaintiff met with HR to again report frustrations with Oliver and his NOC teammates. DSMF ¶¶ 12, 16. He complained about several issues, including work assignments, teammates sleeping on the job, the just-described February 2019 incident, and past comments and jokes about his national origin. Id. For instance, according to Plaintiff, before Oliver became NOC manager, he remarked that "Haitians love to work." Id. ¶ 16. He added that teammates occasionally made fun of his Haitian accent, once referred to the catastrophic 2010 earthquake in Haiti, and introduced him to a Dominican vendor for no apparent reason (even though, Plaintiff explained, Haiti and the Dominican Republic have had a violent relationship). Id. ¶ 12; PSMF ¶ 42; Pl. Dep. at 119–24.

Someone even joked one time about placing a Dominican flag on his desk. DSMF ¶ 16. By Plaintiff's admission, however, only the flag comment had occurred after 2016. Pl. Resp. to DSMF ¶ 16 (Doc. No. [52]); Pl. Dep. at 118–23.

HR investigated the allegations, interviewing nine individuals including Plaintiff, Oliver, Fitzhugh, and several other NOC technicians. DSMF ¶ 13. HR found no evidence that he had been discriminated against. Id. ¶ 15; Doc. No. [47-3]. In fact, several teammates reported that Plaintiff himself caused conflict in the

NOC. DSMF ¶ 15. At any rate, in December 2019, HR arranged for the entire NOC team (including Plaintiff) to undergo professional conduct training to address issues such as workplace conduct, accountability, and performance expectations. Id. ¶ 18.

Later, during a team meeting in August 2020, Plaintiff and Oliver disagreed over work protocols. Id. ¶ 27. Throughout their exchange, Oliver called Plaintiff "bro," "big dog," and a "smart ass." Pl. Dep. at 139, 145–48. Plaintiff met with Oliver and Fitzhugh to discuss the incident. DSMF ¶ 28. Oliver apologized. Id. Several days later, Plaintiff emailed Fitzhugh and Campbell to again report the incident together with what he believed was general disparate treatment based on his race and nationality. DSMF ¶ 29; Pl. Dep., Ex. 14. According to him: "[B]ecause I'm a Haitian I'm consistently being insulted, look down up on, making fun of because of my accent, my spelling, my tone, they are not being sensitive to my work ethics, my culture . . . . I don't think [Oliver] or the team respects me as a black life." Pl. Dep., Ex. 14.

To support his discrimination complaint, Plaintiff referred specifically to a white teammate who, in his words, had called him a "Haitian N****" several times the year before, in 2019. DSMF ¶¶ 30, 32; Pl. Dep., Ex. 14. At his deposition,

however, Plaintiff admitted that his teammate had called him "Haitian Ninja," not "Haitian Nigger," as his email stated. Pl. Dep. at 117, 126–29, 149–53. A text message produced during discovery provides some context—after completing a work task, the white teammate texted Plaintiff: "Excellent. Just the way I like it. Flying under the radar. Just call me a Haitian Ninja in training." DSMF ¶ 33; Pl. Dep., Ex. 15. Notably, in an unsent email draft, Plaintiff had originally used the word "Ninja" rather than the elliptical term "N****." DSMF ¶ 31; Pl. Dep., Ex. 13. But for some reason he changed the wording in the email sent to Fitzhugh and Campbell. Pl. Dep. at 149–50. Fitzhugh expressed frustration with Plaintiff's portrayal of events but confided to HR that "it really might just be a foundational language barrier." Grubbs Dep., Ex. 4.

HR met with Plaintiff and investigated his allegations but could not substantiate his discrimination claims. DSMF ¶¶ 34–35; Grubbs Dep. at 53. Fitzhugh, Campbell, and HR discussed the possibility of terminating Plaintiff's employment at that time because his mistrust and poor collaboration had become a distraction, but they decided to give him a chance to move forward. Id. at 225, Ex. 5.

In October 2020, Plaintiff met with Fitzhugh, Campbell, and HR to discuss his conflicts with the NOC team. DSMF ¶ 36. Campbell urged him to be a "team player," advising that his unsubstantiated complaints negatively affected his workplace relationships. Id. ¶ 37. Campbell also warned Plaintiff that if he did not commit to being a team player it could result in termination. Doc. No. [47-5] Ex. H; Doc. No. [48], Ex. H at 00:12:07–00:12:20. Campbell explained, however, that he was not directing Plaintiff not to report discriminatory treatment, only that he must cooperate with any ensuing investigations to substantiate his claims. DSMF ¶ 38. When Campbell noted that NOC team members had not corroborated his past allegations, Plaintiff suggested that "the whole team is in on it." Id. A day after the meeting, Fitzhugh emailed Plaintiff a recap, reiterating that his allegations "could not be verified or corroborated." Pl. Dep., Ex. 16. And Fitzhugh echoed Campbell's sentiment from the day before: "Being a positive, helpful, and effective NOC team member is critical to the success of the team, department, and organization, and if these expectations are not met, it could result in additional disciplinary action, up to and including termination." Id.

11

On April 8, 2021, Plaintiff filed a charge with the EEOC alleging race and national-origin discrimination as well as retaliation. DSMF ¶ 42; Pl. Dep., Ex. 17. He then continued to file internal complaints. For instance, in February 2022, he reported that others were not providing adequate phone assistance. Pl. Dep., Ex. 27. And a couple months later in April 2022, he reported that a teammate was fabricating his work results. DSMF ¶ 51; Pl. Dep., Ex. 28. In July 2022, Plaintiff and a white teammate had an oral disagreement during a team meeting. DSMF ¶ 52; Pl. Dep. at 45. The teammate used the words "shit" and "fuck" during the exchange. DSMF ¶ 52. Plaintiff promptly exited the meeting and reported the incident to Oliver, who directed the teammate to apologize for the offensive language. Id. ¶¶ 52–53; Pl. Dep., Ex. 29.

In August 2022, Plaintiff received his right-to-sue letter from the EEOC. DSMF ¶ 54. That same month, he emailed HR to describe his "ongoing mistreatment"—specifically from Oliver. Id. ¶ 55; Pl. Dep., Ex. 31. He complained that Oliver had unilaterally changed his job description without notice, unfairly directed him to communicate with and mentor teammates, and then issued him a performance improvement plan ("PIP") when he failed to meet the new, adjusted performance expectations. DSMF ¶ 55; Pl. Dep., Ex. 31.

Plaintiff again claimed discrimination, stating: "It is clear my national of origin (Haitian) is the reason Mr. Oliver has been targeting me and has displayed a different set of rules and job description pertaining to me. [sic]" Pl. Dep., Ex. 31. This time, Defendant hired outside counsel to investigate the allegations. DSMF ¶ 56. But the investigation resulted in the same conclusion—there was no evidence that Plaintiff had been discriminated against. Id.

### 2.    *Performance Reviews, Discipline, and Termination*

Beyond the alleged harassment he endured, Plaintiff insists that Defendant also targeted him with several adverse employment actions—negative performance reviews, a performance improvement plan ("PIP"), and termination.

### a)    <u>Performance reviews</u>

Below are Plaintiff's annual performance ratings from 2017 through 2021 (the last year he received a review):

- 2017 – Sometimes Exceeds Expectations

- 2018 – Sometimes Exceeds Expectations

- 2019 – Above Expectations

- 2020 – Below Expectations

13

- 2021 – Below Expectations

Pl. Dep., Ex. 20. Oliver issued each rating.

In 2020 and 2021, the two years about which Plaintiff complains, Oliver noted Plaintiff's poor teamwork and leadership. In 2020, for instance, Oliver explained: "[Plaintiff] ha[s] issues with working with his team which is highly necessary for our NOC team to do everyday. The NOC Tech 2 is expected to help train, mentor, and assist NOC Tech 1 team members. . . . Due to this deficiency, [he] is not meeting a key expectation of his role." Id., Bates No. RaceTrac000105.

Oliver added that Plaintiff "does help and resolve issues that others have worked on and didn't complete, but the other side of team work where he can teach and mentor others needs improvement. I know his relationships with the team isn't the best and that holds up his progress for improving his leadership skills." Id., Bates No. RaceTrac000107. When awarding the same subpar rating a year later in 2021, Oliver repeated the refrain: "[Plaintiff's] role as a [Level II] NOC Tech has the expectation to function as a peer leader and collaborate with all of his teammates to resolve issues . . . [and] teach his peers how to solve these issues. Throughout the year, [he] was not meeting that expectation fully." Id., Bates No. RaceTrac000108. Oliver had voiced the same concerns when

14

completing his 2018 and 2019 performance reviews, though Plaintiff does not allege those earlier reviews were improperly motivated. DSMF ¶ 19.[3] Despite his poor reviews in 2020 and 2021, Plaintiff still received annual raises. Id. ¶¶ 41, 51. In fact, from at least 2019 through his termination in 2022, Plaintiff was the highest paid NOC technician. DSMF ¶ 20.

Although Plaintiff was terminated before he could receive a 2022 performance review, Oliver again admonished him in July of that year for poor leadership. Pl. Dep., Ex. 2. Plaintiff apparently continued to complain about teammates using curse words in meetings, even after the conduct had been addressed. Id. Following a discussion, Oliver urged him to show patience and build relationships with his peers. Id. In Oliver's view, however, Plaintiff "continue[d] to exhibit behaviors that d[id] not comport with [the] expectations of a NOC Tech II." Id. For instance, according to Oliver, rather than trying to get

---

[3] In Plaintiff's 2018 review, Oliver wrote: "I would like for [Plaintiff] to share more of his knowledge with the lower NOC techs to help build their skills in troubleshooting. [He] has the knowledge and skills to be a leader. I would like for him to be more vocal and interactive with the team." Pl. Dep., Ex. 20, Bates No. RaceTrac000409. And in Plaintiff's 2019 review, Oliver stressed the same point, noting under "Areas of Improvement" that Plaintiff "can work on his relationships with his team members. . . . I would also like for [him] to work on being more vocal." Id., Bates No. RaceTrac000413.

along with and mentor his teammates, Plaintiff insisted on publicly airing work-assignment disputes (rather than working directly with peers for resolution), tracking his teammates' time and attendance, "going behind [them] and checking their work, [and] trying to manage the[ir] performance." Id. After reminding Plaintiff that similar issues had been addressed "multiple times before," Oliver warned that the next disciplinary action would be termination. Id.    **PIP**

In August 2021, Plaintiff met with Campbell and Shoemake. Id. ¶ 46. Campbell explained that he wanted to develop a plan to improve Plaintiff's soft skills, and on August 18, 2021, he placed Plaintiff on a PIP to address his workplace leadership and communication. Id. ¶¶ 46–47; PSMF ¶ 7; Pl. Dep., Ex. 21. There is no dispute that Plaintiff was a technically proficient and productive employee. But the PIP listed leadership and communication as two "Areas of Concern." Pl. Dep., Ex. 21. The PIP directed him to "[p]rovide support/mentorship," "be more vocal in team meetings," "communicate with [his] teammate[s]," and "[h]elp train/mentor NOC Tech I" teammates. Id. Over the next several weeks, Plaintiff met each week with Shoemake and Oliver to monitor and discuss his progress. DSMF ¶ 47; Pl. Dep., Ex. 26.

In September 2021, Defendant took Plaintiff off the PIP. DSMF ¶ 49. Shoemake praised his progress but warned him that regression could result in discipline, up to and including termination. Id. Although he showed improvement during the PIP period, as noted above, Plaintiff still received a "Below Expectations" rating for the year based on his deficiencies in collaboration and leadership skills. Pl. Dep. Ex. 20.

### b) <u>Termination</u>

In February 2020, Defendant hired Lukas as Vice President of Information Systems and Technology; his purpose was to assess and overhaul the company's network systems. DSMF ¶¶ 21–23. He identified several processes, specifically with respect to Defendant's many retail store locations, that he believed could be streamlined and improved. Id. ¶ 23. By the third quarter of 2020, Lukas began implementing an automation strategy to improve the company's organizational capabilities. Lukas Dep. at 20–21. As relevant here, the strategy involved three major elements designed to aid with store support: (1) updated hardware, which reduced the number of connection outages; (2) redundant network connections, which provided back-up when outages occurred; and (3) remote hardware imaging, which allowed outsourced field technicians—rather than centralized

17

NOC staff—to program replacement hardware. DSMF ¶ 25. Together, these changes significantly reduced the NOC's workload. Id. ¶ 26.

In October 2022, in light of the changes, Lukas decided that the NOC team was no longer necessary. Id. ¶¶ 58–59. In his view, any residual connection-support work could be distributed across other positions and outside partners. Id. ¶ 59. As a result, he implemented a "reduction in force." Id. On November 30, 2022, Defendant officially eliminated the NOC team. Id. ¶ 60; PSMF ¶ 2. Plaintiff and two others (one of whom was white)—the last remaining NOC technicians— were terminated. DSMF ¶ 60. Defendant did not offer Plaintiff another position in the company, but he nevertheless applied for an HR-related position after termination. Id. ¶ 61; PSMF ¶¶ 51, 54. Defendant, however, chose an in-house candidate familiar with its HR software who had administrative experience. DSMF ¶ 61.

### B.    <u>Procedural History</u>

Plaintiff filed a charge with the EEOC on April 8, 2021, alleging race and national-origin discrimination as well as retaliation. Pl. Dep., Ex. 17. He claimed that—based on his race, Haitian origin, and/or his regular complaints—he had been harassed and given a poor performance review. Id.

18

Plaintiff's charge narrative is presented here in full:

I began my employment with [Defendant] on October 15, 2012, with my most recent position as a Network Technician. For the past 4 years, since Greg Oliver, Manager, became my supervisor I have been harassed, called racist names and have been written up twice. On or about February 1, 2019, and continuing I have complained to Directors, senior managers and human resources but the harassment and hostile environment has continued. I complained again on or about August 1, 2020, to management and I was given a substandard appraisal. On or about October 1, 2020, I was told by senior management that if I made anymore "baseless" claims it could lead to termination. The reason that I was given for my poor appraisal was for leadership. No actions have been taken regarding my complaints. I believe that I have been discriminated against because of my National Origin (Haitian) race (African American) and in retaliation for opposing unlawful employment practices in violation of Title VII.

Id. He received his EEOC right-to-sue letter in August 2022. DSMF ¶ 54.

In November 2022, Plaintiff initiated this action. Doc. No. [1]. In his Amended Complaint, the current operative pleading, Plaintiff asserts the following claims: (1) race discrimination, in violation of Title VII (Count I); (2) national-origin discrimination, in violation of Title VII (Count II); (3) race discrimination, in violation of 42 U.S.C. § 1981 (Count III); (4) retaliation, in violation of Title VII (Count IV); and (5) retaliation, in violation of § 1981 (Count V). Doc. No. [19-1].

Defendant moved for summary judgment on all claims. Doc. No. [47]. Plaintiff filed a response in opposition to Defendant's Motion for Summary Judgment (Doc. No [51]), and Defendant filed a reply in support of its Motion, (Doc. No. [59]).

## III. R&R

In the R&R, the Magistrate Judge recommended that summary judgment be granted on all claims. The basis for the recommendations as to each specific claim are summarized below.

### A.    <u>Title VII Claims</u>

#### 1.    *Exhaustion of Administrative Remedies*

The Magistrate Judge determined that Plaintiff failed to exhaust some of the claims he raised in the Amended Complaint. R&R at 18–24. However, she found that Plaintiff properly exhausted his discrimination claim based on his December 2020 performance review and six retaliation claims based on the following events:

- December 2020 performance review

- August 2021 PIP

- September 2021 termination warning by Shoemake

- December 2021 performance review

- July 2022 termination warning by Oliver

- November 2022 termination.

Id. at 18–24. Accordingly, the Magistrate Judge analyzed only those six discreet actions under the applicable burden-shifting framework. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

Plaintiff raised no objection to the Magistrate Judge's conclusion regarding unexhausted claims. Therefore, the Court has reviewed the determinations based on exhaustion for clear error and finds none.

### 2.    *Discrimination*

The single discrimination claim properly raised by Plaintiff is based on his December 2020 performance review. The Magistrate Judge found that Plaintiff could not make out a prima facie case of discrimination because he could not point to similarly situated employees outside of his class who were treated more favorably. See McDonnell Douglas, 411 U.S. at 802. She analyzed the two comparators cited by Plaintiff—Gerard Peters and Evan Jones—both of whom held the same title and reported to the same manager as Plaintiff. R&R at 27. Despite these basic similarities, the Magistrate Judge determined that Peters and

21

Jones did not engage in the same conduct as Plaintiff and they did not share similar disciplinary histories. Id. at 27 n.17. Accordingly, she found that Peters and Jones were not proper comparators in this case.

Even though she found that Plaintiff failed to make out a *prima facie* case of discrimination, the Magistrate Judge went further and determined that Plaintiff also failed to show that Defendant's proffered reasons for the unfavorable performance review in December 2020 were pretextual. Defendant claimed that Plaintiff had longstanding leadership shortcomings and friction with his NOC teammates. The Magistrate Judge concluded that in rebuttal of those proffered reasons, Plaintiff pointed to no evidence to cast doubt on Defendant's rationale and suggest that Plaintiff was discriminated against. R&R at 30.

As the Magistrate Judge explained, even if Plaintiff cannot prevail under the McDonnell Douglas standard, he could survive summary judgment if there is evidence to reasonably support an inference of intentional discrimination. R&R at 31. Finding that the aggregate evidence was insufficient to support such an inference, the Magistrate Judge recommended that summary judgment be granted in favor of Defendant on Plaintiff's discrimination claim. R&R at 31–32.

22

### 3.    *Retaliation*

Turning to the six discreet claims of retaliation, the Magistrate Judge first determined that Plaintiff could not make out a *prima facie* case based on the December 2020 performance review because, at that time, he had not engaged in any protected activity. R&R at 34. The Magistrate Judge recognized that Plaintiff regularly complained about what he perceived to be harassment and mistreatment at work before receiving the 2020 performance review, but she found that Plaintiff failed to demonstrate that he had an objectively reasonable belief that Defendant acted unlawfully. In fact, the Magistrate Judge points out that Plaintiff, in response to the Motion for Summary Judgment, appeared to concede this point because he argued only that he "honestly believed in good-faith" that Defendant acted unlawfully when Eleventh Circuit authority specifically requires not just a subjective showing but also an objective one. R&R at 34, 35 n.19 (citing Little v. United Technologies, 103 F.3d 956, 959 (11th Cir. 1997)).

With respect to the five actions that occurred after he filed the EEOC charge, the Magistrate Judge properly found that Plaintiff engaged in protected activity. R&R at 35. But, she concluded that he cannot show that any of the actions

23

he complains about were causally connected to the filing of the EEOC charge. R&R at 36. As such, according to the Magistrate Judge, Plaintiff cannot make out a *prima facie* case of retaliation.

As she did with the discrimination claim, the Magistrate Judge went on to consider pretext under McDonnell Douglas as well as the convincing mosaic standard. R&R at 37–40. She concluded that Plaintiff failed to adduce evidence that the proffered reasons given for each of the six instances at issue were pretextual. Id. at 37–39. Finally, the Magistrate Judge concluded that even viewed in the aggregate, the collected evidence in this case fails to exhibit a mosaic of unlawful retaliation. Id. at 40.

### B. Section 1981

#### 1. *Discrimination*

##### a) Hostile work environment

The Magistrate Judge determined that the relatively few offensive remarks related to race cited by Plaintiff are insufficient to rise to the level of severe and pervasive under Eleventh Circuit precedent. R&R at 44. Furthermore, the Magistrate Judge reached the same conclusion even if the additional evidence related to Plaintiff's national origin is considered. Id. at 45 n.22. Therefore, the

Magistrate Judge recommended that summary judgment be granted in favor of Defendant on Plaintiff's hostile work environment claim.

### b)    <u>Adverse actions</u>

The Magistrate Judge analyzed the same six discreet actions that were discussed in the context of Plaintiff's retaliation claim under Title VII. She concluded that Plaintiff cannot prevail under § 1981 for the same reason he could not win under Title VII: he has failed to establish that similarly situated employees were treated differently. <u>Id.</u> at 47. Likewise, the Magistrate Judge found that even if Plaintiff could point to proper comparators, he cannot show that legitimate, non-discriminatory reasons articulated by Defendant for each of the six challenged actions was pretext. <u>Id.</u> And, the Magistrate Judge considered the evidence adduced by Plaintiff in the aggregate and found no inference of discriminatory conduct. <u>Id.</u> at 48. Therefore, the Magistrate Judge recommended granting summary judgment to Defendant on Plaintiff's claims of adverse discriminatory actions.

### 2.    *Retaliation*

Finally, the Magistrate Judge considered the six challenged actions in the context of retaliation under § 1981. She concluded that Plaintiff could not make

25

out a *prima facie* case of retaliation with respect to any of the six, and even if she could, he could not demonstrate pretext. Id. at 49. And viewing the evidence related to the six challenged actions in the aggregate, the Magistrate Judge found that Plaintiff had not presented enough evidence to suggest that Defendant would not have taken those actions but for Plaintiff's complaints. Id. Therefore, she recommended that Defendant's Motion for Summary Judgment be granted as to Plaintiff's § 1981 retaliation claims.

## IV.   PLAINTIFF'S OBJECTIONS

As the party objecting to the R&R, Plaintiff has the burden of specifying with particularity the alleged error(s) made. See Macort, 208 F. App'x at 784 ("It is critical that the objection be sufficiently specific and not a general objection to the report."). To be specific, an objection must refer to particular findings in the R&R and assert the precise basis for objection. Heath v. Jones, 863 F.2d 815, 822 (11th Cir. 1989); Sledge v. PHH Mortg. Corp., No. 1:22-CV-1704-WMR, 2023 WL 2949989, at *2 (N.D. Ga. Jan. 25, 2023). While Plaintiff filed a 25-page document entitled "Objections," the submission contains only a few specific allegations of error by the Magistrate Judge. Doc. No. [64]. The bulk of the filing is a seemingly

26

random recitation of facts, many of which are not even supported with citations

to the record. The Court will address the specific allegations of error below.

### A.    Defendant's Failure to Respond to Plaintiff's Statement of Material Facts

Plaintiff argues that the Magistrate Judge improperly failed to deem the

facts contained in his Statement of Material Facts as admitted. Doc. No. [64] 11–

16. It is true that Defendant did not file a response to Plaintiff's Statement of

Material Facts, which the Magistrate Judge noted. See R&R at 2 n.2. However, the

Magistrate Judge correctly considered those asserted facts but did not deem them

admitted. Unlike Local Rule 56.1(B)(2)(a)(2), which allows the Court to deem each

of the movant's facts admitted if the respondent fails to respond to them in

appropriate ways, the Court cannot simply deem the respondent's [i.e.,

Plaintiff's] additional facts admitted because the movant (i.e., Defendant) did not

respond to them. See N.D. Ga. R. 56.1(B)(3) (requiring movant to respond to

additional facts, but not providing for such facts to be deemed admitted in the

absence of a sufficient response); Rogers v. I D Design, Inc., No. 1:06-CV-2101-

CAP-WEJ, 2009 WL 10668634, at *2 (N.D. Ga. Mar. 6, 2009), R&R adopted, 2009

WL 10670932 (N.D. Ga. Apr. 17, 2009). Therefore, to the extent Plaintiff objects to

the R&R on basis that facts contained in his Statement of Material Facts were not deemed admitted, his objections are **OVERRULED**.

B.    <u>Discrimination Claim: Comparators</u>

Plaintiff objects to the Magistrate Judge's rejection of Peters and Jones as comparators to support his discrimination claim. Doc. No. [64], 7, 10, 11. For the most part,  Plaintiff objects to the Magistrate Judge's conclusion that because Jones and Peters are Black, like Plaintiff, they are inapt comparators to support a race claim. Plaintiff argues that because he is Haitian Black and Jones and Peters are African Americans, they are not of the same race.

The Plaintiff's objection ignores the Magistrate Judge's ultimate reasoning for rejecting Peters and Jones as comparators—Plaintiff's failure to adduce evidence that the two men were similar with respect to the conduct at issue and disciplinary history. R&R at 27. It is true that the R&R notes that Plaintiff cannot rely on Black comparators to support a race discrimination claim because he is Black. <u>Id.</u> at 26. But, the Magistrate Judge recognizes that Plaintiff has also asserted a national origin discrimination claim and that Peters and Jones did not share Plaintiff's national origin. <u>Id.</u> Therefore, she properly considered whether Plaintiff had adduced evidence of the substantial similarity that is required in

28

this Circuit. <u>See</u> <u>Lewis v. City of Union City</u>, 918 F.3d 1213, 1220–21 (11th Cir. 2019). She found that beyond evidence to establish that Jones and Peters held the same title and reported to the same supervisor as Plaintiff, there were <u>no</u> facts regarding Peters's employment or disciplinary history and <u>insufficient</u> facts regarding Jones.

In the objections, Plaintiff points to only two pages from his own deposition in which he described (1) Jones telling Plaintiff that he was not going to undertake leadership responsibilities, and  (2) Jones watching television while on duty. Doc. No. [64], 7. This Court agrees with the Magistrate Judge in concluding that "what little evidence there is does not establish the requisite similarity." R&R at 27 n.17. Accordingly, Plaintiff's objections regarding the Magistrate Judge's rejection of Peters and Jones as comparators are **OVERRULED**.

### C.    <u>Discrimination Claim: Pretext</u>

Plaintiff seemingly objects to the Magistrate Judge's determination regarding pretext as to his discrimination claim because he titles Section VII of his submission "Defendant's Reason for Termination was Pretext for Discrimination and in Retaliation." Doc. No. [64] at 18. However, as explained in

the R&R, the only discrimination claim that was properly exhausted was premised on the unfavorable performance review Plaintiff received in December 2020. R&R at 22–24. Plaintiff's objections regarding pretext do not relate to the December 2020 performance review.

Another objection Plaintiff raises but does not link specifically to the single instance of discrimination that is at issue here is Plaintiff's contention that the Magistrate Judge found that Plaintiff's job had a leadership component without recognizing that he tried to uphold those duties while Jones and Peters did not. Doc. No. [64], 20. On its face, this argument pertains to the rejected comparators, but in response to the Motion for Summary Judgment, Plaintiff argued that Defendant's reliance on lack of leadership was suspect because his job did not have a leadership role. Doc. No. [51], 18. As the Magistrate Judge explained, Plaintiff's written job description included "several competencies that fall under the umbrella of leadership." R&R at 11 n.11. Having reviewed the written job description, this Court agrees. Doc. No. [44-2], 1–2. There is nothing in Plaintiff's Objections that undermines this conclusion.

Therefore, to the extent that Plaintiff objects to the Magistrate Judge's conclusion that he failed to rebut Defendant's proffered reason for the

30

unfavorable performance review in December 2020—Plaintiff's longstanding leadership shortcomings and friction with his NOC teammates—Plaintiff has failed to point to evidence that undercuts Defendant's reasoning.[4] Furthermore, to the extent that Plaintiff seeks to undercut Defendant's reasoning by reviving his argument that his job had no leadership role, he has failed to adduce evidence to support his contention. Accordingly, any objections regarding the determination that Plaintiff could not show pretext as to the reasons Defendant gave for the unfavorable December 2020 performance review are **OVERRULED**.

### D.    <u>Retaliation Claims</u>

#### 1.    *December 2020 Performance Review*

As set forth above, the Magistrate Judge determined that Plaintiff's retaliation claim based on any action that occurred prior to his filing of the EEOC charge fails because he cannot show that he engaged in protected activity. R&R at 34. She did not consider Plaintiff's frequent complaints to his employer about

---

[4] A plaintiff may show pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered [sic] explanation is unworthy of credence." <u>Brooks v. Cnty. Comm'n of Jefferson Cnty.</u>, 446 F.3d 1160, 1163 (11th Cir. 2006) (citation and quotation marks omitted).

what he perceived to be harassment and mistreatment that occurred before the

December 2020 performance review because Plaintiff failed to demonstrate that

he had an objectively reasonable belief that Defendant acted unlawfully. Id.

Plaintiff objects and states, "the R&R erred when it mentioned that somehow the

disparate treatment that Plaintiff suffered was not sufficient to show that the

discrimination reported by him was not 'objectively reasonable for him to believe

that he was the target of unlawful activity.'"[5] Plaintiff cites nothing to support

this bald objection. This Court agrees with the Magistrate Judge's determination

that Plaintiff failed to establish that he engaged in protected activity before he

received the December 2020 performance review. Therefore, Plaintiff failed to

satisfy his burden of making a *prima facie* case of retaliation based on this specific

action.

### 2.    *Retaliation: Termination*

Plaintiff has included a section in his Objections entitled "Defendant's

Reason for Termination was Pretext for Discrimination and in Retaliation" Doc.

———————————————

[5] While Plaintiff uses quotation marks, he does not provide a citation to what he is
quoting. While the quoted language is similar to what is stated in the R&R, it is not
verbatim. See R&R at 34.

32

No. 64], 18. Following this section title, Plaintiff cites cases that discuss whether a reduction in force is a valid proffered reason for termination. Id. at 18–19. However, Plaintiff fails to offer any argument or evidence that would show that Defendant's reduction in force in this case was somehow pretextual. Moreover, Plaintiff makes no objection to the Magistrate Judge's conclusion that he failed to make a causal connection between his EEOC charge and his termination (or any of the adverse actions he complains about). This Court finds no error in the Magistrate Judge's conclusion that Plaintiff failed to show a causal connection between Plaintiff's protected activity—the EEOC charge—and the five post-charge actions that he contends amount to retaliation. Without that causal connection, the issue of pretext is moot. Accordingly, Plaintiff's objections regarding the Magistrate Judge's determination that he failed to show pretext with respect to the proffered reasons Defendant gave for each of the challenged actions are **OVERRULED**.

### E.      Section 1981 Claims

Plaintiff contends that the Magistrate Judge erred in concluding that "Plaintiff's facts are not compensable under Section 1981 because the statute does not include national origin. (Except when it does[.])" Doc. No. [64], 17. Plaintiff

is correct that the Magistrate Judge pointed out that by its express terms, § 1981 prohibits employment discrimination based only on race, not national origin. R&R at 42 (citing 42 U.S.C. § 1981(a)). Nevertheless, recognizing that "the line between national origin discrimination and racial discrimination is an extremely difficult one to trace[,]" the Magistrate Judge went on to find that even if the additional evidence of alleged harassment related to Plaintiff's national origin were considered, his claims would still fail. Id. at 42 n. 21, 45 n.23. Plaintiff's objection wholly ignores this portion of the Magistrate Judge's analysis. Accordingly, the objection related to the recommendation as to Plaintiff's § 1981 claim are **OVERRULED**.

### F.    Remaining Objections

Plaintiff asserts two objections regarding the Magistrate Judge's factual construction. First, he argues that the R&R downplayed an incident in which Plaintiff reported a co-worker who brought a knife to work. Doc. No. [64], 8–9. Second, he claims that the Magistrate Judge improperly relied on Defendant's version of a conversation between Plaintiff and a supervisor. Id. at 21. With both objections, Plaintiff fails to explain to what element of the summary judgment analysis these facts pertain  or what the better construction of the facts would be.

Crucially, he does not articulate how considering the facts in a light more to his liking would change the outcome on the claims at issue here. Accordingly, Plaintiff's objections related to how the Magistrate Judge described the knife incident and the conversation between Plaintiff and his supervisor are **OVERRULED**.

V.    **CONCLUSION**

Plaintiff's Objections (Doc. No. [64]) are **OVERRRULED,** and the R&R (Doc. No. [61]) is **ADOPTED** as the order and opinion of this court. The Clerk is **DIRECTED** to terminate this civil action.

**IT IS SO ORDERED** this  9th day of August, 2024.

HONORABLE STEVE C. JONES
United States District Judge